VALERIE D. ROJAS (SBN 180041)
vrojas@cozen.com
JEFFREY M. TSAIR (SBN 325489)
jtsair@cozen.com
**COZEN O'CONNOR**
601 S. Figueroa Street Suite 3700
Los Angeles, CA 90017
Telephone: (213) 892-7965
Facsimile: (213) 892-7999

Attorneys for Plaintiff
SCOTTSDALE INSURANCE COMPANY

**UNITED STATES DISTRICT COURT**

**NORTHERN DISTRICT OF CALIFORNIA**

| | |
|---|---|
| SCOTTSDALE INSURANCE COMPANY, an Ohio corporation,<br><br>Plaintiff,<br><br>v.<br><br>BIOQ PHARMA INCORPORATED, a California corporation; JOSHUA KRIESEL, a California citizen; LLEW KELTNER, an Oregon citizen; MARK EHLERT, a Michigan citizen; DANIEL TASSE, a New Jersey citizen; MARIJN DEKKERS, a New Hampshire citizen; RICHARD NESBIT, a California citizen; and BILL JASPER, a California citizen,<br><br>Defendants. | Case No.<br><br>**SCOTTSDALE INSURANCE COMPANY'S COMPLAINT FOR DECLARATORY JUDGMENT** |

For its Complaint against Defendants BioQ Pharma, Inc. ("BioQ"), Joshua Kriesel ("Kriesel"), Llew Keltner ("Keltner"), Mark Ehlert ("Ehlert"), Daniel Tasse ("Tasse"), Marijn Dekkers ("Dekkers"), Richard Nesbit ("Nesbit"), and Bill Jasper ("Jasper" or, together with Kriesel, Keltner, Ehlert, Tasse, Dekkers, and Nesbit, the "D&Os"), Plaintiff Scottsdale Insurance Company ("Scottsdale") states as follows:

1. This is an insurance coverage action seeking declaratory relief pursuant to 28 U.S.C. §§ 2201, 2202, and 1332.

**PARTIES**

2. Scottsdale is a corporation organized and existing under the laws of the State of Ohio with its principal place of business located in Scottsdale, Arizona.

3. BioQ is a California corporation with its principal place of business located in San Francisco, California.

4. Kriesel was the co-founder, Chief Executive Officer, President, and Chairman of the Board of Directors of BioQ and is a citizen on the state of California.

5. Keltner was a Director of BioQ and is a citizen of the State of Oregon.

6. Ehlert was a Director of BioQ and is a citizen of the State of Michigan.

7. Tasse was a Director of BioQ and is a citizen of the State of New Jersey.

8. Dekkers was a Director of BioQ and is a citizen of State of New Hampshire.

9. Nesbit was a Director of BioQ and is a citizen of the State of California.

10. Jasper was a Director of BioQ and is a citizen of the State of California.

**JURISDICTION AND VENUE**

11. The Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332(a)(1). There is complete diversity of citizenship between Scottsdale and Defendants, and the amount in controversy exceeds $75,000 exclusive of interest and costs.

12. Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) because a substantial part of the events or omissions giving rise to the claim occurred in this district.

**FACTUAL ALLEGATIONS**

**The Policy**

13. Scottsdale issued Business and Management Indemnity Policy No. EKS3586644 to BioQ (the "Policy") effective for the period from August 29, 2025 to August 29, 2026 (the "Policy Period"). A copy of the Policy is attached hereto as "Exhibit 1."

14. Subject to the Policy's terms, conditions, limitations, exclusions, and endorsements, the Policy provides coverage under a Directors and Officers and Company ("D&O") Coverage Section and a Fiduciary Coverage Section. (*Id.* at Declarations, Item 3.)

///

15. Insuring Clause A(1) of the D&O Coverage Section of the Policy states that Scottsdale shall pay the "Loss" of the "Directors and Officers" for which the "Directors and Officers" are not indemnified by the "Company" and which the "Directors and Officers" have become legally obligated to pay by reason of a "Claim" first made against the "Directors and "Officers" during the Policy Period or, if elected, the "Extended Period," and reported to Scottsdale pursuant to Section E(1) of the Policy, for any "Wrongful Act" taking place prior to the end of the Policy Period. (Ex. 1 at D&O Coverage Section § A(1).)

16. Insuring Clause A(2) of the D&O Coverage Section of the Policy states that Scottsdale shall pay the "Loss" of the "Directors and Officers" for which the "Company" had indemnified the "Directors and Officers" and which the "Directors and Officers" have become legally obligated to pay by reason of a "Claim" first made against the "Directors and "Officers" during the Policy Period or, if elected, the "Extended Period," and reported to Scottsdale pursuant to Section E(1) of the Policy, for any "Wrongful Act" taking place prior to the end of the Policy Period. (Ex. 1 at D&O Coverage Section § A(2).)

17. Insuring Clause A(3) of the D&O Coverage Section of the Policy states that Scottsdale shall pay the "Loss" of the "Company" which the "Company" has become legally obligated to pay by reason of a "Claim" first made against the "Company" during the Policy Period or, if elected, the "Extended Period," and reported to Scottsdale pursuant to Section E(1) of the Policy, for any "Wrongful Act" taking place prior to the end of the Policy Period. (Ex. 1 at D&O Coverage Section § A(3).)

18. "Company" is defined in the Policy as the "Parent Company" (i.e., BioQ and BioQuiddity Inc.) and any "Subsidiary." (Ex. 1 at General Terms & Conditions §§ B(2) and (7) and Declarations, Item 1, as amended by Endorsement No. 2.)

19. "Directors and Officers" is defined in the Policy, in relevant part, as any person who was, now is, or shall become a duly elected or appointed director, officer, or similar executive of the Company, or any member of the management board of the Company," among other things. (Ex. 1 at D&O Coverage Section § B(4)(a), as amended by Endorsements No. 6, 20, 29, and 39.)

///

20. "Loss" is defined in the Policy, in pertinent part, as damages, judgments, settlements, pre-judgment or post-judgment interest awarded by a court, and "Costs, Charges and Expenses" incurred by Directors and Officers under Insuring Clauses 1 or 2 or the Company under Insuring Clause 3, subject to several exceptions (Ex. 1 at D&O Coverage Section § B(7), as amended by Endorsements No. 7 and 31.)

21. "Claim" is defined in the Policy, in relevant part, as a civil proceeding against any "Insured" seeking monetary damages or non-monetary or injunctive relief, commenced by the service of a complaint or similar pleading, among other things. (Ex. 1 at D&O Coverage Section § B(1)(c), as amended by Endorsements No. 5, 25, 30, and 41.)

22. "Wrongful Act" is defined in the Policy as any actual or alleged error, omission, misleading statement, misstatement, neglect, breach of duty or act allegedly committed or attempted by (a) any of the Directors and Officers, while acting in their capacity as such, or any matter claimed against any Director and Officer solely by reason of his or her serving in such capacity; (b) any of the Directors and Officers, while acting in their capacity as a director, officer, trustee, governor, executive director or similar position of any "Outside Entity" where such service is with the knowledge and consent of the Company; and (c) the Company, but only with respect to Insuring Clause 3 of the D&O Coverage Section. (Ex. 1 at D&O Coverage Section § B(9).)

23. The Policy states that Scottsdale shall not be liable for Loss under the D&O Coverage Section on account of any Claim brought, or maintained by, on behalf of, in the right of, at the direction of, at the behest of, or for the benefit of any: (i) person; (ii) partnership or any of its partners, directors, officers, or employes; or (iii) corporation, or any of its directors, officers or employees, who is a secured or unsecured creditor of the Company (the "Creditors Exclusion"). (Ex. 1 at D&O Coverage Section § C(1), as amended by Endorsement No. 26.)

24. The Policy states that it shall be the duty of Scottsdale and not the duty of the Insureds to defend any Claim. (Ex. 1 at D&O Coverage Section § F(1).)

**The Underlying Action**

25. On or about June 23, 2026, Madryn Health Partners, LP, Madryn Health Partners (Cayman Master), LP, derivatively on behalf of BioQ, and Madryn Health Partners, LP, Madryn

Health Partners (Cayman Master), LP, Madryn Fund Administration, LLC, Madryn BioQ SPV, LLC, and Madryn Asset Management, LP, directly as creditors (collectively, the ”Underlying Plaintiffs“), filed a lawsuit against BioQ, the D&Os, and others, Case No. CGC-26-638538, in the Superior Court of the State of California, San Francisco County (the ”Underlying Action“). A copy of the complaint filed in the Underlying Action is attached hereto as ”Exhibit 2.“

26. In the Underlying Action, the Underlying Plaintiffs allege that, in 2017, Madryn Health Partners, LP, Madryn Health Partners (Cayman Master) LP, and Madryn Asset Management LP (collectively, ”Madryn“) entered into a Credit Agreement with BioQ pursuant to which Madryn loaned BioQ $25 million and became a secured creditor and shareholder of BioQ.

27. According to the Underlying Plaintiffs, BioQ committed various events of default within two years of the Credit Agreement and has been in default since November 14, 2019.

28. The Underlying Plaintiffs allege that Madryn attempted to work with BioQ on the defaults and, between December 20, 2021 and December 15, 2023, the parties entered into sixteen amended and restated forbearance agreements.

29. According to the Underlying Plaintiffs, as of January 2024, BioQ owed Madryn more than $50 million.

30. The Underlying Plaintiffs assert that Madryn provided two emergency loans to BioQ on January 2, 2024 and February 1, 2024 to cover payroll and other necessary expenses.

31. According to the Underlying Plaintiffs, on February 17, 2024, Madryn presented BioQ’s Board of Directors with a Restructuring Support Agreement (”RSA“) that, if accepted, would have allowed BioQ to cure its defaults and relieve a portion of its debt to Madryn by converting certain debt to special shares of equity held by Madryn.

32. The Underlying Plaintiffs allege that the D&Os rejected Madryn’s proposal because it would have diluted their personal equity in BioQ, and that the D&Os failed to generate any viable alternative options to restructure BioQ. As a result, according to the Underlying Plaintiffs, Madryn was forced to foreclose on the debt with BioQ in May 2026.

33. The complaint in the Underlying Action sets forth the following causes of action against BioQ and the D&Os: (1) breach of fiduciary duty; (2) aiding and abetting breach of

fiduciary duty; (3) waste of corporate assets; (4) tortious interference with contract; (5) tortious interference with prospective economic advantage; and (6) breach of fiduciary duty/trust fund doctrine.

**Scottsdale's Coverage Position**

34. After the Underlying Action was tendered to Scottsdale for coverage under the Policy, on or about August 11, 2026, counsel for Scottsdale sent a letter to Kriesel and BioQ indicating that Scottsdale would provide a defense to BioQ and the D&Os in connection with the Underlying Action pursuant to its right and duty to defend under the Policy and subject to a reservation of certain rights under the Policy and at law. A copy of the August 11, 2026 letter is attached hereto as "Exhibit 3."

35. As of September 9, 2026, Scottsdale has appointed three separate law firms to represent BioQ and the D&Os in the Underlying Action subject to its reservation of rights.

36. Defendant Kriesel, on behalf of the other Defendants, has informed Scottsdale that Defendants do not believe that the Creditors Exclusion precludes coverage for the Underlying Action under the Policy.

**COUNT I – DECLARATORY JUDGMENT AS TO CREDITORS EXCLUSION**

37. Scottsdale hereby adopts by reference the allegations contained in paragraphs 1 through 36 of this Complaint as if fully set forth herein.

38. An actual, present, and justiciable controversy exists concerning whether the Creditors Exclusion precludes coverage for the Underlying Action under the Policy.

39. Scottsdale requests that the Court declare that the Creditors Exclusion precludes coverage for the Underlying Action under the Policy and that, as a result, Scottsdale is not obligated to defend or indemnify Defendants in connection with the Underlying Action, and is entitled to recoup from Defendants any Costs, Charges and Expenses it has paid on their behalves in the Underlying Action to date.

///

///

///

## PRAYER FOR RELIEF

WHEREFORE, Scottsdale prays that this Court enter an Order:

1. Declaring that the Policy's Creditors Exclusion precludes coverage for the Underlying Action under the Policy and, as a result, Scottsdale is not obligated to defend or indemnify Defendants in connection with the Underlying Action;

2. Directing Defendants to pay to Scottsdale any Costs, Charges and Expenses Scottsdale has paid on their behalves in the Underlying Action to date;

3. Awarding Scottsdale its costs and expenses; and

4. Awarding Scottsdale all other relief that the Court deems just and equitable.

Dated: September 25, 2026

COZEN O'CONNOR

By: */s/ Valerie D. Rojas*
Valerie D. Rojas
Jeffrey M. Tsair
Attorneys for Plaintiff
SCOTTSDALE INSURANCE COMPANY

# EXHIBIT 1

E-Risk Services, LLC®

9/3/2025

Kevin Ware
CRC - CA (San Fran-50 Cali St)
50 California Street
#2000
San Francisco, CA 94111

**RE: BioQ Pharma Incorporated**
**PolicyNo.: EKS3586644**

Dear Kevin:

Attached please find the following items for the policy for the above mentioned account. Review and report any discrepancies to our office right away.

1. **California Fraud Statement** ILN018 (1-22)
2. **Declarations** EKS-D-1 (11/16)
3. **Notice to Policyholders-Address Change** NOTS0658-EK (09-23)
4. **E-Risk Management Tools Center** HLPDO (1-18)
5. **California Policyholder Notice** NOTX0015CA (3-19)
6. **California Surplus Lines Notice** NOTS0021CA (1-20)
7. **General Terms and Conditions** EKS-1 (04/08)
8. **Directors & Officers and Company Coverage Section** EKS-P-1 (04/08)
9. **Fiduciary Coverage Section** EKS-P-3 (04/08)
10. **502(c) and 507 Civil Money Penalties Extension** EKS-1650 (8-16)
11. **Additional Parent Company** EKS-45 (04/08)
12. **Allocation Provision** EKS-782 (01/09)
13. **Amend Conduct Exclusion** EKS-1613 (10-22)
14. **Amend Definition of Claim to Include Subpoena** EKS-1977 (8-18)
15. **Amend Definition of Directors and Officers-Board Observer** EKS-1600 (4-15)
16. **Amend Definition of Loss** EKS-1614 (6-15)
17. **Amend Discovery Election-90 Days** EKS-787 (01/09)
18. **Amend Insured V. Insured Exclusion (Dilution Claims Exception)** EKS-1606 (4-15)
19. **Amend Notice of Circumstances** EKS-6 (04/08)
20. **Amend Notice Provision - D&O** EKS-8 (04/08)
21. **Amend Notification Provision to Include Reporting of Facts or Circumstances During Extended Period** EKS-1655 (2-17)
22. **Amend Other Insurance to be Primary** EKS-199 (4-20)
23. **Amend Other Insurance to be Primary - Fiduciary** EKS-200 (04/08)
24. **Amend Outside Services Exclusion** EKS-14 (01/09)
25. **Amend Pollution Exclusion - Side A** EKS-846 (11/09)
26. **Amend Subrogation Provision - Final Judgment** EKS-784 (01/09)
27. **Amend Warranty Provision Non-Rescindable Coverage** EKS-16 (04/09)
28. **Amend Whistle-Blower Endorsement** EKS-1599 (9-21)

29. **Amended Definition of Directors & Officers - Leased / Contracted Employees** EKS-202 (04/08)
30. **Amended Insured Versus Insured Exclusion** EKS-17 (03/10)
31. **Amended Insured Versus Insured Exclusion - Foreign Jurisdiction** EKS-845 (05/09)
32. **Amended Limit of Liability and Retentions** EKS-2193 (10-19)
33. **Cap on Losses from Certified Acts of Terrorism** EKS-351 (1-15)
34. **Cost of Investigations Coverage** EKS-781 (01/09)
35. **Creditor Exclusion** EKS-62 (04/08)
36. **Crisis Costs Endorsement** EKS-820 (03/09)
37. **Delete Paragraph iii. from Exclusion n.** EKS-775 (01/09)
38. **Employed Lawyers Extension** EKS-21 (04/08)
39. **Extradition Coverage Endorsement** EKS-788 (01/09)
40. **Foreign Corrupt Practices Act Civil Penalties Coverage** EKS-990 (09/11)
41. **HIPAA Expenses Endorsement** EKS-1639 (2-16)
42. **IRS Section 4975 Coverage** EKS-1566 (7-14)
43. **Patent, Copyright, Trademark Exclusion** EKS-29 (04/08)
44. **PPACA Civil Money Penalties Extension** EKS-1562 (6-14)
45. **Professional Services Exclusion - Securities Holder Exception** EKS-165 (04/08)
46. **Regulatory Agency-Costs, Charges and Expenses Sublimit Endorsement** EKS-1510 (08/13)
47. **Removal of Alternative Dispute Resolution Provision** EKS-37 (04/08)
48. **Scientific And Advisory Board Extension** EKS-19 (04/08)
49. **Settlor Capacity** EKS-1516 (09/13)
50. **Tolling or Waiving the Statute of Limitations** EKS-786 (01/09)
51. **Voluntary Compliance Program Extension** EKS-20 (4-08)
52. **Amendatory Endorsement - California** UTS-253-CA (01/97)
53. **Service of Suit Clause** UTS-9g (6-22)
54. **Policyholder Disclosure Notice of Terrorism Insurance Coverage** NOTS0601CW (12/20)

Thank you.

**Kevin Keane**

(862) 345-5795



Nationwide

Underwritten by Scottsdale Insurance Company

**CALIFORNIA FRAUD STATEMENT**

For your protection, California law requires the following to appear on this form: Any person who knowingly presents false or fraudulent information to obtain or amend insurance coverage or to make a claim for the payment of a loss is guilty of a crime and may be subject to fines and confinement in state prison.

Underwritten by: Scottsdale Insurance Company
Home Office: One Nationwide Plaza • Columbus, Ohio 43215
Administrative Office: 8877 North Gainey Center Drive • Scottsdale, Arizona 85258
1-800-423-7675 • A Stock Company

# BUSINESS AND MANAGEMENT INDEMNITY POLICY DECLARATIONS

**THE EMPLOYMENT PRACTICES, DIRECTORS AND OFFICERS AND COMPANY, FIDUCIARY, BUSINESSOWNERS, PRIVACY PLUS, TECHNOLOGY, MEDIA AND PROFESSIONAL SERVICES AND MISCELLANEOUS PROFESSIONAL SERVICES COVERAGE SECTIONS OF THIS POLICY, WHICHEVER ARE APPLICABLE, COVER ONLY CLAIMS FIRST MADE AGAINST THE INSURED DURING THE POLICY PERIOD OR, IF ELECTED, THE EXTENDED PERIOD AND REPORTED TO THE INSURER PURSUANT TO THE TERMS OF THE RELEVANT COVERAGE SECTION. THE CRIME COVERAGE SECTION, IF APPLICABLE, APPLIES ONLY TO LOSS DISCOVERED DURING THE POLICY PERIOD. PLEASE READ THIS POLICY CAREFULLY.**

**THE LIMITS OF LIABILITY AVAILABLE TO PAY INSURED LOSS SHALL BE REDUCED BY AMOUNTS INCURRED FOR COSTS, CHARGES AND EXPENSES, UNLESS OTHERWISE PROVIDED HEREIN. AMOUNTS INCURRED FOR COSTS, CHARGES AND EXPENSES AND LOSS SHALL ALSO BE APPLIED AGAINST THE RETENTION AND DEDUCTIBLE AMOUNTS.**

**TERMS THAT APPEAR IN BOLDFACE TYPE HAVE SPECIAL MEANING. PLEASE REFER TO THE APPROPRIATE DEFINITIONS SECTIONS OF THIS POLICY.**

| | | | | |
|---|---|---|---|---|
| Item 1. | **Parent Company** & Mailing Address: | BioQ Pharma Incorporated<br>1325 Howard St.<br>San Francisco, CA 94107 | **Policy** No:<br>Agent No:<br>Renewal No:<br>Agent Name & Mailing Address: | EKS3586644<br>29406<br>EKS3540765<br>E-Risk Services, LLC<br>Northwest Professional Center<br>227 US Hwy 206<br>Suite 302<br>Flanders, NJ 07836-9174 |

Principal Address, if different from mailing address:

Item 2. **Policy Period**: From 8/29/2025 to 8/29/2026
12:01 A.M. local time at Principal Address shown above.

Item 3. Coverage Sections and Limit of Liability

Directors and Officers and Company Coverage Section

1. Limit of Liability:
   a. $3,000,000 aggregate for all **Loss**, subject to 1.b. and 1.c. immediately below.
   b. $1,000,000 additional aggregate for all **Loss** under Insuring Clause A.1., subject to 1.c, immediately below.
   c. $4,000,000 maximum aggregate for this Coverage Section
2. Retention:
   a. $0 each **Claim** under Insuring Clause 1.
   b. $50,000 each **Claim** under Insuring Clause 2.
   c. $50,000 each **Claim** under Insuring Clause 3.
3. **Continuity Date:** 11-6-2006

Fiduciary Coverage Section

1. Limit of Liability $1,000,000 maximum aggregate for this Coverage Section
2. Retention $2,500 each **Claim**
3. **Continuity Date:** 11/6/2014



Nationwide

| | | |
|---|---|---|
| Item 4. | Premium: $XXXX | |
| Item 5. | **Discovery Period** options:<br>1. One (1) year = 100% of the premium<br>2. Two (2) years = 125% of the premium<br>3. Three (3) years = 150% of the premium<br>As provided in Section H. of the General Terms and Conditions, only one of the above **Discovery Period** options may be elected and purchased. | |
| Item 6. | **Run-Off Period**:<br>1. One (1) year = 110% of the premium<br>2. Two (2) years = 112% of the premium<br>3. Three (3) years = 115% of the premium<br>4. Four (4) years = 120% of the premium<br>5. Five (5) years = 122% of the premium<br>6. Six (6) years = 125% of the premium<br>As provided in Section I. of the General Terms and Conditions, only one of the above **Run-Off Period** options may be elected and purchased. | |
| Item 7. | Forms and Endorsements Effective at Inception of **Policy:**<br>Click Here to Compare Endorsements From Expiring Policy to Current<br>ILN018 (1-22), EKS-D-1 (11/16), NOTS0658-EK (09-23), HLPDO (1-18), NOTX0015CA (3-19), NOTS0021CA (1-20), EKS-1 (04/08), EKS-P-1 (04/08), EKS-P-3 (04/08), EKS-1650 (8-16), EKS-45 (04/08), EKS-782 (01/09), EKS-1613 (10-22), EKS-1977 (8-18), EKS-1600 (4-15), EKS-1614 (6-15), EKS-787 (01/09), EKS-1606 (4-15), EKS-6 (04/08), EKS-8 (04/08), EKS-1655 (2-17), EKS-199 (4-20), EKS-200 (04/08), EKS-14 (01/09), EKS-846 (11/09), EKS-784 (01/09), EKS-16 (04/09), EKS-1599 (9-21), EKS-202 (04/08), EKS-17 (03/10), EKS-845 (05/09), EKS-2193 (10-19), EKS-351 (1-15), EKS-781 (01/09), EKS-62 (04/08), EKS-820 (03/09), EKS-775 (01/09), EKS-21 (04/08), EKS-788 (01/09), EKS-990 (09/11), EKS-1639 (2-16), EKS-1566 (7-14), EKS-29 (04/08), EKS-1562 (6-14), EKS-165 (04/08), EKS-1510 (08/13), EKS-37 (04/08), EKS-19 (04/08), EKS-1516 (09/13), EKS-786 (01/09), EKS-20 (4-08), UTS-253-CA (01/97), UTS-9g (6-22), NOTS0601CW (12/20) | |
| Item 8. | Notices to **Insurer:**<br>Notice of Claims to:<br>Nationwide Management Liability & Specialty<br>Attention: Claims Manager<br>7 World Trade Center, 37th Floor<br>250 Greenwich Street<br>New York, NY 10007<br>MLSReportALoss@nationwide.com | Other Notices to:<br>Nationwide Management Liability & Specialty<br>Attention: Claims Manager<br>7 World Trade Center, 37th Floor<br>250 Greenwich Street<br>New York, NY 10007<br>MLSReportALoss@nationwide.com |

These Declarations, together with the **Application**, **Coverage Sections**, General Terms and Conditions, and any written endorsement(s) attached thereto, shall constitute the contract between the **Insured** and the **Insurer**.

Nationwide

Underwritten by: Scottsdale Insurance Company
Home Office: One Nationwide Plaza • Columbus, Ohio 43215
Administrative Office: 18700 North Hayden Road •Scottsdale, Arizona 85255
1-800-423-7675 • A Stock Company

In Witness Whereof, the Company has caused this policy to be executed and attested.

Secretary

President

The information contained herein replaces any similar information contained elsewhere in the policy.

Underwritten by Scottsdale Insurance Company

**NOTICE TO POLICYHOLDERS-ADDRESS CHANGE**

Effective January 1, 2023, the address of your insurance company is changing.

The physical address of:

- 7 World Trade Center, 37th Floor, 250 Greenwich Street, New York NY 10007-0033
- One Nationwide Plaza, Columbus, Ohio 43215
- 8877 North Gainey Center Drive, Scottsdale, Arizona 85258

wherever they appear, is changed to:

Home Office
One West Nationwide Boulevard
Columbus, Ohio 43215

Administrative Office
18700 North Hayden Road
Scottsdale, Arizona 85255

The claims/notices address of 7 World Trade Center, 37th Floor, 250 Greenwich Street, New York NY 10007-0033, wherever it appears, is changed to:

PO Box 182452
Columbus, Ohio 43218-2452



Nationwide

**E-RISK MANAGEMENT TOOLS CENTER**

# E-RISK SERVICES MANAGEMENT RESOURCES



**EMPLOYERS FACE CONTINUOUSLY CHANGING D&O-RELATED LAWS AND ONGOING CHALLENGING ISSUES.** The E-Risk Services Management Resources program is here to help with these challenges and deliver thousands of dollars of risk management value to your organization. These services have helped thousands of employers protect themselves from risk, and we encourage you to take full advantage.

Unlimited, specific, documented, and confidential advice from experienced D&O attorneys

+

Online training courses focused on information directors and officers need to know

+

Online tools include best practice guidelines, checklists, news and more

= **THOUSANDS OF DOLLARS**

IN ANNUAL EMPLOYER VALUE

## HOW DOES THE E-RISK SERVICES MANAGEMENT RESOURCES PROGRAM WORK?

*Employers are provided valuable services:*

- Direct access to D&O attorneys to receive confidential, document responses to specific questions
- Online risk management tools including D&O-focused training modules
- Proactive regulatory updates based on each user's selected preferences
- Dedicated relationship managers that can help you take full advantage of these benefits

Insureds can experience this complimentary D&O value by registering a valid policy number and billing ZIP code. Get started today.

eriskmgmtresources.com | 877.568.6655

© Copyright 2019 Enquiron



Nationwide

Underwritten by Scottsdale Insurance Company

**CALIFORNIA POLICYHOLDER NOTICE**

IMPORTANT INFORMATION FOR CALIFORNIA POLICYHOLDERS

In the event you need to contact someone about this policy for any reason, please contact your agent first. If you have additional questions, you may contact the insurance company issuing this policy at the following address and telephone number:

8877 North Gainey Center Drive
Scottsdale, Arizona 85258
Telephone: 1-800-423-7675

If you have been unable to contact or obtain satisfaction from the company or agent, you may contact the California Insurance Department at:

California Department of Insurance
Consumer Affairs Unit
300 South Spring Street, 9th Floor, South Tower
Los Angeles, California 90013
Telephone: 1-800-927-4357 or 213-897-8921 (out of state)
www.insurance.ca.gov

When contacting your agent, company or the Insurance Department, please have your policy number available.



Nationwide

Underwritten by Scottsdale Insurance Company

**CALIFORNIA SURPLUS LINES NOTICE**

**IMPORTANT NOTICE TO CALIFORNIA INSURED**

1. **THE INSURANCE POLICY THAT YOU HAVE PURCHASED IS BEING ISSUED BY AN INSURER THAT IS NOT LICENSED BY THE STATE OF CALIFORNIA. THESE COMPANIES ARE CALLED "NON-ADMITTED" OR "SURPLUS LINE" INSURERS.**

2. **THE INSURER IS NOT SUBJECT TO THE FINANCIAL SOLVENCY REGULATION AND ENFORCEMENT THAT APPLY TO CALIFORNIA LICENSED INSURERS.**

3. **THE INSURER DOES NOT PARTICIPATE IN ANY OF THE INSURANCE GUARANTEE FUNDS CREATED BY CALIFORNIA LAW. THEREFORE, THESE FUNDS WILL NOT PAY YOUR CLAIMS OR PROTECT YOUR ASSETS IF THE INSURER BECOMES INSOLVENT AND IS UNABLE TO MAKE PAYMENTS AS PROMISED.**

4. **THE INSURER SHOULD BE LICENSED EITHER AS A FOREIGN INSURER IN ANOTHER STATE IN THE UNITED STATES OR AS A NON-UNITED STATES (ALIEN)INSURER. YOU SHOULD ASK QUESTIONS OF YOUR INSURANCE AGENT, BROKER, OR "SURPLUS LINE" BROKER OR CONTACT THE CALIFORNIA DEPARTMENT OF INSURANCE AT THE TOLL-FREE TELE-PHONE NUMBER 1-800-927-4357 OR INTERNET WEBSITE www.insurance.ca.gov. ASK WHETHER OR NOT THE INSURER IS LICENSED AS A FOREIGN OR NON-UNITED STATES (ALIEN) INSURER AND FOR ADDITIONAL INFORMATION ABOUT THE INSURER. YOU MAY ALSO VISIT THE NAIC'S INTERNET WEBSITE AT www.naic.org. THE NAIC - THE NATIONAL ASSOCIATION OF INSURANCE COMMISSIONERS - IS THE REGULATORY SUPPORT ORGANIZATION CREATED AND GOVERNED BY THE CHIEF INSURANCE REGULATORS IN THE UNITED STATES.**

5. **FOREIGN INSURERS SHOULD BE LICENSED BY A STATE IN THE UNITED STATES AND YOU MAY CONTACT THAT STATES DEPARTMENT OF INSURANCE TO OBTAIN MORE INFORMATION ABOUT THAT INSURER. YOU CAN FIND A LINK TO EACH STATE FROM THIS NAIC INTERNET WEBSITE: https://naic.org/state_web_map.htm.**

6. **FOR NON-UNITED STATES (ALIEN) INSURERS, THE INSURER SHOULD BE LICENSED BY A COUNTRY OUTSIDE OF THE UNITED STATES AND SHOULD BE ON THE NAIC'S INTERNATIONAL INSURERS DEPARTMENT (IID) LISTING OF APPROVED NONADMITTED NON-UNITED STATES INSURERS. ASK YOUR AGENT, BROKER, OR "SURPLUS LINE" BROKER TO OBTAIN MORE INFORMATION ABOUT THAT INSURER.**

7. **CALIFORNIA MAINTAINS A LIST OF APPROVED SURPLUS LINE INSURERS (LASLI). ASK YOUR AGENT OR BROKER IF THE INSURER IS ON THAT LIST, OR VIEW THAT LIST AT THE INTERNET WEBSITE OF THE CALIFORNIA DEPARTMENT OF INSURANCE: www.insurance.ca.gov/01-consumers/120-company/07-lasli/lasli.cfm.**

8. **IF YOU, AS THE APPLICANT, REQUIRED THAT THE INSURANCE POLICY YOU HAVE PURCHASED BE EFFECTIVE IMMEDIATELY, EITHER BECAUSE EXISTING COVERAGE WAS GOING TO LAPSE WITHIN TWO BUSINESS DAYS OR BECAUSE YOU WERE REQUIRED TO HAVE COVERAGE WITHIN TWO BUSINESS DAYS, AND YOU DID NOT RECEIVE THIS DISCLOSURE FORM AND A REQUEST FOR YOUR SIGNATURE UNTIL AFTER COVERAGE BECAME EFFECTIVE, YOU HAVE THE RIGHT TO CANCEL THIS POLICY WITHIN FIVE DAYS OF RECEIVING THIS DISCLOSURE. IF YOU CANCEL COVERAGE, THE PREMIUM WILL BE PRORATED AND ANY BROKERS FEE CHARGED FOR THIS INSURANCE WILL BE RETURNED TO YOU.**

Underwritten by Scottsdale Insurance Company

A Stock Insurance Company, herein called the **Insurer**

# BUSINESS AND MANAGEMENT INDEMNITY POLICY

## GENERAL TERMS AND CONDITIONS

In consideration of the payment of premium, in reliance on the **Application** and subject to the Declarations, and terms and conditions of this **Policy**, the **Insurer** and the **Insureds** agree as follows

A. **SEVERABILITY OF GENERAL TERMS AND CONDITIONS**

These General Terms and Conditions apply to each and every Coverage Section of this **Policy**. The terms and conditions of each Coverage Section apply only to that Coverage Section and shall not be construed to apply to any other Coverage Section.

B. **DEFINITIONS**

Whenever used in this **Policy**, the terms that appear below in **boldface** type shall have the meanings set forth in this Definitions subsection of the General Terms and Conditions. However, if a term also appears in **boldface** type in a particular Coverage Section and is defined in that Coverage Section, that definition shall apply for purposes of that particular Coverage Section. Terms that appear in **boldface** in the General Terms and Conditions but are not defined in this Definitions subsection and are defined in other Coverage Sections of the **Policy** shall have the meanings ascribed to them in those Coverage Sections.

1. **Application** means all applications, including any attachments thereto, and all other information and materials submitted by or on behalf of the **Insureds** to the **Insurer** in connection with the **Insurer** underwriting this **Policy** or any policy of which this **Policy** is a renewal or replacement. All such applications, attachments, information, materials and documents are deemed attached to and incorporated into this **Policy**.

2. **Company** means:

    a. the **Parent Company**; and

    b. any **Subsidiary**,

    and includes any such organization as a debtor-in-possession or the bankruptcy estate of such entity under United States bankruptcy law or an equivalent status under the law of any other jurisdiction.

3. **Discovery Period** means one of the periods described in Item 5. of the Declarations which is elected and purchased pursuant to Section H. below.

4. **Domestic Partner** means any natural person qualifying as a domestic partner under the provision of any applicable federal, state or local law or under the provisions of any formal program established by the **Company**.

5. **Extended Period** means the **Discovery Period** or the **Run-Off Period,** if such provision is elected and purchased pursuant to Sections H. or I. respectively, below.

6. **Insurer** means the insurance company providing this insurance.

7. **Parent Company** means the entity first named in Item 1. of the Declarations.



Nationwide

8. **Policy** means, collectively, the Declarations, the **Application**, this policy form and any endorsements.

9. **Policy Period** means the period from the effective date and hour of the inception of this **Policy** to the **Policy** expiration date and hour as set forth in Item 2. of the Declarations, or its earlier cancellation date and hour, if any.

10. **Run-Off Period** means one of the periods described in Item 6. of the Declarations, which is elected and purchased pursuant to Section I. below.

11. **Subsidiary** means:

    a. any entity of which more than fifty percent (50%) of the outstanding securities representing the present right to vote for the election of such entity's directors or managers are owned by the **Parent Company**, directly or indirectly, if such entity:

        i. was so owned on or prior to the inception date of this **Policy**; or

        ii. becomes so owned after the inception date of this **Policy**; and

    b. any joint venture entity in which the **Parent Company**, or an entity described in a. above, has an exact fifty percent (50%) ownership of the interests of such joint venture entity and where, pursuant to a written joint venture agreement, the **Parent Company** or entity described in a. above solely controls the management and operations of such joint venture entity.

12. **Takeover** means:

    a. the acquisition by any person or entity of more than fifty percent (50%) of the outstanding securities of the **Parent Company** representing the present right to vote for the election of directors; or

    b. the merger or consolidation of the **Parent Company** into another entity such that the **Parent Company** is not the surviving entity.

All definitions shall apply equally to the singular and plural forms of the respective words.

C. **LIMITS OF LIABILITY, RETENTIONS AND DEDUCTIBLES**

1. The Limits of Liability, Retentions and Deductibles for each Coverage Section are separate Limits of Liability, Retentions and Deductibles pertaining only to the Coverage Section for which they are shown. The application of a Retention or Deductible to **Loss** under one Coverage Section shall not reduce the Retention or Deductible under any other Coverage Section, and no reduction in the Limit of Liability applicable to one Coverage Section shall reduce the Limit of Liability under any other Coverage Section.

2. In the event that any **Claim** is covered, in whole or in part, under two or more Insuring Clauses or more than one Coverage Section, the total applicable Retention or Deductible shall not exceed the single largest applicable Retention or Deductible. The largest applicable Retention or Deductible shall apply only once to such **Claim.**

D. **WARRANTY**

It is warranted that the particulars and statements contained in the **Application** are the basis of this **Policy** and are to be considered as incorporated into and constituting a part of this **Policy** and each Coverage Section.

By acceptance of this **Policy**, the **Insureds** agree that:

1. the statements in the **Application** are their representations, that such representations shall be deemed material to the acceptance of the risk or the hazard assumed by **Insurer** under this **Policy**, and that this **Policy** and each Coverage Section are issued in reliance upon the truth of such representations; and

2. in the event the **Application**, including materials submitted or required to be submitted therewith ,contains any misrepresentation or omission made with the intent to deceive, or contains any misrepresentation or omission which materially affects either the acceptance of the risk or the hazard assumed by **Insurer** under this **Policy**, this **Policy**, including each and all Coverage Sections, shall be void ab initio with respect to any **Insureds** who had knowledge of such misrepresentation or omission.

E. **CANCELLATION**

1. By acceptance of this **Policy**, the **Insureds** hereby confer to the **Parent Company** the exclusive power and authority to cancel this **Policy** on their behalf. The **Parent Company** may cancel this **Policy** in its entirety or any of the applicable Coverage Sections individually by surrender thereof to the **Insurer**, or by mailing written notice to the **Insurer** stating when thereafter such cancellation shall be effective. The mailing of such notice shall be sufficient notice and the effective date of cancellation shall be the date the **Insurer** received such notice or any later date specified in the notice, and such effective date shall become the end of the **Policy** or applicable Coverage Section. Delivery of such written notice shall be equivalent to mailing.

2. This **Policy** may be cancelled by the **Insurer** only for nonpayment of premium, by mailing written notice to the **Parent Company** stating when such cancellation shall be effective, such date to be not less than ten (10) days from the date of the written notice. The mailing of such notice shall be sufficient notice and the effective date of cancellation stated in the notice shall become the end of the **Policy Period**. Delivery of such written notice by the **Insurer** shall be equivalent to mailing. If the foregoing notice period is in conflict with any governing law or regulation, then the notice period shall be deemed to be the minimum notice period permitted under the governing law or regulation.

3. If this **Policy** or any Coverage Section is cancelled, the **Insurer** shall retain the pro rata proportion of the premium therefore. Payment or tender of any unearned premium by **Insurer** shall not be a condition precedent to the effectiveness of cancellation.

F. **ESTATES, LEGAL REPRESENTATIVES, AND SPOUSES**

The estates, heirs, legal representatives, assigns, spouses and **Domestic Partners** of natural persons who are **Insureds** shall be considered **Insureds** under this **Policy**; provided, however, coverage is afforded to such estates, heirs, legal representatives, assigns, spouses and **Domestic Partners** only for a **Claim** arising solely out of their status as such and, in the case of a spouse or **Domestic Partner**, where the **Claim** seeks damages from marital community property, jointly held property or property transferred from the natural person who is an **Insured** to the spouse or **Domestic Partner**. No coverage is provided for any **Wrongful Act** of an estate, heir, legal representative, assign, spouse or **Domestic Partner**. All of the terms and conditions of this **Policy** including, without limitation, the Retentions and Deductibles applicable to **Loss** incurred by natural persons who are **Insureds** shall also apply to **Loss** incurred by such estates, heirs, legal representatives, assigns, spouses and **Domestic Partners**.

G. **AUTHORIZATION CLAUSE**

By acceptance of this **Policy**, the **Parent Company** agrees to act on behalf of all **Insureds**, and the **Insureds** agree that the **Parent Company** will act on their behalf, with respect to the giving of all notices to **Insurer**, the receiving of notices from **Insurer**, the agreement to and acceptance of endorsements, the payment of the premium and the receipt of any return premium.

H. **DISCOVERY PERIOD**

1. If this **Policy** or any Coverage Section is cancelled or is not renewed by the **Insurer**, for reasons other than non-payment of premium or if the **Parent Company** elects to cancel or not to renew this **Policy** or a Coverage Section, then the **Parent Company** shall have the right, upon payment of an additional premium calculated at that percentage shown in Item 5. of the Declarations of the total premium for this **Policy,** or the total premium for the cancelled or not renewed Coverage Section, whichever is applicable, to purchase an extension of the coverage granted by this **Policy** or the applicable cancelled or not renewed Coverage Section with respect to any **Claim** first made during the period of time set forth in Item 5. of the Declarations after the effective date of such cancellation or, in the event of a refusal to renew, after the **Policy** expiration date, but only with respect to any **Wrongful Act** committed before such date. The **Parent Company** shall have the right to elect only one of the **Discovery Periods** set forth in Item 5. of the Declarations.

2. As a condition precedent to the right to purchase the **Discovery Period** set forth in subsection H.1. above, the total premium for the **Policy** must have been paid. Such right to purchase the **Discovery Period** shall terminate unless written notice, together with full payment of the premium for the **Discovery Period**, is received by **Insurer** within thirty (30) days after the effective date of cancellation, or, in the event of a refusal to renew, within thirty (30) days after the **Policy** expiration date. If such notice and premium payment is not so given to **Insurer**, there shall be no right to purchase the **Discovery Period**.

3. In the event of the purchase of the **Discovery Period**, the entire premium therefore shall be deemed earned at the commencement of the **Discovery Period**.

4. The exercise of the **Discovery Period** shall not in any way increase or reinstate the limit of **Insurer's** liability under any Coverage Section.

I. **RUN-OFF COVERAGE**

In the event of a **Takeover**:

1. The **Parent Company** shall have the right, upon payment of an additional premium calculated at the percentage of the total premium for this **Policy** set forth in Item 6. of the Declarations, to an extension of the coverage granted by this **Policy** with respect to any **Claim** first made during the **Run-Off Period**, as set forth in Item 6. of the Declarations, but only with respect to any **Wrongful Act** committed before the effective date of the **Takeover** (herein defined as "Run-Off Coverage"); provided, however, such additional premium shall be reduced by the amount of the unearned premium from the date of the **Takeover** or the date of notice of the election of the Run-Off Coverage, whichever is later, through the expiration date set forth in Item 2. of the Declarations.

2. The **Parent Company** shall have the right to elect only one of the periods designated in Item 6. of the Declarations. The election must be made prior to the expiration of the **Policy Period**. The right to purchase a **Run-Off Period** shall terminate on the expiration of the **Policy Period**.

3. If a **Run-off Period** is elected and purchased:

   a. Section E. above, is deleted in its entirety and neither the **Insureds** nor the **Insurer** may cancel this **Policy** or any Coverage Section thereof;

   b. Section H. above, is deleted in its entirety; and

   c. the maximum aggregate Limit of Liability of the **Insurer** for each Coverage Section purchased and set forth on the Declarations shall be twice the otherwise applicable maximum aggregate Limit of Liability set forth in Item 3. of the Declarations for such Coverage Section; provided, however, the maximum aggregate Limit of Liability of the **Insurer** in connection with any one **Claim** shall be amount originally shown as the maximum aggregate Limit of Liability for each Coverage Section purchased and set forth on the Declaration.

J. **ALTERNATIVE DISPUTE RESOLUTION**

The **Insureds** and the **Insurer** shall submit any dispute or controversy arising out of or relating to this **Policy** or the breach, termination or invalidity thereof to the alternative dispute resolution ("ADR") process described in this subsection.

Either an **Insured** or the **Insurer** may elect the type of ADR process discussed below; provided, however, that the **Insured** shall have the right to reject the choice by the **Insurer** of the type of ADR process at any time prior to its commencement, in which case the choice by the **Insured** of ADR process shall control.

There shall be two choices of ADR process: (1) non-binding mediation administered by any mediation facility to which the **Insurer** and the **Insured** mutually agree, in which the **Insured** and the **Insurer** shall try in good faith to settle the dispute by mediation in accordance with the then-prevailing commercial mediation rules of the mediation facility; or (2) arbitration submitted to any arbitration facility to which the **Insured** and the **Insurer** mutually agree, in which the arbitration panel shall consist of three disinterested individuals. In either mediation or arbitration, the mediator or arbitrators shall have knowledge of the legal, corporate management, and insurance issues relevant to the matters in dispute. In the event of arbitration, the decision of the arbitrators shall be final and binding and provided to both parties, and the award of the arbitrators shall not include attorneys' fees or other costs. In the event of mediation, either party shall have the right to commence arbitration in accordance with this section; provided, however, that no such arbitration shall be commenced until at least sixty (60) days after the date the mediation shall be deemed concluded or terminated. In all events, each party shall share equally the expenses of the ADR process.

Either ADR process may be commenced in New York, New York or in the state indicated in Item 1. of the Declarations as the principal address of the **Parent Company**. The **Parent Company** shall act on behalf of each and every **Insured** in connection with any ADR process under this section.

K. **TERRITORY**

Coverage under this **Policy** shall extend to **Wrongful Acts** taking place or **Claims** made anywhere in the world.

L. **ASSISTANCE, COOPERATION AND SUBROGATION**

The **Insureds** agree to provide **Insurer** with such information, assistance and cooperation as **Insurer** reasonably may request, and they further agree that they shall not take any action which in any way increases **Insurer's** exposure under this **Policy**. In the event of any payments under this **Policy**, **Insurer** shall be subrogated to the extent of such payment to all of the **Insureds'** rights of recovery against any person or entity. The **Insureds** shall execute all papers required and shall do everything that may be necessary to secure and preserve such rights, including the execution of such documents as are necessary to enable **Insurer** effectively to bring suit or otherwise pursue subrogation in the name of the **Insureds**, and shall provide all other assistance and cooperation which **Insurer** may reasonably require.

M. **ACTION AGAINST INSURER, ALTERATION AND ASSIGNMENT**

Except as provided in Section J. above, Alternative Dispute Resolution, no action shall lie against **Insurer** unless, as a condition precedent thereto, there shall have been compliance with all of the terms of this **Policy**. No person or organization shall have any right under this **Policy** to join **Insurer** as a party to any action against the **Insureds** to determine their liability, nor shall **Insurer** be impleaded by the **Insureds** or their legal representative. No change in, modification of, or assignment of interest under this **Policy** shall be effective except when made by a written endorsement to this **Policy** which is signed by an authorized representative of the **Insurer**.

N. **ENTIRE AGREEMENT**

By acceptance of this **Policy**, the **Insureds** agree that this **Policy** embodies all agreements existing between them and **Insurer** or any of their agents relating to this insurance. Notice to any agent or knowledge possessed by any agent or other person acting on behalf of **Insurer** shall not effect a waiver or a change in any part of this **Policy** or estop **Insurer** from asserting any right under the terms of this **Policy** or otherwise, nor shall the terms be deemed waived or changed except by written endorsement or rider issued by **Insurer** to form part of this **Policy**.

Underwritten by Scottsdale Insurance Company

A Stock Insurance Company, herein called the **Insurer**

# BUSINESS AND MANAGEMENT INDEMNITY POLICY

# DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION

In consideration of the payment of premium, in reliance on the **Application** and subject to the Declarations, and terms and conditions of this **Policy**, the **Insurer** and the **Insureds** agree as follows

A. **INSURING CLAUSES**

1. The **Insurer** shall pay the **Loss** of the **Directors and Officers** for which the **Directors and Officers** are not indemnified by the **Company** and which the **Directors and Officers** have become legally obligated to pay by reason of a **Claim** first made against the **Directors and Officers** during the **Policy Period** or, if elected, the **Extended Period**, and reported to the **Insurer** pursuant to Section E.1. herein, for any **Wrongful Act** taking place prior to the end of the **Policy Period.**

2. The **Insurer** shall pay the **Loss** of the **Company** for which the **Company** has indemnified the **Directors and Officers** and which the **Directors and Officers** have become legally obligated to pay by reason of a **Claim** first made against the **Directors and Officers** during the **Policy Period** or, if elected, the **Extended Period**, and reported to the **Insurer** pursuant to Section E.1. herein, for any **Wrongful Act** taking place prior to the end of the **Policy Period**.

3. The **Insurer** shall pay the **Loss** of the **Company** which the **Company** becomes legally obligated to pay by reason of a **Claim** first made against the **Company** during the **Policy Period** or, if applicable, the **Extended Period**, and reported to the **Insurer** pursuant to Section E.1. herein, for any **Wrongful Act** taking place prior to the end of the **Policy Period**.

B. **DEFINITIONS**

1. **Claim** means:

    a. a written demand against any **Insured** for monetary damages or non-monetary or injunctive relief;

    b. a written demand by one or more of the securities holders of the **Company** upon the board of directors or the management board of the **Company** to bring a civil proceeding against any of the **Directors and Officers** on behalf of the **Company**;

    c. a civil proceeding against any **Insured** seeking monetary damages or non-monetary or injunctive relief, commenced by the service of a complaint or similar pleading;

    d. a criminal proceeding against any **Insured** commenced by a return of an indictment or similar document, or receipt or filing of a notice of charges;

    e. an arbitration proceeding against any **Insured** seeking monetary damages or non-monetary or injunctive relief; or

    f. a civil, administrative or regulatory proceeding, or a formal governmental investigation against any **Insured** commenced by the filing of a notice of charges, investigative order or similar document.

2. **Continuity Date** means the date set forth in Item 3. of the Declarations relating to this Coverage Section.

3. **Costs, Charges and Expenses** means:

    a. reasonable and necessary legal costs, charges, fees and expenses incurred by any of the **Insureds** in defending **Claims** and the premium for appeal, attachment or similar bonds arising out of covered judgments, but with no obligation to furnish such bonds and only for the amount of such

judgment that is up to the applicable Limit of Liability; and

b. reasonable and necessary legal costs, charges, fees and expenses incurred by any of the **Insureds** in investigating a written demand, by one or more of the securities holders of the **Company** upon the board of directors or the management board of the **Company,** to bring a civil proceeding against any of the **Directors and Officers** on behalf of the **Company**.

**Costs, Charges and Expenses** do not include salaries, wages, fees, overhead or benefit expenses of or associated with officers or employees of the **Company.**

4. **Directors and Officers** means any person who was, now is, or shall become:

   a. a duly elected or appointed director, officer, or similar executive of the **Company**, or any member of the management board of the **Company**;

   b. a person who was, is or shall become a full-time or part-time employee of the **Company**; and

   c. the functional equivalent of directors or officers of a **Company** incorporated or domiciled outside the United States of America.

5. **Insured** means the **Company** and the **Directors and Officers**.

6. **Interrelated Wrongful Acts** means all **Wrongful Acts** that have as a common nexus any fact, circumstance, situation, event, transaction, cause or series of facts, circumstances, situations, events, transactions or causes.

7. **Loss** means damages, judgments, settlements, pre-judgment or post-judgment interest awarded by a court, and **Costs, Charges and Expenses** incurred by **Directors and Officers** under Insuring Clauses 1. or 2. or the **Company** under Insuring Clause 3. **Loss** does not include:

   a. taxes, fines or penalties;

   b. matters uninsurable under the laws pursuant to which this **Policy** is construed;

   c. punitive or exemplary damages, or the multiple portion of any multiplied damage award, except to the extent that such punitive or exemplary damages, or multiplied portion of any multiplied damage award are insurable under the internal laws of any jurisdiction which most favors coverage for such damages and which has a substantial relationship to the **Insureds**, **Insurer**, this **Policy** or the **Claim** giving rise to such damages;

   d. the cost of any remedial, preventative or other non-monetary relief, including without limitation any costs associated with compliance with any such relief of any kind or nature imposed by any judgment, settlement or governmental authority;

   e. any amount for which the **Insured** is not financially liable or legally obligated to pay;

   f. the costs to modify or adapt any building or property to be accessible or accommodating, or more accessible or accommodating, to any disabled person; or

   g. any amounts owed or paid to one or more securities holders of the **Company** under any written or express contract or agreement.

8. **Outside Entity** means:

   a. any non-profit company which is exempt from taxation under the Internal Revenue Code, as amended, in which any of the **Directors and Officers** is a director, officer, trustee, governor, executive director or similar position of such non-profit company; and

   b. any other company specifically identified by endorsement to this **Policy**.

9. **Wrongful Act** means any actual or alleged error, omission, misleading statement, misstatement, neglect, breach of duty or act allegedly committed or attempted by:

   a. any of the **Directors and Officers**, while acting in their capacity as such, or any matter claimed against any **Director and Officer** solely by reason of his or her serving in such capacity;

b. any of the **Directors and Officers**, while acting in their capacity as a director, officer, trustee, governor, executive director or similar position of any **Outside Entity** where such service is with the knowledge and consent of the **Company**; and

c. the **Company**, but only with respect to Insuring Clause 3. of this Coverage Section.

C. **EXCLUSIONS**

1. Exclusions Applicable to All Insuring Clauses

**Insurer** shall not be liable for **Loss** under this Coverage Section on account of any **Claim**:

a. for actual or alleged bodily injury, sickness, disease, death, false imprisonment, assault, battery, mental anguish, emotional distress, invasion of privacy of any person, or damage to or destruction of any tangible or intangible property including loss of use thereof, whether or not such property is physically injured;

b. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

i. any **Wrongful Act**, fact, circumstance or situation which has been the subject of any written notice given under any other policy of which this **Policy** is a renewal or replacement or which it succeeds in time; or

ii. any other **Wrongful Act**, whenever occurring, which together with a **Wrongful Act** which has been the subject of such prior notice, would constitute **Interrelated Wrongful Acts**;

c. Alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

i. the actual, alleged or threatened discharge, dispersal, release, escape, seepage, migration or disposal of **Pollutants**; or

ii. any direction or request that any **Insured** test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**, or any voluntary decision to do so;

provided, however, this exclusion shall not apply to any **Claim** brought directly, derivatively or otherwise by one or more securities holders of the **Company** in their capacity as such.

For purposes of this exclusion, **Pollutants** means any substance exhibiting any hazardous characteristics as defined by, or identified on, a list of hazardous substances issued by the United States Environmental Protection Agency or any federal, state, county, municipal or local counterpart thereof or any foreign equivalent. Such substances shall include, without limitation, solids, liquids, gaseous, biological, bacterial or thermal irritants, contaminants or smoke, vapor, soot, fumes, acids, alkalis, chemicals or waste materials (including materials to be reconditioned, recycled or reclaimed). **Pollutants** shall also mean any other air emission or particulate, odor, waste water, oil or oil products, infectious or medical waste, asbestos or asbestos products, noise, fungus (including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi, but does not include any fungi intended by the **Insured** for consumption) and electric or magnetic or electromagnetic field;

d. for any actual or alleged violation of the responsibilities, obligations or duties imposed by Employee Retirement Income Security Act of 1974, as amended, or any rules or regulations promulgated thereunder, or similar provisions of any federal, state or local statutory or common law;

e. brought or maintained by, on behalf of, in the right of, or at the direction of any **Insured** in any capacity, any **Outside Entity** or any person or entity that is an owner of or joint venture participant in any **Subsidiary** in any respect and whether or not collusive, unless such **Claim**:

i. is brought derivatively by a securities holder of the **Parent Company** and is instigated and continued totally independent of, and totally without the solicitation, assistance, active participation of, or intervention of, any **Insured**;

ii. is brought or maintained by any **Insured** in the form of a cross-claim, third-party claim or other proceeding for contribution or indemnity which is part of, and directly results from a **Claim** that is covered by this Coverage Section;

iii. is brought or maintained by an employee of the **Company** who is not or was not a director or officer of the **Company**;

iv. is brought or maintained by any former director or officer of the **Company** solely in their capacity as a securities holder of the **Company** and where such **Claim** is solely based upon and arising out of **Wrongful Acts** committed subsequent to the date such director or officer ceased to be a director or officer of the **Company** and where such **Claim** is first made two (2) years subsequent to the date such director or officer ceased to be a director or officer of the **Company**; or

v. is brought or maintained by any bankruptcy trustee or bankruptcy appointed representative of the **Company**;

f. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

i. any dishonest, deliberately fraudulent or criminal act of an **Insured**; provided, however this exclusion f.i. shall not apply unless and until there is a final judgment against such **Insured** as to such conduct; or

ii. the gaining of any profit, remuneration or financial advantage to which any **Directors and Officers** were not legally entitled; provided, however this exclusion f.ii. shall not apply unless and until there is a final judgment against such **Directors and Officers** as to such conduct.

When f.i. or ii. apply, the **Insured** shall reimburse the **Insurer** for any **Costs, Charges or Expenses**;

g. for the return by any of the **Directors and Officers** of any remuneration paid to them without the previous approval of the appropriate governing body of the **Company** or **Outside Entity**, which payment without such previous approval shall be held to be in violation of law;

h. against any of the **Directors and Officers** of any **Subsidiary** or against any **Subsidiary** alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving any **Wrongful Act** actually or allegedly committed or attempted by a **Subsidiary** or **Directors and Officers** thereof:

i. before the date such entity became a **Subsidiary** or after the date such entity ceased to be a **Subsidiary**; or

ii. occurring while such entity was a **Subsidiary** which, together with a **Wrongful Act** occurring before the date such entity became a **Subsidiary**, would constitute **Interrelated Wrongful Acts**;

i. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving any **Wrongful Act** actually or allegedly committed subsequent to a **Takeover**;

j. for a **Wrongful Act** actually or allegedly committed or attempted by any of the **Directors and Officers** in his or her capacity as a director, officer, trustee, manager, member of the board of managers or equivalent executive of a limited liability company or employee of, or independent contractor for or in any other capacity or position with any entity other than the **Company**; provided, however, that this exclusion shall not apply to **Loss** resulting from any such **Claim** to the extent that:

i. such **Claim** is based on the service of any of the **Directors and Officers** as a director, officer, trustee, governor, executive director or similar position of any **Outside Entity** where such service is with the knowledge and consent of the **Company**; and

ii. such **Outside Entity** is not permitted or required by law to provide indemnification to such **Directors and Officers**; and

iii. such **Loss** is not covered by insurance provided by any of the **Outside Entity's** insurer(s);

k. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

i. any prior or pending litigation or administrative or regulatory proceeding, demand letter or formal or informal governmental investigation or inquiry filed or pending on or before the **Continuity Date**; or

ii. any fact, circumstance, situation, transaction or event underlying or alleged in such litigation or administrative or regulatory proceeding, demand letter or formal or informal governmental investigation or inquiry;

l. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving, any **Wrongful Act**, fact, circumstance or situation which any of the **Insureds** had knowledge of prior to the **Continuity Date** where such **Insureds** had reason to believe at the time that such known **Wrongful Act** could reasonably be expected to give rise to such **Claim**;

m. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving any employment or employment-related matters brought by or on behalf of or on the right of an applicant for employment with the **Company,** or any of the **Directors and Officers**, including any voluntary, seasonal, temporary, leased or independently-contracted employee of the **Company**;

n. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

i. any initial public offering of securities undertaken and consummated by the **Company**, including all activities in connection therewith;

ii. the actual or alleged violation of the Securities Act of 1933, the Securities Exchange Act of 1934, any rules or regulations of the Securities Exchange Commission adopted thereunder, any federal, state or provincial statute or common law regulating securities similar to the foregoing, including any amendments thereto, any rules or regulations adopted pursuant thereto in connection with any **Wrongful Act** actually or allegedly committed subsequent to the consummation of an initial public offering of securities of the **Company**; or

iii. any equity or debt offering, solicitation, sale, distribution or issuance of securities of the **Company** in excess of $50 million where such issuance takes place during the **Policy Period** and is exempt from the registration requirements of the Securities and Exchange Commission pursuant to Section 3.b. of the Securities Act of 1933 and rules and regulations promulgated thereunder, or any activities or transactions dealing in any way with such issuance of securities of the **Company**; provided, however, this exclusion shall not apply if the **Insurer** agrees in writing to extend coverage for **Wrongful Acts** in connection with such issuance of securities and the **Insureds** have paid the premium required by the **Insurer** for such coverage extension; or

o. for that portion of **Loss** which is covered under any other Coverage Section of this **Policy.**

2. Exclusions Applicable Only to Insuring Clause A.3.

**Insurer** shall not be liable for **Loss** on account of any **Claim**:

a. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving the actual or alleged breach of any contract or agreement; except and to the extent the **Company** would have been liable in the absence of such contract or agreement; or

b. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

i. any actual or alleged infringement, misappropriation, or violation of copyright, patent, service marks, trademarks, trade secrets, title or other proprietary or licensing rights or

intellectual property of any products, technologies or services; or

ii. any goods or products manufactured, produced, processed, packaged, sold, marketed, distributed, advertised or developed by the **Company**.

Provided, however, the exclusions in 2.a. and 2.b. above shall not apply to any such **Claim** brought or maintained, directly or indirectly, by one or more securities holders of the **Company** in their capacity as such.

No **Wrongful Act** of one or more **Insureds** shall be imputed to any other **Insureds** for the purpose of determining the applicability of any of the above exclusions.

D. **LIMIT OF LIABILITY AND RETENTIONS**

1. The liability of the **Insurer** shall apply only to that part of **Loss** which is excess of the Retention amounts applicable to this Coverage Section, as shown in Item 3. of the Declarations. Such Retentions shall be borne uninsured by the **Insureds** and at their own risk. If different parts of a single **Claim** are subject to different applicable Retentions under this Coverage Section, the applicable Retentions will be applied separately to each part of such **Loss**, but the sum of such Retentions shall not exceed the largest applicable Retention.

2. As shown in Item 3. of the Declarations relating to this Coverage Section, the following Limits of Liability of the **Insurer** shall apply:

   a. The amount set forth in Item 3.1.a. relating to this Coverage Section shall be the aggregate limit of liability for the payment of **Loss** under all Insuring Clauses for this Coverage Section, subject to additional payments for **Loss** under Insuring Clause A.1. as further described in subsection b. immediately below.

   b. The amount set forth in Item 3.1.b. relating to this Coverage Section shall be an aggregate limit of liability for the payment of **Loss** under Insuring Clause A.1. in addition to the limit described in subsection a. immediately above; provided, all payments for **Loss** under the additional limits described in this subsection b. shall be excess of the limit described in subsection a. above, and excess of any other available insurance that is specifically excess to this **Policy**. Such excess insurance must be completely and fully exhausted through the payment of loss, including but not limited to defense costs thereunder, before the **Insurer** shall have any obligations to make any payments under the additional limits described in this subsection b.

   c. The amount set forth in Item 3.1.c. of the Declarations relating to this Coverage Section shall be the maximum aggregate limit of liability for the payment of **Loss** under all Insuring Clauses for this Coverage Section. The Limit of Liability set forth in Items 3.1.a. and 3.1.b. relating to this Coverage Section shall be a part of and not in addition to the maximum aggregate limit of liability set forth in Item 3.1.c. for this Coverage Section.

3. All **Claims** arising out of the same **Wrongful Act** and all **Interrelated Wrongful Acts** shall be deemed to constitute a single **Claim** and shall be deemed to have been made at the earliest of the following times, regardless of whether such date is before or during the **Policy Period**:

   a. the time at which the earliest **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Act** is first made; or

   b. the time at which the **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed to have been made pursuant to Section E.2. below.

4. The Retention applicable to Insuring Clause 2. shall apply to **Loss** resulting from any **Claim** if indemnification for the **Claim** by the **Company** is required or permitted by applicable law, to the fullest extent so required or permitted, regardless of whether or not such actual indemnification by the **Company** is made, except and to the extent such indemnification is not made by the **Company** solely by reason of the **Company's** financial insolvency.

5. Payments of **Loss** by **Insurer** shall reduce the Limit(s) of Liability under this Coverage Section. **Costs, Charges and Expenses** are part of, and not in addition to, the Limits of Liability and payment of **Costs, Charges and Expenses** reduce the Limits of Liability. If such Limit(s) of Liability are exhausted by payment of **Loss**, the obligations of the **Insurer** under this Coverage Section are completely fulfilled and

extinguished.

E. **NOTIFICATION**

1. The **Insureds** shall, as a condition precedent to their rights to payment under this Coverage Section only, give **Insurer** written notice of any **Claim** as soon as practicable, but in no event later than sixty (60) days after the end of the **Policy Period.** If any **Claim** is first made against the **Insureds** during the **Extended Period**, if purchased, written notice to **Insurer** must be given as soon as practicable, but in no event later than sixty (60) days after the end of the **Extended Period.**

2. If, during the **Policy Period** or the **Discovery Period**, if purchased, any of the **Insureds** first becomes aware of a specific **Wrongful Act** which may reasonably give rise to a future **Claim** covered under this **Policy,** and if the **Insureds**, during the **Policy Period** or the **Discovery Period**, if purchased, give written notice to **Insurer** as soon as practicable of:

   a. a description of the **Wrongful Act** allegations anticipated;

   b. the identity of the potential claimants;

   c. the circumstances by which the **Insureds** first became aware of the **Wrongful Act**;

   d. the identity of the **Insureds** allegedly involved;

   e. the consequences which have resulted or may result; and

   f. the nature of the potential monetary damages and non-monetary relief;

   then any **Claim** made subsequently arising out of such **Wrongful Act** shall be deemed for the purposes of this Coverage Section to have been made at the time such notice was received by the **Insurer**. No coverage is provided for fees, expenses and other costs incurred prior to the time such **Wrongful Act** results in a **Claim**.

3. Notice to **Insurer** shall be given to the address shown under Item 8. of the Declarations for this **Policy**.

F. **SETTLEMENT AND DEFENSE**

1. It shall be the duty of the **Insurer** and not the duty of the **Insureds** to defend any **Claim**. Such duty shall exist even if any of the allegations are groundless, false or fraudulent. The **Insurer's** duty to defend any **Claim** shall cease when the Limits of Liability have been exhausted by the payment of **Loss** including **Costs, Charges and Expenses.**

2. The **Insurer** may make any investigation it deems necessary, and shall have the right to settle any **Claim**; provided, however, no settlement shall be made without the consent of the **Parent Company**, such consent not to be unreasonably withheld.

3. The **Insureds** agree not to settle or offer to settle any **Claim**, incur any **Costs, Charges and Expenses** or otherwise assume any contractual obligation or admit any liability with respect to any **Claim** without the prior written consent of the **Insurer**, such consent not to be unreasonably withheld. The **Insurer** shall not be liable for any settlement, **Costs, Charges and Expenses**, assumed obligation or admission to which it has not consented. The **Insureds** shall promptly send to the **Insurer** all settlement demands or offers received by any **Insured** from the claimant(s).

4. The **Insureds** agree to provide the **Insurer** with all information, assistance and cooperation which the **Insurer** reasonably requests and agree that, in the event of a **Claim,** the **Insureds** will do nothing that shall prejudice the position of the **Insurer** or its potential or actual rights of recovery.

G. **OTHER INSURANCE**

If any **Loss** covered under this Coverage Section is covered under any other valid and collectible insurance, then this **Policy** shall cover the **Loss**, subject to its terms and conditions, only to the extent that the amount of the **Loss** is in excess of the amount of such other insurance whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written only as specific excess insurance over the Limit of Liability for this Coverage Section.

H. **PAYMENT PRIORITY**

1. If the amount of any **Loss** which is otherwise due and owing by the **Insurer** exceeds the then remaining Limit of Liability applicable to the **Loss**, the **Insurer** shall pay the **Loss,** subject to such Limit of Liability, in the following priority:

    a. First, the **Insurer** shall pay any **Loss** covered under Insuring Clause A.1. in excess of any applicable Retention shown in Item 3. of the Declarations; and

    b. Second, only if and to the extent the payment under subsection 1. above does not exhaust the applicable Limit of Liability, the **Insurer** shall pay any **Loss** in excess of the Retention shown in Item 3. of the Declarations covered under any other applicable Insuring Clause.

    c. Subject to the foregoing subsection, the **Insurer** shall, upon receipt of a written request from the Chief Executive Officer of the **Parent Company**, delay any payment of **Loss** otherwise due and owing to or on behalf of the **Company** until such time as the Chief Executive Officer of the **Parent Company** designates, provided the liability of the **Insurer** with respect to any such delayed **Loss** payment shall not be increased, and shall not include any interest, on account of such delay.

Underwritten by Scottsdale Insurance Company

A Stock Insurance Company, herein called the **Insurer**

# BUSINESS AND MANAGEMENT INDEMNITY POLICY

# FIDUCIARY COVERAGE SECTION

In consideration of the payment of premium, in reliance on the **Application** and subject to the Declarations, and terms and conditions of this **Policy**, the **Insurer** and the **Insureds** agree as follows.

A. **INSURING CLAUSE**

**Insurer** shall pay the **Loss** of the **Insureds** which the **Insureds** have become legally obligated to pay by reason of a **Claim** first made against the **Insureds** during the **Policy Period** or, if elected, the **Extended Period**, and reported to the **Insurer** pursuant to Section E.1. herein, for any **Wrongful Act** taking place prior to the end of the **Policy Period**.

B. **DEFINITIONS**

1. **Administration** means:

   a. counseling employees, beneficiaries or **Plan** participants with respect to any **Plan**;

   b. providing interpretations with respect to any **Plan**;

   c. handling records in connection with any **Plan**; or

   d. enrolling, terminating, or canceling employees under any **Plan.**

2. **Claim** means:

   a. a written demand for damages or other relief against an **Insured**;

   b. a civil, administrative, regulatory or arbitration proceeding against any **Insured** seeking damages or other relief, commenced by the service of a complaint or similar pleading, including any appeal therefrom; or

   c. a civil proceeding or formal investigation brought by the United States Department of Labor, the United States Pension Benefit Guaranty Corporation or any similar federal, state or local governmental body, including any appeal therefrom.

3. **Continuity Date** means the date set forth in Item 3. of the Declarations relating to this Coverage Section.

4. **Costs, Charges and Expenses** means reasonable and necessary legal costs, charges, fees and expenses incurred by any of the **Insureds** in defending **Claims** and the premium for appeal, attachment or similar bonds arising out of covered judgments, but with no obligation to furnish such bonds and only for the amount of such judgment that is up to the applicable Limit of Liability. **Costs, Charges and Expenses** do not include salaries, wages, overhead or benefit expenses associated with officers or employees of any of the **Insureds**.

5. **Employee Benefit Plan** means any plan so defined by the Employee Retirement Income Security Act of 1974, as amended, or any similar state or local common or statutory law, or any rules and regulations promulgated thereunder.

6. **Insured Persons** means:

   a. any natural persons who were, now are, or shall become a trustee, director, officer or employee of the **Sponsor Company** or **Plan**;

b. any natural persons who were, now are, or shall become a fiduciary of any **Plan**; and

c. any natural persons for whose **Wrongful Acts** any of the **Insureds** are legally responsible.

7. **Insured Plan** means any government-mandated insurance for workers' compensation, unemployment, social security or disability benefits for employees of the **Sponsor Company.**

8. **Insureds** means:

a. the **Sponsor Company**,

b. any **Plan**,

c. any **Insured Persons**; and

d. any other natural person or entity who was, now are, or shall be acting as a plan administrator of any of the **Plans** at the written request and consent of the **Sponsor Company**.

9. **Interrelated Wrongful Acts** means all **Wrongful Acts** which have as a common nexus any fact, circumstance, situation, event, cause, transaction or series of facts, circumstances, situations, causes, events or transactions.

10. **Loss** means monetary damages, judgments, settlements, pre-judgment or post-judgment interest awarded by a court, and **Costs, Charges and Expenses** incurred by any of the **Insureds. Loss** does not include:

a. taxes, fines or penalties;

b. matters uninsurable under the laws pursuant to which this **Policy** is construed; or

c. punitive or exemplary damages, or the multiple portion of any multiplied damage award, except to the extent that such punitive or exemplary damages or the multiple portion of any multiplied damage award are insurable under the internal laws of any jurisdiction which most favors coverage for such damages and which has a substantial relationship to the **Insureds**, **Insurer**, this **Policy** or the **Claim** giving rise to such damages;

11. **Pension Benefit Plan** means any plan so defined in the Employee Retirement Income Security Act of 1974, as amended.

12. **Plan** means:

a. any **Sponsored Plan**, and

b. any **Insured Plan**,

established before or after the inception of this **Policy**.

13. **Plan Termination** means the termination, suspension, merger or dissolution of any **Plan**.

14. **Sponsor Company** means the **Company**.

15. **Sponsored Plan** means:

a. any **Employee Benefit Plan**, **Pension Benefit Plan**, or **Welfare Benefit Plan** which is operated by the **Sponsor Company** for the benefit of the employees of the **Sponsor Company**;

b. any other plan, fund or program specifically included as a **Sponsored Plan** by endorsement to this **Policy**; and

c. any other employee benefit plan or program not subject to Title 1 of the Employee Retirement Income Security Act of 1974, as amended, or any similar state or local common or statutory law, and any rules and regulations promulgated thereunder, sponsored by the **Sponsor Company** for the benefit of the employees of the **Sponsor Company**, including any employee stock ownership plan;

provided, however, that the **Sponsored Plan** shall not include any multi-employer plan, as defined in the Employee Retirement Income Security Act of 1974, as amended, or any similar state or local common or statutory law, and any rules and regulations promulgated thereunder.

16. **Welfare Benefit Plan** means any employee welfare benefit plan so defined in the Employee Retirement Income Security Act of 1974, as amended, or any similar state or local common or statutory law, and any rules and regulations promulgated thereunder.

17. **Wrongful Act** means:

    a. with respect to a **Sponsored Plan**:

        i. any actual or alleged breach of the responsibilities, obligations or duties imposed upon fiduciaries of the **Sponsored Plan** by the Employee Retirement Income Security Act of 1974, as amended, or by the Health Insurance Portability and Accountability Act of 1996, or any similar state or local common or statutory law, and any rules and regulations promulgated under either of these Acts;

        ii. any other matter claimed against the **Sponsor Company** or any of the **Insured Persons** solely because of the service of the **Sponsor Company** or any of the **Insured Persons** as a fiduciary of any **Sponsored Plan**, including any actual or alleged violation of the Health Insurance Portability and Accountability Act of 1996 or any similar state or local common or statutory law, and any rules and regulations promulgated thereunder; or

        iii. any actual or alleged act, error or omission in the **Administration** of any **Sponsored Plan**, including any actual or alleged violation of the Health Insurance Portability and Accountability Act of 1996 or any similar state or local common or statutory law, and any rules and regulations promulgated thereunder; and

    b. with respect to an **Insured Plan**, any actual or alleged act, error or omission in the **Administration** of such **Insured Plan**.

C. **EXCLUSIONS**

1. **Insurer** shall not be liable for **Loss** under this Coverage Section on account of any **Claim**:

    a. for actual or alleged bodily injury, sickness, disease, death, false imprisonment, assault, battery, mental anguish, emotional distress, invasion of privacy of any person, or damage to or destruction of any tangible or intangible property including loss of use thereof, whether or not such property is physically injured;

    b. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

        i. any **Wrongful Act**, fact, circumstance or situation which has been the subject of any written notice given under any other policy of which this **Policy** is a renewal or replacement or which it succeeds in time; or

        ii. any other **Wrongful Act**, whenever occurring, which together with a **Wrongful Act** which has been the subject of such prior notice, would constitute **Interrelated Wrongful Acts**;

    c. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

        i. the actual, alleged or threatened discharge, dispersal, release, escape, seepage, migration or disposal of **Pollutants**; or

        ii. any direction or request that any **Insured** test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**, or any voluntary decision to do so;

    including without limitation any **Claim** by or on behalf of the **Company**, its securities holders or creditors based upon, arising out of, or attributable to the matters described in this exclusion.

    For purposes of this exclusion, **Pollutants** means any substance exhibiting any hazardous characteristics as defined by, or identified on, a list of hazardous substances issued by the United

States Environmental Protection Agency or any federal, state, county, municipal or local counterpart thereof or any foreign equivalent. Such substances shall include, without limitation, solids, liquids, gaseous, biological, bacterial or thermal irritants, contaminants or smoke, vapor, soot, fumes, acids, alkalis, chemicals or waste materials (including materials to be reconditioned, recycled or reclaimed). **Pollutants** shall also mean any other air emission or particulate, odor, waste water, oil or oil products, infectious or medical waste, asbestos or asbestos products, noise, fungus (including mold or mildew and any mycotoxins, spores, scents or byproducts produced or released by fungi, but does not include any fungi intended by the **Insured** for consumption) and electric or magnetic or electromagnetic field;

d. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving, the failure to comply with any statutory or common law governing workers' compensation, unemployment, social security or disability benefits or any similar law; provided, however, this exclusion shall not apply to any actual or alleged obligation of any **Insured** pursuant to the:

   i. Consolidated Omnibus Budget Reconciliation Act of 1985, as amended; or

   ii. Health Insurance Portability and Accountability Act of 1996, as amended;

e. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

   i. any dishonest, deliberately fraudulent or criminal act of an **Insured**; provided, however this exclusion e.i. shall not apply unless and until there is a final judgment against such **Insured** as to such conduct; or

   ii. the gaining of any profit, remuneration or financial advantage to which any **Insured Person** was not legally entitled; provided, however this exclusion e.ii. shall not apply unless and until there is a final judgment against such **Insured Person** as to such conduct;

   When e.i. or ii. apply, the **Insured** shall reimburse the Insurer for any **Costs, Charges or Expenses**;

f. against any **Subsidiary** or any of the **Insured Persons** of a **Subsidiary** alleging**,** based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving any **Wrongful Act** actually or allegedly committed or attempted by a **Subsidiary** or any of the **Insured Persons** of a **Subsidiary:**

   i. before the date such entity became a **Subsidiary** or after the date such entity ceased to be a **Subsidiary**; or

   ii. occurring while such entity was a **Subsidiary** which, together with a **Wrongful Act** occurring before the date such entity became a **Subsidiary,** would constitute **Interrelated Wrongful Acts**;

g. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving, any **Wrongful Act** actually or allegedly committed subsequent to a **Takeover**;

h. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

   i. any prior or pending litigation, arbitration, or administrative or regulatory proceeding, demand letter or formal or informal governmental investigation or inquiry filed or pending on or before of the **Continuity Date**; or

   ii. any fact, circumstance, situation, transaction, cause or event underlying or alleged in such litigation, arbitration, administrative or regulatory proceeding, demand letter or formal or informal governmental investigation or inquiry;

i. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving, any **Wrongful Act** actually or allegedly committed subsequent to a **Plan Termination**; provided, however, that this exclusion shall only apply to those **Plans** which were the subjects of the **Plan Termination**;

j. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving any employment or employment-related matters; provided, however, this exclusion shall not apply to any **Claim** where such employment or employment-related matters involve actual or alleged violations of the Employee Retirement Income Security Act of 1974, as amended, or any similar state or local common or statutory law, and any rules and regulations promulgated thereunder;

k. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving any **Wrongful Act**, fact, circumstance or situation which any of the **Insureds** had knowledge of prior to the **Continuity Date** where such **Insureds** had reason to believe at the time that such known **Wrongful Act** could reasonably be expected to give rise to such **Claim**; or

l. for that portion of **Loss** which is covered under any other Coverage Section of this **Policy.**

2. **Insurer** shall not be liable to make any payment under this Coverage Section, other than **Costs, Charges and Expenses**, on account of any **Claim**:

   a. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving the actual or alleged breach of any contract or agreement; except to the extent that liability would have attached to the **Sponsor Company** in the absence of such contract or agreement, or where the liability was assumed in accordance with or under the trust agreement or equivalent document pursuant to which any of the **Plans** was established;

   b. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving, any actual or attempted reversion or payment of assets of any of the **Plans** to the **Sponsor Company**, or to any successor or assign of the **Sponsor Company**;

   c. for or which seeks or constitutes fines or penalties or the multiple portion of any multiplied damage award, other than the five percent (5%) or less, or the twenty percent (20%) or less, civil penalties imposed upon any of the **Insureds** as a fiduciary under Section 502 i. or l. , respectively, of the Employee Retirement Income Security Act of 1974, as amended;

   d. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving, the failure to collect from the **Sponsor Company** contributions owed to any of the **Plans**, or the failure to fund a **Plan** in accordance with the Employee Retirement Income Security Act of 1974, as amended, or any similar state or local common or statutory law, and any rules and regulations promulgated thereunder, unless the failure is solely due to the negligence of any of the **Insureds**; or

   e. which constitutes benefits due to or to become due under the terms of any **Plan** if such **Plan** complied with all applicable law, unless and to the extent that:

      i. the **Insured** is a natural person and the benefits are payable by such **Insured** as a personal obligation; and

      ii. recovery for the benefits is based upon a covered **Wrongful Act**.

No **Wrongful Act** of one or more **Insureds** shall be imputed to any other **Insureds** for the purpose of determining the applicability of any of the above exclusions.

D. **LIMIT OF LIABILITY AND RETENTION**

1. The liability of the **Insurer** shall apply only to that part of **Loss** which is excess of the Retention amount applicable to this Coverage Section, as shown in Item 3. of the Declarations. Such Retention shall be borne uninsured by the **Insureds** and at their own risk.

2. The amount shown in Item 3. of the Declarations relating to this Coverage Section shall be the maximum aggregate Limit of Liability of **Insurer** under this Coverage Section.

3. All **Claims** arising out of the same **Wrongful Act** and all **Interrelated Wrongful Acts** shall be deemed to be a single **Claim** and shall be deemed to have been made at the earliest of the following times, regardless of whether such date is before or during the **Policy Period**:

a. the time at which the earliest **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Act** is first made; or

b. the time at which the **Claim** involving the same **Wrongful Act** or **Interrelated Wrongful Acts** shall be deemed to have been made pursuant to subsection E.2. below.

4. Payments of **Loss**, other than **Costs, Charges and Expenses,** by **Insurer** shall reduce the Limit(s) of Liability under this Coverage Section. **Costs, Charges and Expenses** are not part of, and are in addition to, the Limit(s) of Liability and payment of **Costs, Charges and Expenses** shall not reduce the Limit(s) of Liability. If such Limit(s) of Liability are exhausted**,** the obligations of the **Insurer** under this Coverage Section are completely fulfilled and extinguished.

E. **NOTIFICATION**

1. The **Insureds** shall, as a condition precedent to their rights to payment under this Coverage Section only, give **Insurer** written notice of any **Claim** as soon as practicable, but in no event later than sixty (60) days after the end of the **Policy Period.** If any **Claim** is first made against the **Insureds** during the **Extended Period**, if purchased, written notice to **Insurer** must be given as soon as practicable, but in no event later than sixty (60) days after the end of the **Extended Period.**

2. If, during the **Policy Period** or the **Discovery Period**, if purchased, any of the **Insureds** first becomes aware of a specific **Wrongful Act** which may reasonably give rise to a future **Claim** covered under this **Policy,** and if the **Insureds**, during the **Policy Period** or the **Discovery Period**, if purchased, give written notice to **Insurer** as soon as practicable of:

   a. a description of the **Wrongful Act** allegations anticipated;

   b. the identity of the potential claimants;

   c. the circumstances by which the **Insureds** first became aware of the **Wrongful Act**;

   d. the identity of the **Insureds** allegedly involved;

   e. the consequences which have resulted or may result; and

   f. the nature of the potential monetary damages and non-monetary relief;

   then any **Claim** made subsequently arising out of such **Wrongful Act** shall be deemed for the purposes of this Coverage Section to have been made at the time such notice was received by the **Insurer**. No coverage is provided for fees, expenses and other costs incurred prior to the time such **Wrongful Act** results in a **Claim**.

3. Notice to **Insurer** shall be given to the address shown under Item 8. of the Declarations for this **Policy**.

F. **SETTLEMENT AND DEFENSE**

1. It shall be the duty of the **Insurer** and not the duty of the **Insureds** to defend any **Claim**. Such duty shall exist even if any of the allegations are groundless, false or fraudulent. The **Insurer's** duty to defend any **Claim** shall cease when the Limits of Liability have been exhausted**.**

2. The **Insurer** may make any investigation it deems necessary and shall have the right to settle any **Claim**; provided, however, no settlement shall be made without the consent of the **Parent Company**, such consent not to be unreasonably withheld.

3. The **Insureds** agree not to settle or offer to settle any **Claim**, incur any **Costs, Charges and Expenses** or otherwise assume any contractual obligation or admit any liability with respect to any **Claim** without the prior written consent of the **Insurer**, such consent not to be unreasonably withheld. The **Insurer** shall not be liable for any settlement, **Costs, Charges and Expenses**, assumed obligation or admission to which it has not consented. The **Insureds** shall promptly send to the **Insurer** all settlement demands or offers received by any **Insured** from the claimant(s).

4. The **Insureds** agree to provide the **Insurer** with all information, assistance and cooperation which the **Insurer** reasonably requests and agree that, in the event of a **Claim,** the **Insureds** will do nothing that shall prejudice the position of the **Insurer** or its potential or actual rights of recovery.

G. **OTHER INSURANCE**

If any **Loss** covered under this Coverage Section is covered under any other valid and collectible insurance, then this **Policy** shall cover the **Loss**, subject to its terms and conditions, only to the extent that the amount of the **Loss** is in excess of the amount of such other insurance whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise, unless such other insurance is written only as specific excess insurance over the Limit of Liability for this Coverage Section.

H. **WAIVER OF RECOURSE**

**Insurer** shall have no right of recourse, including but not limited to rights of contribution and subrogation, against any **Insureds** with respect to any **Claim** if this Coverage Section has been purchased by that **Insured,** with the exception of any of the **Plans**.

| Underwritten by Scottsdale Insurance Company | | | ENDORSEMENT NO. 1 |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3586644 | 8/29/2025 | BioQ Pharma Incorporated | 29406 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**502(C) AND 507 CIVIL MONEY PENALTIES EXTENSION**

In consideration of the premium paid, it is agreed that this endorsement modifies insurance provided under the following:

**FIDUCIARY COVERAGE SECTION**

It is agreed that the Fiduciary Coverage Section is amended as follows

1. Section B., **DEFINITIONS**, subsection 10.a. is deleted and replaced by the following:

   a. taxes, fines or penalties, other than civil money penalties imposed upon **Insureds** as a fiduciary pursuant to Section 502(c) of the Employee Retirement Income Security Act of 1974, including any amendments thereto pursuant to the Pension Protection Act of 2006, Title V. Section 507;

2. Section D., **LIMIT OF LIABILITY AND RETENTION**, subsection 2. is amended to include the following:

   - The amount set forth in Item 3.1. relating to this coverage section shall be amended to include the below listed sub-limit amounts. Such sub-limit amounts shall be a part of and not in addition to the limit of liability set forth in Item 3.1.of the Declarations.

     $250,000 sub-limit aggregate for all 502(c) and Section 507 **Claims**.

3. No Retention shall apply to 502(c) and Section 507 **Claims**.

All other terms and conditions of this **Policy** remain unchanged.

| Underwritten by Scottsdale Insurance Company | | | ENDORSEMENT NO. 2 |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3586644 | 8/29/2025 | BioQ Pharma Incorporated | 29406 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**ADDITIONAL PARENT COMPANY**

The following **Parent Company** is added to Item 1. of the Declarations:

BioQuiddity Inc.

All other terms and conditions of this **Policy** remain unchanged.



Nationwide

| Underwritten by Scottsdale Insurance Company | | | ENDORSEMENT NO. 3 |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3586644 | 8/29/2025 | BioQ Pharma Incorporated | 29406 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**ALLOCATION PROVISION**

This endorsement modifies insurance provided under the following:

**GENERAL TERMS AND CONDITIONS**

The following Section O., **ALLOCATION**, is added to the General Terms and Conditions Section.

O. **ALLOCATION**

1. In the event the **Insurer** has the duty to defend a **Claim** under any Coverage Section in which both **Loss** that is covered by the applicable Coverage Section and loss which is not covered by the applicable Coverage Section is incurred, either because such **Claim** includes both covered and uncovered matters or because such **Claim** is made against both covered and uncovered parties, then:

   a. this **Policy** shall pay one hundred percent (100%) of **Costs, Charges and Expenses** incurred by such **Insured** on account of such **Claim**; and

   b. there shall be a fair and equitable allocation of any remaining loss incurred by such **Insured** on account of such **Claim** between covered **Loss** and uncovered loss based upon the relative legal and financial exposures and the relative benefits obtained.

2. In the event the **Insured** has the duty to defend a **Claim** under any Coverage Section in which both **Loss** that is covered by the applicable Coverage Section and loss which is not covered by the applicable Coverage Section is incurred, either because such **Claim** includes both covered and uncovered matters or because such **Claim** is made against both covered and uncovered parties, then the **Insured** and the **Insurer** shall use their best efforts to determine a fair and proper allocation as between such insured and uninsured loss, taking into account the relative legal and financial exposures and the relative benefits obtained.

All other terms and conditions of this **Policy** remain unchanged.

| Underwritten by Scottsdale Insurance Company | | | ENDORSEMENT NO. 4 |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3586644 | 8/29/2025 | BioQ Pharma Incorporated | 29406 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**AMEND CONDUCT EXCLUSION**

In consideration of the premium paid, it is agreed that this endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION**

Section C., **EXCLUSIONS**, subsection 1., paragraph f. is deleted in its entirety and replaced by the following:

f. alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

i. any deliberately dishonest or deliberately fraudulent act of an **Insured**;

ii. a criminal act, actually or allegedly, committed in any jurisdiction within the United States, or committed in a jurisdiction outside the United States to the extent such criminal act under such foreign jurisdiction would be considered a criminal act under any federal, state or local law or act within any jurisdiction in the United States; or

iii. the gaining of any profit, remuneration or financial advantage to which any **Directors and Officers** were not legally entitled;

provided, however, this exclusion shall not apply unless such act or illegal gain is established by a final, non-appealable adjudication in such **Claim**;

All other terms and conditions of this **Policy** remain unchanged.

| Underwritten by Scottsdale Insurance Company | | | ENDORSEMENT NO. 5 |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3586644 | 8/29/2025 | BioQ Pharma Incorporated | 29406 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**AMEND DEFINITION OF CLAIM TO INCLUDE SUBPOENA**

In consideration of the premium paid, it is agreed that this endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION**

The following is added to Section B., **DEFINITIONS**, subsection 1.:

1. **Claim** means:
   - a formal governmental investigation against any **Insured** commenced by the receipt of a governmental subpoena in connection with its formal investigation of any **Insured**.

All other terms and conditions of this **Policy** remain unchanged.



Nationwide

| Underwritten by Scottsdale Insurance Company | | | ENDORSEMENT NO. 6 |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3586644 | 8/29/2025 | BioQ Pharma Incorporated | 29406 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**AMEND DEFINITION OF DIRECTORS AND OFFICERS-BOARD OBSERVER**

This endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION**

In consideration of the premium paid, it is agreed that the following is added to Section B., **DEFINITIONS**, subsection 4.:

- a natural person who is a board observer of the **Company** that is indemnified by the **Company** pursuant to a written indemnification agreement. The **Company** agrees to indemnify the board observer to the fullest extent permitted by law, taking all steps necessary or advisable in furtherance thereof, including the making in good faith of any application for court approval, the passing of any resolution by the board of directors or shareholders of the **Company**, the amendment of any charter, bylaws, operating agreement or similar documents of the **Company** or the execution of any contract. The **Company** further agrees to advance **Costs, Charges and Expenses** actually and reasonably incurred by any board observer in defending any threatened, pending or contemplated action, suit or proceeding prior to a final disposition of any such action, suit or proceeding and shall not require any determination or adjudication, interim or final, of the entitlement of the board observer to indemnification, where permitted by law to do so. The financial ability of any board observer to make repayment shall not be a prerequisite to the making of such an advance, and the right to receive advancement of **Costs, Charges and Expenses** herein is a contractual right. The agreements contained in this paragraph are binding upon the **Company** and enforceable by the **Insurer** or the board observer.

All other terms and conditions of this **Policy** remain unchanged.

| Underwritten by Scottsdale Insurance Company | | | ENDORSEMENT NO. 7 |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3586644 | 8/29/2025 | BioQ Pharma Incorporated | 29406 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**AMEND DEFINITION OF LOSS**

In consideration of the premium paid, it is agreed that this endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION**

It is agreed that Section B., **DEFINITIONS**, subsection 7.c. is deleted in its entirety and replaced with the following:

c. punitive or exemplary damages, or the multiple portion of any multiplied damage award, except to the extent that such punitive or exemplary damages, or multiplied portion of any multiplied damage award are insurable under the internal laws of any jurisdiction which most favors coverage for such damages and where the **Insureds**, **Insurer**, this **Policy** or the **Claim** giving rise to such damages is located in such jurisdiction;

All other terms and conditions of this **Policy** remain unchanged.

| Underwritten by Scottsdale Insurance Company | | | ENDORSEMENT NO. 8 |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3586644 | 8/29/2025 | BioQ Pharma Incorporated | 29406 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**AMEND DISCOVERY ELECTION-90 DAYS**

This endorsement modifies insurance provided under the following:

**GENERAL TERMS AND CONDITIONS**

Section H., **DISCOVERY PERIOD**, subsection 2., is replaced by:

2. As a condition precedent to the right to purchase the **Discovery Period** set forth in subsection H.1. above, the total premium for the **Policy** must have been paid. Such right to purchase the **Discovery Period** shall terminate unless written notice, together with full payment of the premium for the **Discovery Period**, is received by **Insurer** within ninety (90) days after the effective date of cancellation, or, in the event of a refusal to renew, within ninety (90) days after the **Policy** expiration date. If such notice and premium payment is not so given to **Insurer**, there shall be no right to purchase the **Discovery Period**.

All other terms and conditions of this **Policy** remain unchanged.

| Underwritten by Scottsdale Insurance Company | | | ENDORSEMENT NO. 9 |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3586644 | 8/29/2025 | BioQ Pharma Incorporated | 29406 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**AMEND INSURED V. INSURED EXCLUSION (DILUTION CLAIMS EXCEPTION)**

In consideration of the premium paid, it is agreed that this endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION**

1. Section C., **EXCLUSIONS**, paragraph 1.e.iv. is deleted in its entirety and replaced with the following:

    iv. is brought or maintained by any former **Director or Officer** of the **Company** solely in their capacity as a securities holder of the **Company** and where such **Claim** is solely based upon and arising out of:

    a. **Wrongful Acts** committed subsequent to the date such **Director or Officer** ceased to be a **Director or Officer** of the **Company** and where such **Claim** is first made two (2) years subsequent to the date such **Director or Officer** ceased to be a **Director or Officer** of the **Company**; or

    b. any actual or alleged unfair dilution of such securities holder s securities interest, but only if such **Claim** is first made within two (2) years after the date such **Director or Officer** ceased to be a **Director or Officer** of the **Company** and such **Claim** is made in connection with the sale of a majority of the assets of the **Company**, the merger of the **Company** with or into another entity, or the initial public offering of the securities of the **Company** ("**Dilution Claims**"); or

2. The Directors and Officers and Company Coverage Section in Item 3. of the Declarations is amended to add the following:

    4. Sublimit of Liability for **Dilution Claims**:

    a. $250,000 aggregate for all **Loss**, subject to b. and c. immediately below,

    b. $0 additional aggregate for all **Costs, Charges and Expenses**, subject to c. immediately below,

    c. $250,000 maximum aggregate for **Loss** arising from **Dilution Claims.**

    This Sublimit of Liability shall be a part of and not in addition to the maximum aggregate Limit of Liability set forth in Item 3.1.c. of the Declarations for this Coverage Section.

All other terms and conditions of this **Policy** remain unchanged.

| Underwritten by Scottsdale Insurance Company | | ENDORSEMENT NO. 10 | |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3586644 | 8/29/2025 | BioQ Pharma Incorporated | 29406 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**AMEND NOTICE OF CIRCUMSTANCES**

This endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION**

Section **E. NOTIFICATION**, subsection **2.** is replaced by:

2. If during the **Policy Period** or the **Discovery Period**, if purchased, any of the **Insureds** first become aware of specific facts or circumstances which may reasonably give rise to a future **Claim** covered under this **Policy**, and if the **Insureds**, during the **Policy Period** or the **Discovery Period**, if purchased, give written notice to **Insurer** as soon as practicable of:

    a. a description of the facts, circumstances, or allegations anticipated;

    b. the identity of potential claimants;

    c. the circumstances by which the **Insureds** first became aware of the facts or circumstances;

    d. the identity of the **Insureds** allegedly involved;

    e. the consequences which have resulted or may result; and

    f. the nature of the potential monetary damages and non-monetary relief;

    then any **Claim** made subsequently arising out of such facts or circumstances shall be deemed for the purposes of this Coverage Section to have been made at the time such notices was received by the **Insurer**. No coverage is provided for fees, expenses and other costs incurred prior to the time such facts or circumstances results in a **Claim**.

**All other terms and conditions of this Policy remain unchanged.**



Nationwide

| Underwritten by Scottsdale Insurance Company | | | ENDORSEMENT NO. 11 |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3586644 | 8/29/2025 | BioQ Pharma Incorporated | 29406 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**AMEND NOTICE PROVISION - D&O**

This endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION**

The following is added to Section E. **NOTIFICATION**, subsection 1.:

A **Claim** shall be deemed to have been first made against the **Insureds** on the date an **Insured** who is an executive officer, director or general counsel becomes aware of such **Claim**.

All other terms and conditions of this **Policy** remain unchanged.

| Underwritten by Scottsdale Insurance Company | | | ENDORSEMENT NO. 12 |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3586644 | 8/29/2025 | BioQ Pharma Incorporated | 29406 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**AMEND NOTIFICATION PROVISION TO INCLUDE REPORTING OF FACTS OR CIRCUMSTANCES DURING EXTENDED PERIOD**

In consideration of the premium paid, it is agreed that this endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION**

It is agreed that Section E., **NOTIFICATION**, subsection 2. is deleted in its entirety and replaced with the following:

2. If, during the **Policy Period** or the **Extended Period** (if purchased), any of the **Insureds** first becomes aware of specific facts or circumstances which may reasonably give rise to a future **Claim** covered under this **Policy**, and if the **Insureds**, during the **Policy Period** or the **Extended Period** (if purchased), give written notice to **Insurer** as soon as practicable of:

   a. a description of the specific facts or circumstances, or anticipated allegations;

   b. the identity of the potential claimants;

   c. the circumstances by which the **Insureds** first became aware of the specific facts or circumstances;

   d. the identity of the **Insureds** allegedly involved;

   e. the consequences which have resulted or may result; and

   f. the nature of the potential monetary damages and non-monetary relief;

   then any subsequent **Claim** made arising out of such specific facts or circumstances shall be deemed, for the purposes of this Coverage Section, to have been made at the time such notice was received by the **Insurer**. No coverage is provided for fees, expenses and other costs incurred prior to the time such specific facts or circumstances result in a **Claim**.

All other terms and conditions of this **Policy** remain unchanged.



Nationwide

| Underwritten by Scottsdale Insurance Company | | | ENDORSEMENT NO. 13 |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3586644 | 8/29/2025 | BioQ Pharma Incorporated | 29406 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**AMEND OTHER INSURANCE TO BE PRIMARY**

In consideration of the premium paid, it is agreed this endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION**

Section G., **OTHER INSURANCE**, is deleted in its entirety and replaced with the following:

G. **OTHER INSURANCE**

If any **Loss** covered under this Coverage Section is covered under any other valid insurance, then this **Policy** shall cover the **Loss**, subject to its terms and conditions, only to the extent that the amount of the **Loss** is in excess of the amount of such other insurance whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise. If any **Loss** covered under this Coverage Section is not collectible or recoverable under such other valid policy, then this **Policy** shall be primary insurance, unless expressly written to be excess over other applicable insurance.

All other terms and conditions of this **Policy** remain unchanged.


Nationwide

| Underwritten by Scottsdale Insurance Company | | | ENDORSEMENT NO. 14 |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3586644 | 8/29/2025 | BioQ Pharma Incorporated | 29406 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**AMEND OTHER INSURANCE TO BE PRIMARY - FIDUCIARY**

This endorsement modifies insurance provided under the following:

**FIDUCIARY COVERAGE SECTION**

Section G., **OTHER INSURANCE**, is replaced by:

G. **OTHER INSURANCE**

For any **Claim**, if any **Loss** covered under this Coverage Section is covered under any other valid and collectable insurance, then this **Policy** shall be primary insurance, unless expressly written to be excess over other applicable insurance.

All other terms and conditions of this **Policy** remain unchanged.



Nationwide

| Underwritten by Scottsdale Insurance Company | | | ENDORSEMENT NO. 15 |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3586644 | 8/29/2025 | BioQ Pharma Incorporated | 29406 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**AMEND OUTSIDE SERVICES EXCLUSION**

This endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION**

Section C., **EXCLUSIONS**, subsection 1., paragraph j., subparagraph ii. is replaced by:

ii. such **Outside Entity** is not permitted or required by law to provide indemnification to such **Directors and Officers**, or is unable to indemnify such **Directors and Officers** as a result of **Financial Impairment**; and

For the purposes of this endorsement **Financial Impairment** means the status of the **Outside Entity** resulting from (1) the appointment by any state or federal official, agency or court of any receiver, conservator, liquidator, trustee, rehabilitator or similar official to take control of, supervise, manage or liquidate the **Outside Entity**, or (2) in the event a bankruptcy proceeding shall be instituted by or against the **Outside Entity**, the **Outside Entity** becoming a debtor-in-possession.

All other terms and conditions of this **Policy** remain unchanged.

| Underwritten by Scottsdale Insurance Company | | | ENDORSEMENT NO. 16 |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3586644 | 8/29/2025 | BioQ Pharma Incorporated | 29406 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**AMEND POLLUTION EXCLUSION - SIDE A**

This endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION**

It is agreed that Section C., **EXCLUSIONS**, subsection 1.c., is deleted in its entirety and replaced by the following:

c. Alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving:

i. the actual, alleged or threatened discharge, dispersal, release, escape, seepage, migration or disposal of **Pollutants**; or

ii. any direction or request that any **Insured** test for, monitor, clean up, remove, contain, treat, detoxify or neutralize **Pollutants**, or any voluntary decision to do so;

provided, however, this exclusion shall not apply to:

- **Loss** of the **Directors and Officers** for which the **Directors and Officers** are not indemnified by the **Company**; or
- any **Claim** brought directly, derivatively or otherwise by one or more securities holders of the **Company** in their capacity as such.

For purposes of this exclusion, **Pollutants** means any substance exhibiting any hazardous characteristics as defined by, or identified on, a list of hazardous substances issued by the United States Environmental Protection Agency or any federal, state, county, municipal or local counterpart thereof or any foreign equivalent. Such substances shall include, without limitation, solids, liquids, gaseous, biological, bacterial or thermal irritants, contaminants or smoke, vapor, soot, fumes, acids, alkalis, chemicals or waste materials (including materials to be reconditioned, recycled or reclaimed). **Pollutants** shall also mean any other air emission or particulate, odor, waste water, oil or oil products, infectious or medical waste, asbestos or asbestos products, noise, fungus (including mold or mildew and any mycotoxins, spores, scents or by-products produced or released by fungi, but does not include any fungi intended by the **Insured** for consumption) and electric or magnetic or electromagnetic field.

All other terms and conditions of this **Policy** remain unchanged.

| Underwritten by Scottsdale Insurance Company | ENDORSEMENT NO. 17 |
|---|---|

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKS3586644 | 8/29/2025 | BioQ Pharma Incorporated | 29406 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**AMEND SUBROGATION PROVISION - FINAL JUDGMENT**

This endorsement modifies insurance provided under the following:

**GENERAL TERMS AND CONDITIONS**

Section L., **ASSISTANCE, COOPERATION AND SUBROGATION**, is deleted in its entirety and replaced by the following:

L. **ASSISTANCE, COOPERATION AND SUBROGATION**

The **Insureds** agree to provide **Insurer** with such information, assistance and cooperation as **Insurer** reasonably may request, and they further agree that they shall not take any action which in any way increases **Insurer's** exposure under this **Policy**. In the event of any payments under this **Policy, Insurer** shall be subrogated to the extent of such payment to all of the **Insureds'** rights of recovery against any person or entity. The **Insureds** shall execute all papers required and shall do everything that may be necessary to secure and preserve such rights, including the execution of such documents as are necessary to enable **Insurer** effectively to bring suit or otherwise pursue subrogation in the name of the **Insureds**, and shall provide all other assistance and cooperation which **Insurer** may reasonably require. In no event, however, shall the **Insurer** exercise its right of subrogation against an **Insured** under this **Policy** unless such **Insured** has been convicted of a deliberate criminal act; or has committed a deliberate fraudulent act, if a final judgment establishes that such deliberate fraudulent act was committed; or has obtained any profit or advantage to which a final judgment establishes the **Insured** was not legally entitled.

All other terms and conditions of this **Policy** remain unchanged.

| Underwritten by Scottsdale Insurance Company | | | ENDORSEMENT NO. 18 |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3586644 | 8/29/2025 | BioQ Pharma Incorporated | 29406 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**AMEND WARRANTY PROVISION NON-RESCINDABLE COVERAGE**

This endorsement modifies insurance provided under the following:

**GENERAL TERMS AND CONDITIONS**

Section D., **WARRANTY**, subsection 2. is replaced by:

2. In the event the **Application**, including materials submitted or required to be submitted therewith, contains any misrepresentation or omission made with the intent to deceive, or contains any misrepresentation or omission which materially affects either the acceptance of the risk or the hazard assumed by the **Insurer** under this **Policy**, this **Policy**, including each and all Coverage Sections, shall not afford coverage to the following **Insureds** for any **Claim** alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving, any untruthful or inaccurate statements, representations or information:

    a. any **Insured** who is a natural person and who knew the facts misrepresented or the omissions, whether or not such individual knew of the **Application**, such materials, or this **Policy**;

    b. any **Company** or **Sponsor Company** to the extent it indemnifies any **Insured** referred to in subsection a. above; and

    c. any **Company**, **Sponsor Company**, **Plan**, **Employee Benefit Plan**, or any other entity that is an **Insured**, if any past or present chief executive officer, chief financial officer, general counsel, risk manager or human resources director (or equivalent positions) of the **Parent Company** knew the facts misrepresented or the omissions, whether or not such individual knew of the **Application**, such materials, or this **Policy**.

    With respect to any statement, representation or information contained in the **Application**, or in the materials submitted or required to be submitted therewith, and solely with respect to the above exclusion, no knowledge possessed by any **Insured** who is a natural person shall be imputed to any other **Insured** who is a natural person.

The following condition is added:

**NON-RESCINDABLE**

The **Insurer** shall not be entitled under any circumstances to rescind any Coverage Section of the **Policy** with respect to any **Insured**. Nothing contained in this section shall limit or waive any other rights or remedies available to the **Insurer**.

The title and any headings in this endorsement are solely for convenience and form no part of the terms and conditions of coverage.

All other terms and conditions of this **Policy** remain unchanged.



Nationwide®

| Underwritten by Scottsdale Insurance Company | | | ENDORSEMENT NO. 19 |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3586644 | 8/29/2025 | BioQ Pharma Incorporated | 29406 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**AMEND WHISTLE-BLOWER ENDORSEMENT**

In consideration of the premium paid, it is agreed that this endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION**

Section C., **EXCLUSIONS**, subsection 1., paragraph e., is amended to include the following

- is brought or maintained by any of the **Directors and Officers** under the federal False Claims Act or any similar state, local or foreign "whistle-blower" law or "whistle-blower" provision of any law.

All other terms and conditions of this **Policy** remain unchanged.



Nationwide®

| Underwritten by Scottsdale Insurance Company | | | ENDORSEMENT NO. 20 |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3586644 | 8/29/2025 | BioQ Pharma Incorporated | 29406 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**AMENDED DEFINITION OF DIRECTORS & OFFICERS - LEASED / CONTRACTED EMPLOYEES**

This endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION**

The following is added to Section **B. DEFINITIONS**, subsection **4.**:

**Directors and/or Officers** means any person who was, now is, or shall become:

any natural person who is a leased employee or is contracted to perform work for the **Company**, or is an independent contractor for the **Company**, but only to the extent such individual performs work or services for or on behalf of the **Company**.

**All other terms and conditions of this Policy remain unchanged.**

| Underwritten by Scottsdale Insurance Company | ENDORSEMENT NO. 21 |
|---|---|

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKS3586644 | 8/29/2025 | BioQ Pharma Incorporated | 29406 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**AMENDED INSURED VERSUS INSURED EXCLUSION**

This endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION**

Section C., **EXCLUSIONS**, subsection 1., paragraph e., subparagraph iii. is replaced by:

iii. is brought or maintained by an employee of the **Company** who is not or was not a director or officer of the **Company**, including any such **Claim** brought or maintained under the Federal False Claims Act or any similar federal, state, local or foreign "whistleblower" law or "whistle-blower" provision of any law.

All other terms and conditions of this **Policy** remain unchanged.

| Underwritten by Scottsdale Insurance Company | | | ENDORSEMENT NO. 22 |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3586644 | 8/29/2025 | BioQ Pharma Incorporated | 29406 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**AMENDED INSURED VERSUS INSURED EXCLUSION - FOREIGN JURISDICTION**

This endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION**

Section C., **EXCLUSIONS**, subsection 1. is amended by adding the following to paragraph e.:

is brought or maintained in a jurisdiction outside the United States of America, Canada or Australia by any **Insured** of the **Company** solely where such **Company** is domiciled or chartered in such foreign jurisdiction;

All other terms and conditions of this **Policy** remain unchanged.



Nationwide

| Underwritten by Scottsdale Insurance Company | | | ENDORSEMENT NO. 23 |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3586644 | 8/29/2025 | BioQ Pharma Incorporated | 29406 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**AMENDED LIMIT OF LIABILITY AND RETENTIONS**

In consideration of the premium paid, it is agreed that this endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION**

Section B., **DEFINITIONS**, is amended to include the following:

- **Financial Impairment Situation** means the financial condition, viability and resources of the **Company** or an **Outside Entity** as the result of or in connection with:

  a. the **Company** or **Outside Entity** becoming a debtor-in-possession;

  b. the appointment of a receiver, conservator, liquidator, trustee, rehabilitator or similar official to control, supervise, manage or liquidate the **Company** or **Outside Entity**; or

  c. the filing of a bankruptcy petition by or against the **Company** or **Outside Entity** under the bankruptcy laws of the United States of America or any equivalent event outside of the United States of America.

Section D., **LIMIT OF LIABILITY AND RETENTIONS**, subsection 4. is deleted in its entirety and replaced with the following:

4. Insuring Clause A.2. and the applicable retention thereto shall apply to **Loss** resulting from any **Claim** if indemnification by the **Company** for such **Claim** is required or permitted by applicable law, to the fullest extent so required or permitted, regardless of whether or not such actual indemnification by the **Company** is made, except and to the extent such indemnification is not made by the **Company** solely by reason of a **Financial Impairment Situation**.

All other terms and conditions of this **Policy** remain unchanged

| Underwritten by Scottsdale Insurance Company | | | ENDORSEMENT NO. 24 |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3586644 | 8/29/2025 | BioQ Pharma Incorporated | 29406 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**CAP ON LOSSES FROM CERTIFIED ACTS OF TERRORISM**

It is agreed that the Limit(s) of Liability section is amended by adding the following:

- Notwithstanding anything in this policy to the contrary, if aggregate **Insured** losses attributable to terrorist acts certified under the federal Terrorism Risk Insurance Act exceed $100 billion in a calendar year and the **Insurer** has met its deductible under the Terrorism Risk Insurance Act, the **Insurer** shall not be liable for the payment of any portion of the amount of such losses that exceeds $100 billion, and in such case **Insured** losses up to that amount are subject to pro rata allocation in accordance with procedures established by the Secretary of the Treasury.

- **Certified Act of Terrorism** means an act that is certified by the Secretary of the Treasury, in accordance with the provisions of the federal Terrorism Risk Insurance Act, to be an act of terrorism pursuant to such Act. The criteria contained in the Terrorism Risk Insurance Act for a **Certified Act of Terrorism** include the following:

    1. The act resulted in **Insured** losses in excess of $5 million in the aggregate, attributable to all types of insurance subject to the Terrorism Risk Insurance Act; and

    2. The act is a violent act or an act that is dangerous to human life, property or infrastructure and is committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States Government by coercion.

All other terms and conditions of this policy remain unchanged

| Underwritten by Scottsdale Insurance Company | | | ENDORSEMENT NO. 25 |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3586644 | 8/29/2025 | BioQ Pharma Incorporated | 29406 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**COST OF INVESTIGATIONS COVERAGE**

This endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION**

It is agreed that:

The following is added to Section B., **DEFINITIONS**:

**Cost of Investigation** means reasonable and necessary legal costs, charges, fees and expenses incurred by any of the **Insureds** in investigating a written demand, by one or more of the securities holders of the **Company** upon the board of directors, the management board of the **Company** or the **Company**, to bring a civil proceeding, including any derivative action, against any of the **Directors and Officers** on behalf of the **Company**.

Section B., **DEFINITIONS**, subsection 1., paragraph b. is deleted in its entirety and is replaced by:

b. a written demand, by one or more of the securities holders of the **Company** upon the board of directors, the management board of the **Company** or the **Company**, to bring a civil proceeding, including any derivative action, against any of the **Directors and Officers** on behalf of the **Company**;

Section B., **DEFINITIONS**, subsection 3., paragraph b. is deleted in its entirety and is replaced by:

b. **Cost of Investigation.**

All other terms and conditions of this **Policy** remain unchanged.

| Underwritten by Scottsdale Insurance Company | | | ENDORSEMENT NO. 26 |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3586644 | 8/29/2025 | BioQ Pharma Incorporated | 29406 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**CREDITOR EXCLUSION**

This endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION**

The following is added to Section **C. EXCLUSIONS**, paragraph **1.** Exclusions Applicable to All Insuring Clauses:

**Insurer** shall not be liable for **Loss** under this Coverage Section on account of any **Claim** brought, or maintained by, on behalf of, in the right of, at the direction of, at the behest of, or for the benefit of any:

i. person;

ii. partnership or any of its partners, directors, officers, or employees; or

iii. corporation, or any of its directors, officers or employees

who is a secured or unsecured creditor of the **Company**.

**All other terms and conditions of this Policy remain unchanged.**

| Underwritten by Scottsdale Insurance Company | | | ENDORSEMENT NO. 27 |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3586644 | 8/29/2025 | BioQ Pharma Incorporated | 29406 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**CRISIS COSTS ENDORSEMENT**

This endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION**

In consideration of the payment of the premium and in reliance upon the statements in the **Application** and subject to the Declarations and the terms and conditions of this **Policy**, the **Insurer** and the **Insureds** agree as follows:

The following is added to A., **INSURING CLAUSES**:

**CRISIS COSTS COVERAGE**

The **Insurer** will pay on behalf of the **Company** any **Crisis Costs** the **Company** becomes legally obligated to pay as a result of a **Crisis** first occurring and reported to the **Insurer** during the **Policy Period** or **Discovery Period**, if applicable.

With respect to this endorsement, the following definitions apply:

**Crisis** means the publication, in a daily newspaper of general circulation or a radio, internet or television news report, of unfavorable information regarding a **Company** that is reasonably likely to lessen public confidence in the competence, integrity or viability of the **Company** to conduct business.

**Crisis Costs** means the following expenses, when incurred by **Company** during the pendancy of or within ninety (90) days prior to, and in the anticipation of, a **Crisis**, regardless of whether a **Claim** is ever made against an **Insured** arising from such **Crisis**, and, in the event that a **Claim** is made, regardless of whether the expenses are incurred prior to or subsequent to the **Claim**:

1. reasonable and necessary fees and expenses incurred by a **Public Relations Firm** in the performance of **Public Relations Services** for the **Company** arising from a **Crisis**; or

2. reasonable and necessary printing, advertising, mailing of materials, or travel by **Insured Persons** or the **Public Relations Firm**, in connection with a **Crisis**;

provided, however, that **Crisis Costs** shall not include salaries, wages, overhead or benefit expenses associated with **Insured Persons** or employees of the **Company.**

**Insured Person** means any person who has been, now is or shall be:

1. a duly elected or appointed director, officer, general counsel, risk manager, and in the case of a limited liability company, a member of the management board (or equivalent position), of the **Company**;

2. in the event a **Subsidiary** operates outside the United States, in a title, position or capacity in such foreign **Subsidiary** equivalent to a position listed in 1. above in an organization incorporated within the United States;

3. a leased employee or independent contractor serving in an executive officer position with the **Company**; or

4. an employee of the **Company**, including any full-time, part-time, seasonal or temporary employee.

**Public Relations Firm** means any public relations firm, crisis management firm or law firm hired by the **Company** with the **Insurer"s** prior written consent to perform **Public Relations Services** in connection with a **Crisis**.

**Public Relations Services** means those services performed by a **Public Relations Firm** to minimize potential harm to public confidence in the competence, integrity or viability of the **Company** to conduct business arising from a **Crisis**, including maintaining and restoring public confidence in the **Company** and providing advice to the **Company** or **Insured Persons.**

Item 3., Coverage Section(s) and Limit of Liability, of the Declarations is amended by adding the following:

**Crisis Costs**

a. Limit of Liability $25,000 All Investigation Costs

b. Retention$2,500

The Limit of Liability stated in Item 3., Coverage Section(s) and Limit of Liability, **Crisis Costs**, of the Declarations is the aggregate limit of the **Insurer's** liability for all **Crises** first occurring and reported to the **Insurer** during the **Policy Period** and the **Discovery Period**, if applicable.

All other terms and conditions of this **Policy** remain unchanged.

| Underwritten by Scottsdale Insurance Company | | | ENDORSEMENT NO. 28 |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3586644 | 8/29/2025 | BioQ Pharma Incorporated | 29406 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**DELETE PARAGRAPH III. FROM EXCLUSION N.**

This endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION**

It is agreed that Section C., **EXCLUSIONS**, subsection 1., paragraph n. iii. is deleted in its entirety.

All other terms and conditions of this **Policy** remain unchanged.

| Underwritten by Scottsdale Insurance Company | | | ENDORSEMENT NO. 29 |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3586644 | 8/29/2025 | BioQ Pharma Incorporated | 29406 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**EMPLOYED LAWYERS EXTENSION**

This endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION**

The following is added to Section B.4.:

**Employed Lawyers** of the **Company**

The following definition is added to Section **B.**:

**Employed Lawyers** means:

employees of the **Company** who:

1. are admitted to practice law in one or more jurisdictions in the United States of America; and
2. are employed within the **Company's** office of the general counsel or its functional equivalent; and
3. acting solely in the capacity of providing professional legal services to the **Company**.

An individual shall not be deemed to be an **Employed Lawyer** to the extent such individual renders or rendered professional legal services to persons or entities other than the **Insureds.**



Nationwide

| Underwritten by Scottsdale Insurance Company | | | ENDORSEMENT NO. 30 |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3586644 | 8/29/2025 | BioQ Pharma Incorporated | 29406 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**EXTRADITION COVERAGE ENDORSEMENT**

This endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION**

The following is added to Section B., **DEFINITIONS**, subsection 1.:

**Claim** means:

- an official request for **Extradition** of any of the **Directors and Officers**; or the execution of a warrant for the arrest of any of the **Directors and Officers** where such execution is an element of **Extradition.**

The following is added to Section B., **DEFINITIONS**, subsection 3.:

**Costs, Charges and Expenses** means:

- reasonable and necessary legal costs, charges, fees and expenses incurred by any of the **Insureds** resulting from any of the **Directors and Officers** lawfully:

  i. opposing, challenging, resisting or defending against any request for or any effort to obtain the **Extradition** of any of such **Directors and Officers**; or

  ii. appealing any order or other grant of **Extradition** of any of such **Directors and Officers.**

The following is added to Section B., **DEFINITIONS**:

**Extradition** means any formal process by which any of the **Directors and Officers** located in any country is surrendered to any other country for trial or otherwise to answer any criminal accusation.

All other terms and conditions of this **Policy** remain unchanged.

| Underwritten by Scottsdale Insurance Company | ENDORSEMENT NO. 31 |
|---|---|

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKS3586644 | 8/29/2025 | BioQ Pharma Incorporated | 29406 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**FOREIGN CORRUPT PRACTICES ACT CIVIL PENALTIES COVERAGE**

This endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION**

It is agreed that Section B., **DEFINITIONS**, subsection 7.a., is deleted in its entirety, and replaced with the following:

a. taxes, fines or penalties, except civil penalties assessed against **Directors and Officers** pursuant to Section 2(g)(2)(B) of the Foreign Corrupt Practices Act;

All other terms and conditions of this **Policy** remain unchanged.

| Underwritten by Scottsdale Insurance Company | | | ENDORSEMENT NO. 32 |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3586644 | 8/29/2025 | BioQ Pharma Incorporated | 29406 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**HIPAA EXPENSES ENDORSEMENT**

In consideration of the premium paid, it is agreed that this endorsement modifies insurance provided under the following:

**FIDUCIARY COVERAGE SECTION**

I. Section B., **DEFINITIONS**, subsection 10., Loss, paragraph a. is deleted in its entirety and replaced with the following:

a. taxes, fines or penalties, other than any **HIPAA Expenses**;

II. Section B., **DEFINITIONS**, is amended to include the following:

- **HIPAA Expenses** means civil fines or penalties assessed against an **Insured** alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving any violation of the Health Insurance Portability and Accountability Act (Public Law 104-191), including any amendments to or regulations promulgated under any such law.

III. Section D., **LIMIT OF LIABILITY AND RETENTIONS**, subsection 2. is deleted in its entirety and replaced with the following:

2. The amount shown in Item 3. of the Declarations relating to this Coverage Section shall be the maximum aggregate Limit of Liability of **Insurer** under this Coverage Section; provided such maximum aggregate Limit of Liability shall include the below listed sub-limit amount for **HIPAA Expenses**. Such sub-limit amount for **HIPAA Expenses** shall be a part of and not in addition to the limit of liability set forth in Item 3. of the Declarations relating to this Coverage Section.

$250,000 sub-limit aggregate for all **HIPAA Expenses**

All other terms and conditions of this **Policy** remain unchanged.

| Underwritten by Scottsdale Insurance Company | | | ENDORSEMENT NO. 33 |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3586644 | 8/29/2025 | BioQ Pharma Incorporated | 29406 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**IRS SECTION 4975 COVERAGE**

This endorsement modifies insurance provided under the following:

**FIDUCIARY COVERAGE SECTION**

Section B., **DEFINITIONS**, subsection 10. subsection a. of the Fiduciary Coverage Section is deleted and replaced by the following:

a. taxes, fines or penalties other than penalties assessed against the **Insured** pursuant to Section 4975(a) of the internal Revenue Code of 1986; provided the **Company's** maximum limit of liability for all such tax penalties on account of all **Claims** first made during the **Policy Period** shall be $250,000, which amount is part of, and not in addition to, the maximum aggregate Limit of Liability set forth in Item 3. of the Declarations available for all **Claims** under this Coverage Section.

All other terms and conditions of this **Policy** remain unchanged.



Nationwide

| Underwritten by Scottsdale Insurance Company | | | ENDORSEMENT NO. 34 |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3586644 | 8/29/2025 | BioQ Pharma Incorporated | 29406 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**PATENT, COPYRIGHT, TRADEMARK EXCLUSION**

This endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION**

Under Section **C. EXCLUSIONS**, subsection **2.** Exclusions Applicable Only to Insuring Clause **A.3.** is amended by the deletion of paragraph **b.i.** in its entirety.

The following is added to **C. EXCLUSIONS**, subsection **1.** Exclusions Applicable to All Insuring Clauses:

**Insurer** shall not be liable for **Loss** on account of any **Claim**:

alleging, based upon, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving any actual or alleged infringement, misappropriation, or violation of copyright, patent, service marks, trade marks, trade secrets, title or other proprietary or licensing rights or intellectual property of any products, technologies or services.

All other terms and conditions of this Policy remain unchanged.



Nationwide

| Underwritten by Scottsdale Insurance Company | | | ENDORSEMENT NO. 35 |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3586644 | 8/29/2025 | BioQ Pharma Incorporated | 29406 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**PPACA CIVIL MONEY PENALTIES EXTENSION**

This endorsement modifies insurance provided under the following:

**FIDUCIARY COVERAGE SECTION**

It is agreed that the Fiduciary Coverage Section is amended as follows

1. Section B., **DEFINITIONS**, subsection 10.a. is deleted and replaced by the following:

   a. taxes, fines or penalties, other than civil money penalties imposed upon **Insureds** for a **PPACA Violation**;

2. Section B., **DEFINITIONS**, is amended to include the following:

   - **PPACA Violation** means an inadvertent violation of the Patient Protection and Affordable Care Act, as amended (PPACA), and any rules or regulations promulgated thereunder.

3. Section D., **LIMIT OF LIABILITY AND RETENTION**, subsection 2. is amended to include the following:

   - The amount set forth in Item 3.1. relating to this coverage section shall be amended to include the below listed sub-limit amounts. Such sub-limit amounts shall be a part of and not in addition to the limit of liability set forth in Item 3.1.of the Declarations.

     $250,000 sub-limit aggregate for all **PPACA Violation Loss**

   - No Retention shall apply to a **PPACA Violation Loss**.

All other terms and conditions of this **Policy** remain unchanged.

| Underwritten by Scottsdale Insurance Company | ENDORSEMENT NO. 36 |
|---|---|

| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
|---|---|---|---|
| EKS3586644 | 8/29/2025 | BioQ Pharma Incorporated | 29406 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**PROFESSIONAL SERVICES EXCLUSION - SECURITIES HOLDER EXCEPTION**

This endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION**

The following is added to Section **C. EXCLUSIONS**, paragraph **1.** Exclusions Applicable to All Insuring Clauses:

> **Insurer** shall not be liable for **Loss** under this Coverage Section on account of any **Claim** alleging, based upon, arising out of, attributable to, directly or indirectly resulting from, in consequence of, or in any way involving the rendering or failing to render professional services, provided, however, this exclusion shall not apply to any **Claim(s)** brought by a securities holder of the **Company** in their capacity as such.

**All other terms and conditions of this Policy remain unchanged.**

| Underwritten by Scottsdale Insurance Company | | | ENDORSEMENT NO. 37 |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3586644 | 8/29/2025 | BioQ Pharma Incorporated | 29406 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**REGULATORY AGENCY-COSTS, CHARGES AND EXPENSES SUBLIMIT ENDORSEMENT**

This endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION**

It is agreed that the Directors and Officers and Company Coverage Section is amended as follows.

Section B., **DEFINITIONS**, is amended to include the following:

- **Regulatory Agency** means any federal, state or municipal agency, or other governmental or quasi-governmental authority, or the office of any state or federal Attorney General, including, but not limited to the U.S. Department of Justice or any other governmental department; provided, however, **Regulatory Agency** shall not include the U.S. Securities and Exchange Commission or any similar state or local agency or division.

Section C., **EXCLUSIONS**, is amended to include the following:

- brought or maintained by, on behalf of, in the right of, or at the direction of any **Regulatory Agency**, whether in the right of such **Regulatory Agency** on behalf of an individual or entity, or by an individual or entity on behalf of such **Regulatory Agency**, provided however, this exclusion shall not apply to **Costs, Charges and Expenses** subject to the sublimit set forth below.

Section D., **LIMIT OF LIABILITY AND RETENTIONS**, subsection 2., is amended to include the following:

- The amount set forth in Item 3.1.a. relating to this Coverage Section shall be amended to include the below listed sub-limit amounts. Such sub-limit amounts shall be a part of and not in addition to the limit of liability set forth in Item 3.1.a. of the Declarations.

| | |
|---|---|
| $100,000 | sub-limit aggregate for all **Costs, Charges and Expenses** from all **Regulatory Agency Claims** |

All other terms and conditions of this **Policy** remain unchanged.

| Underwritten by Scottsdale Insurance Company | | | ENDORSEMENT NO. 38 |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3586644 | 8/29/2025 | BioQ Pharma Incorporated | 29406 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**REMOVAL OF ALTERNATIVE DISPUTE RESOLUTION PROVISION**

This endorsement modifies insurance provided under the following:

**GENERAL TERMS AND CONDITIONS**

Section **J. ALTERNATIVE DISPUTE RESOLUTION** is deleted in its entirety.

**All other terms and conditions of this Policy remain unchanged.**



Nationwide®

| Underwritten by Scottsdale Insurance Company | | | ENDORSEMENT NO. 39 |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3586644 | 8/29/2025 | BioQ Pharma Incorporated | 29406 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**SCIENTIFIC AND ADVISORY BOARD EXTENSION**

This endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION**

The following is added to Section **B. DEFINITIONS**, subsection **4.**:

**Directors and/or Officers** means any person who was, now is, or shall become:

a natural person member of the Scientific or Advisory Board of the **Company** (collectively "**Advisory Board Members**") that is indemnified by the **Company** pursuant to a written indemnification agreement. The **Company** agrees to indemnify the **Advisory Board Members** to the fullest extent permitted by law, taking all steps necessary or advisable in furtherance thereof, including the making in good faith of any application for court approval, the passing of any resolution by the board of directors or shareholders of the **Company**, the amendment of any charter, bylaws, operating agreement or similar documents of the **Company** or the execution of any contract. The **Company** further agrees to advance **Costs, Charges and Expenses** actually and reasonably incurred by any **Advisory Board Member** in defending any threatened, pending or contemplated action, suit or proceeding prior to a final disposition of any such action, suit or proceeding and shall not require any determination or adjudication, interim or final, of the entitlement of the **Advisory Board Member** to indemnification, where permitted by law to do so. The financial ability of any **Advisory Board Member** to make repayment shall not be a prerequisite to the making of such an advance, and the right to receive advancement of **Costs, Charges and Expenses** herein is a contractual right. The agreements contained in this paragraph are binding upon the **Company** and enforceable by the **Insurer** or the **Advisory Board Member**.

**All other terms and conditions of this Policy remain unchanged.**



Nationwide

| Underwritten by Scottsdale Insurance Company | | | ENDORSEMENT NO. 40 |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3586644 | 8/29/2025 | BioQ Pharma Incorporated | 29406 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**SETTLOR CAPACITY**

This endorsement modifies insurance provided under the following:

**FIDUCIARY COVERAGE SECTION**

It is agreed that the Fiduciary Coverage Section is amended as follows:

Section B., **DEFINITIONS**, Section 17.a. is amended by the addition of the following:

- any actual or alleged act, error or omission by an **Insured Persons** in a settlor capacity.

All other terms and conditions of this **Policy** remain unchanged.



Nationwide

| Underwritten by Scottsdale Insurance Company | | | ENDORSEMENT NO. 41 |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3586644 | 8/29/2025 | BioQ Pharma Incorporated | 29406 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**TOLLING OR WAIVING THE STATUTE OF LIMITATIONS**

This endorsement modifies insurance provided under the following:

**DIRECTORS AND OFFICERS AND COMPANY COVERAGE SECTION**

The following is added to Section B., **DEFINITIONS**, subsection 1.:

**Claim** means:

a written request received by the **Company** to toll or waive the statute of limitations regarding a potential **Claim**. Such **Claim** shall be commenced by the receipt of such request.

All other terms and conditions of this **Policy** remain unchanged.



Nationwide

| Underwritten by Scottsdale Insurance Company | | | ENDORSEMENT NO. 42 |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3586644 | 8/29/2025 | BioQ Pharma Incorporated | 29406 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**VOLUNTARY COMPLIANCE PROGRAM EXTENSION**

This endorsement modifies insurance provided under the following:

**FIDUCIARY COVERAGE SECTION**

Fiduciary Coverage Section of Item 3. of the Declarations is replaced by:

Fiduciary Coverage Section

1. Limit of Liability

   a. Limit of Liability $1,000,000 maximum aggregate for this Coverage Section

   b. Voluntary Compliance Loss and Delinquent Filers Penalties Sublimit of Liability $250,000

2. Retention: $2,500 each **Claim**

3. **Continuity Date**: 11/6/2014

4. Voluntary Compliance Program and Delinquent Filer Penalties Coverage Purchased: YES.

Section A., **INSURING CLAUSE,** of the Fiduciary Coverage Section is replaced by:

A. **INSURING CLAUSE**

1. **Insurer** shall pay the **Loss** of the **Insureds** which the **Insureds** have become legally obligated to pay by reason of a **Claim** first made against the **Insureds** during the **Policy Period** or, if elected, the **Extended Period**, and reported to the **Insurer** pursuant to subsection E.1. herein, for any **Wrongful Act** taking place prior to the end of the **Policy Period.**

2. If **Voluntary Compliance Program** and **Delinquent Filer Penalties** coverage is purchased pursuant to Item 3., Fiduciary Coverage Section, section 4. of the Declarations as amended in this endorsement, the **Insurer** shall pay **Delinquent Filer Penalties** assessed against an **Insured**, and **Voluntary Compliance Loss** of the **Insureds** relating to a **Voluntary Compliance Notice** first given to the **Insurer** during the **Policy Period** or, if elected, the **Extended Period**, and reported to the **Insurer** pursuant to subsection E.1. herein, for any **Wrongful Act** taking place prior to the end of the **Policy Period.**

Section B., **DEFINITIONS**, subsection 2. of the Fiduciary Coverage Section is replaced with:

2. **Claim** means:

   a. a written demand for damages or other relief against an **Insured**;

   b. a civil, administrative, regulatory or arbitration proceeding against any **Insured** seeking damages or other relief, commenced by the service of a complaint or similar pleading, including any appeal therefrom;

   c. a civil proceeding or formal investigation brought by the United States Department of Labor, the United States Pension Benefit Guaranty Corporation or any similar federal, state or local governmental body, including any appeal therefrom; or


Nationwide®

d. solely with respect to Insuring clause A.2, if purchased, a **Voluntary Compliance Notice**.

The following is added to Section B., **DEFINITIONS**:

**Delinquent Filer Penalties** means penalties assessed by the United States Department of Labor or the IRS under a Delinquent Filer **Voluntary Compliance Program** for inadvertent failure to file Form 5500, provided that the failure to file such Form 5500 occurred during the **Policy Period** or during the policy period of a policy issued by the **Insurer** of which this **Policy** is a continuous renewal thereof.

**Voluntary Compliance Loss** means fines, penalties, sanctions, voluntary correction fees, compliance fees or user fees assessed against or collected from an **Insured** by the United States Internal Revenue Service pursuant to a **Voluntary Compliance Program** for the actual or alleged inadvertent non-compliance by a **Plan** with any statute, rule or regulation if participation by the **Insured** in such **Voluntary Compliance Program** results in the **Insured** obtaining a "No Action" letter from the governmental authority; provided **Voluntary Compliance Loss** shall not include: (i) any costs to correct the non-compliance, or any other charges, expenses, taxes or damages; or (ii) any fees, fines, penalties, sanctions or **Costs, Charges and Expenses** relating to a **Plan** which, as of the earlier of inception of this **Policy** or inception of the first policy in an uninterrupted series of policies issued by the **Insurer** of which this **Policy** is a direct or indirect renewal or replacement, any **Insured Person** knew to be actually or allegedly non-compliant.

**Voluntary Compliance Notice** means prior written notice to the **Insurer** by the **Insured** of the **Insured's** intent to enter into a **Voluntary Compliance Program**.

**Voluntary Compliance Program** means a written agreement to correct an inadvertent **Plan** defect under a voluntary compliance resolution program or similar voluntary settlement program administered by the United States Internal Revenue Service, the United States Department of Labor or other similar governmental authority, including without limitation the Employee Plans Compliance Resolution System, the Audit Closing Agreement Program, the Voluntary Compliance Resolution Program, the Walk-in Closing Agreement Program, the Administrative Policy Regarding Self-Correction, the Tax Sheltered Annuity Voluntary Correction Program, the Delinquent Filer Voluntary Compliance Program, and the Voluntary Fiduciary Correction Program, provided that such agreement to correct such **Plan** defect was entered into in writing by the **Insured** with the United States Internal Revenue Service during the **Policy Period**, or during the policy period of a policy issued by the **Insurer** of which this **Policy** is a continuous renewal.

Section B., **DEFINITIONS**, subsection 10. of the Fiduciary Coverage Section is replaced with:

10. **Loss** means monetary damages, judgments, settlements, pre-judgment or post-judgment interest awarded by a court, and **Costs, Charges and Expenses** incurred by any of the **Insureds** and, solely with respect to Insuring Clause A.2., if purchased, **Voluntary Compliance Loss**, which the **Insured** becomes legally obligated to pay on account of any covered **Claim** for **Wrongful Acts** to which this **Policy** applies. **Loss** does not include:

    a. taxes, fines or penalties;

    b. matters uninsurable under the laws pursuant to which this **Policy** is construed; or

    c. punitive or exemplary damages, or the multiple portion of any multiplied damage award, except to the extent that such punitive or exemplary damages or the multiple portion of any multiplied damage award are insurable under the internal laws of any jurisdiction which most favors coverage for such damages and which has a substantial relationship to the **Insureds**, **Insurer**, this **Policy** or the **Claim** giving rise to such damages.

Section D., **LIMIT OF LIABILITY AND RETENTION**, subsection 2. is replaced by:

2. The amount shown in Item 3., Fiduciary Coverage Section, section 1., subsection a. of the Declarations as amended in this endorsement shall be the maximum aggregate Limit of Liability of the **Insurer** under this Coverage Section. However, if **Voluntary Compliance Program** coverage is purchased pursuant to Item 3., Fiduciary Coverage Section, section 4. of the Declarations as amended in this endorsement, the **Voluntary Compliance Loss** Sublimit of Liability set forth in Item 3., Fiduciary Coverage Section, section 1., subsection b. of the Declarations as amended in this endorsement is the maximum liability of the **Insurer** for all **Voluntary Compliance Loss** resulting from all **Voluntary Compliance Notices** first given to the **Insurer** in the **Policy Period.** Such **Voluntary Compliance Loss** Sublimit of Liability is part of, and not in addition to, the Aggregate Limit of Liability set forth in Item 3., Fiduciary Coverage Section, section 1., subsection a. of the Declarations as amended in this endorsement and in no way shall be deemed to increase the Aggregate Limit of Liability as set forth therein.

All other terms and conditions of this **Policy** remain unchanged.

| Underwritten by Scottsdale Insurance Company | | | ENDORSEMENT NO. 43 |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3586644 | 8/29/2025 | BioQ Pharma Incorporated | 29406 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**AMENDATORY ENDORSEMENT - CALIFORNIA**

Whenever the term AUTHORIZED REPRESENTATIVE appears beneath a signature line in this policy, it is removed and replaced by the term COUNTERSIGNATURE.

For example:

DATE AUTHORIZED REPRESENTATIVE

is replaced by:

DATE COUNTERSIGNATURE



Nationwide

| Underwritten by Scottsdale Insurance Company | | | ENDORSEMENT NO. 44 |
|---|---|---|---|
| ATTACHED TO AND FORMING A PART OF POLICY NUMBER | ENDORSEMENT EFFECTIVE DATE (12:01 A.M. STANDARD TIME) | NAMED INSURED | AGENT NO. |
| EKS3586644 | 8/29/2025 | BioQ Pharma Incorporated | 29406 |

THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

**SERVICE OF SUIT CLAUSE**

It is agreed that in the event of the failure of the Company to pay any amount claimed to be due under this policy, the Company, at the request of the Insured (or reinsured), will submit to the jurisdiction of any court of competent jurisdiction within the United States of America and will comply with all requirements necessary to give the court jurisdiction. All matters which arise will be determined in accordance with the law and practice of the court. In a suit instituted against it under this contract, the Company agrees to abide by the final decision of the court or of any appellate court in the event of an appeal. However, nothing in this endorsement constitutes a waiver of Company's right to remove an action to a United States District Court or to seek a transfer of a case to another court as permitted by the laws of the United States or of any state in the United States.

Pursuant to any statute of any state, territory or district of the United States of America which makes a provision therefor, the Company will designate the Superintendent, Commissioner or Director of Insurance or other officer specified for that purpose in the statute, or his successor or successors in office, as their true and lawful attorney upon whom may be served any lawful process in any action, suit, or proceeding instituted by or on behalf of the Insured (or reinsured) or any beneficiary arising out of this contract of insurance (or reinsurance).

The person named below is authorized and directed to accept service of process on behalf of the Company:

Commissioner of Insurance
300 Capitol Mall, 17th Floor
Sacramento, CA 95814

Having accepted service of process on behalf of the Company, the person designated above is authorized to mail the process or a true copy to:

CSC-Lawyers Incorporating Service
2710 Gateway Oaks Drive, Suite 150N
Sacramento, CA 95833-3505

Underwritten by Scottsdale Insurance Company

A Stock Insurance Company

# POLICYHOLDER DISCLOSURE
# NOTICE OF TERRORISM INSURANCE COVERAGE

## PREMIUM CHARGE FOR TERRORISM COVERAGE

### TERRORISM RISK INSURANCE ACT

You are hereby notified that the Terrorism Risk Insurance Act of 2002, as amended pursuant to the Terrorism Risk Insurance Program Reauthorization Act of 2019, effective January 1, 2021 (collectively referred to as "TRIA" or the "Act"), established a program within the Department of the Treasury under which the federal government shares, with the insurance industry, the risk of loss from future terrorist attacks. Under the Act, you have a right to purchase insurance coverage for losses arising out of acts of terrorism. As defined in Section 102(1) of the Act: The term "certified acts of terrorism" means any act that is certified by the Secretary of the Treasury -- in consultation with the Secretary of Homeland Security, and the Attorney General of the United States -- to be an act of terrorism; to be a violent act or an act that is dangerous to human life, property, or infrastructure; to have resulted in damage within the United States, or outside the United States in the case of certain air carriers or vessels or the premises of a United States mission; to have been committed by an individual or individuals as part of an effort to coerce the civilian population of the United States or to influence the policy or affect the conduct of the United States government by coercion.

### DISCLOSURE OF FEDERAL SHARE OF COMPENSATION

You should know that where coverage is provided by this policy for losses resulting from "certified acts of terrorism," such losses may be partially reimbursed by the United States government under a formula established by federal law. However, your policy may contain other exclusions which might affect your coverage, such as an exclusion for nuclear events. Under the formula, the United States government agrees to reimburse eighty percent (80%) of covered terrorism losses that exceed the statutorily established deductible paid by the insurance company providing the coverage. The premium charged for terrorism coverage is provided below and does not include any charges for the portion of loss that may be covered by the federal government under the Act.

### CAP ON LOSSES FROM "CERTIFIED ACTS OF TERRORISM"

You should also know that the Terrorism Risk Insurance Act, as amended, contains a $100 billion cap that limits United States government reimbursement as well as insurers' liability for losses resulting from "certified acts of terrorism" when the amount of such losses in any one calendar year exceeds $100 billion. If the aggregate insured losses for all insurers exceed $100 billion, your coverage may be reduced.

### CONDITIONAL TERRORISM COVERAGE

The Terrorism Risk Insurance Program Reauthorization Act of 2019 is scheduled to terminate at the end of December 31, 2027 unless renewed, extended or otherwise continued by the federal government. Should the Act terminate on December 31, 2027, or be repealed, any terrorism coverage as defined by the Act provided in the policy will also terminate.

### DISCLOSURE OF PREMIUM

In accordance with the Act, we are required to offer you coverage for losses resulting from an act of terrorism that is certified under TRIA as an act of terrorism. The policy's other provisions will still apply to such an act. We are further required to provide you with a notice disclosing the portion of your premium, if any, attributable to coverage for terrorist acts certified under the Terrorism Risk Insurance Act.

Your premium for certified terrorism coverage is **$634.00**. This amount does not include any charges for the portion of losses covered by the United States government under the Act.

**If you choose to accept this offer, this form does not have to be returned.**

**You may choose to reject this offer by signing the statement below and returning to us.** Your policy will be changed to exclude the described coverage.

**NOTE**: In this state, a terrorism exclusion makes an exception for (and thereby provides coverage for) fire losses resulting from a certified act of terrorism. Therefore, if you reject the offer of terrorism coverage, that rejection does not apply to fire losses resulting from a certified act of terrorism and coverage for such fire losses will be provided in your policy.

**REJECTION OF COVERAGE FOR "CERTIFIED ACTS OF TERRORISM"**

| | |
|---|---|
| | I hereby reject the purchase of certified terrorism coverage on behalf of the Policyholder/Applicant. I understand that the policy will provide no coverage for losses resulting from "certified acts of terrorism" (with the exception of fire losses resulting from a "certified act of terrorism"), and an exclusion of certain terrorism losses will be made part of this policy. |

| | |
|---|---|
| | BioQ Pharma Incorporated |
| Policyholder / Applicant's Signature* | Named Insured / Business Name |
| | EKS3586644 |
| Print Name* | Policy Number, if available |
| | |
| Date* | |

*If rejected, signature required & completed form must be returned to E-Risk Services. Please contact your broker with any questions.

# EXHIBIT 2

SUM-100

# SUMMONS
## *(CITACION JUDICIAL)*

FOR COURT USE ONLY
*(SOLO PARA USO DE LA CORTE)*

**NOTICE TO DEFENDANT:**
***(AVISO AL DEMANDADO):***
JOSHUA KRIESEL, an individual; JOHN IANNUCCILLO, individually and as Trustee of the Iannuccillo Family Trust; Additional Parties Attachment form is attached

**YOU ARE BEING SUED BY PLAINTIFF:**
***(LO ESTÁ DEMANDANDO EL DEMANDANTE):***
MADRYN HEALTH PARTNERS, LP, and MADRYN HEALTH PARTNERS, derivatively on behalf of BioQ Pharma, Incorporated; Additional Parties Attachment form is attached

NOTICE! You have been sued. The court may decide against you without your being heard unless you respond within 30 days. Read the information below.

You have 30 CALENDAR DAYS after this summons and legal papers are served on you to file a written response at this court and have a copy served on the plaintiff. A letter or phone call will not protect you. Your written response must be in proper legal form if you want the court to hear your case. There may be a court form that you can use for your response. You can find these court forms and more information at the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), your county law library, or the courthouse nearest you. If you cannot pay the filing fee, ask the court clerk for a fee waiver form. If you do not file your response on time, you may lose the case by default, and your wages, money, and property may be taken without further warning from the court.

There are other legal requirements. You may want to call an attorney right away. If you do not know an attorney, you may want to call an attorney referral service. If you cannot afford an attorney, you may be eligible for free legal services from a nonprofit legal services program. You can locate these nonprofit groups at the California Legal Services Web site (*www.lawhelpcalifornia.org*), the California Courts Online Self-Help Center (*www.courtinfo.ca.gov/selfhelp*), or by contacting your local court or county bar association. **NOTE:** The court has a statutory lien for waived fees and costs on any settlement or arbitration award of $10,000 or more in a civil case. The court's lien must be paid before the court will dismiss the case.

***¡AVISO!*** *Lo han demandado. Si no responde dentro de 30 días, la corte puede decidir en su contra sin escuchar su versión. Lea la información a continuación.*

*Tiene 30 DÍAS DE CALENDARIO después de que le entreguen esta citación y papeles legales para presentar una respuesta por escrito en esta corte y hacer que se entregue una copia al demandante. Una carta o una llamada telefónica no lo protegen. Su respuesta por escrito tiene que estar en formato legal correcto si desea que procesen su caso en la corte. Es posible que haya un formulario que usted pueda usar para su respuesta. Puede encontrar estos formularios de la corte y más información en el Centro de Ayuda de las Cortes de California (www.sucorte.ca.gov), en la biblioteca de leyes de su condado o en la corte que le quede más cerca. Si no puede pagar la cuota de presentación, pida al secretario de la corte que le dé un formulario de exención de pago de cuotas. Si no presenta su respuesta a tiempo, puede perder el caso por incumplimiento y la corte le podrá quitar su sueldo, dinero y bienes sin más advertencia.*

*Hay otros requisitos legales. Es recomendable que llame a un abogado inmediatamente. Si no conoce a un abogado, puede llamar a un servicio de remisión a abogados. Si no puede pagar a un abogado, es posible que cumpla con los requisitos para obtener servicios legales gratuitos de un programa de servicios legales sin fines de lucro. Puede encontrar estos grupos sin fines de lucro en el sitio web de California Legal Services, (www.lawhelpcalifornia.org), en el Centro de Ayuda de las Cortes de California, (www.sucorte.ca.gov) o poniéndose en contacto con la corte o el colegio de abogados locales. AVISO: Por ley, la corte tiene derecho a reclamar las cuotas y los costos exentos por imponer un gravamen sobre cualquier recuperación de $10,000 ó más de valor recibida mediante un acuerdo o una concesión de arbitraje en un caso de derecho civil. Tiene que pagar el gravamen de la corte antes de que la corte pueda desechar el caso.*

The name and address of the court is:
*(El nombre y dirección de la corte es):* Superior Court of California, County of San Francisco, Civic Center Courthouse, 400 McAllister Street, San Fransisco, CA 94102

CASE NUMBER:
*(Número del Caso):*
**CGC-26-638583**

The name, address, and telephone number of plaintiff's attorney, or plaintiff without an attorney, is:
*(El nombre, la dirección y el número de teléfono del abogado del demandante, o del demandante que no tiene abogado, es):*

DATE: *(Fecha)* **07/27/2026** Clerk, by *(Secretario)* **ERNALYN BURA**, Deputy *(Adjunto)*

*(For proof of service of this summons, use* Proof of Service of Summons *(form POS-010).)*
*(Para prueba de entrega de esta citatión use el formulario* Proof of Service of Summons, *(POS-010)).*

[SEAL]

SUPERIOR COURT OF CALIFORNIA COUNTY OF SAN FRANCISCO EUREKA

**NOTICE TO THE PERSON SERVED:** You are served
1. ☐ as an individual defendant.
2. ☐ as the person sued under the fictitious name of *(specify):*
3. ☐ on behalf of *(specify):*

under: ☐ CCP 416.10 (corporation) ☐ CCP 416.60 (minor)
☐ CCP 416.20 (defunct corporation) ☐ CCP 416.70 (conservatee)
☐ CCP 416.40 (association or partnership) ☐ CCP 416.90 (authorized person)
☐ other *(specify):*

4. ☐ by personal delivery on *(date)*:

SUM-200(A)

| SHORT TITLE: MADRYN HEALTH PARTNERS v. JOSHUA KRIESEL, et al. | CASE NUMBER: |
|---|---|

**INSTRUCTIONS FOR USE**

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.)*:

[x] Plaintiff [ ] Defendant [ ] Cross-Complainant [ ] Cross-Defendant

and MADRYN HEALTH PARTNERS, LP, MADRYN HEALTH PARTNERS (CAYMAN MASTER), LP, MADRYN FUND ADMINISTRATION, LLC, MADRYN BIOQ SPV, LLC, and MADRYN ASSET MANAGEMENT, LP., directly as creditors



Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

**SUM-200(A)**

| SHORT TITLE: MADRYN HEALTH PARTNERS v. JOSHUA KRIESEL, et al. | CASE NUMBER: |
|---|---|

**INSTRUCTIONS FOR USE**

→ This form may be used as an attachment to any summons if space does not permit the listing of all parties on the summons.

→ If this attachment is used, insert the following statement in the plaintiff or defendant box on the summons: "Additional Parties Attachment form is attached."

**List additional parties** *(Check only one box. Use a separate page for each type of party.)*:

☐ Plaintiff ☒ Defendant ☐ Cross-Complainant ☐ Cross-Defendant

LLEW KELTNER, an individual; MARK EHLERT, an individual; DANIEL TASSE, an individual; MARIJN DEKKERS, an individual; RICHARD NESBIT, an individual; BILL JASPER, an individual, and Does 1 through 100, inclusive

Individual Defendants; and

BIOQ PHARMA, INCORPORATED, a California corporation

Nominal Defendant.



Form Adopted for Mandatory Use
Judicial Council of California
SUM-200(A) [Rev. January 1, 2007]

**ADDITIONAL PARTIES ATTACHMENT**
**Attachment to Summons**

**MCGUIREWOODS LLP**
Nicholas J. Hoffman (SBN #284472)
nhoffman@mcguirewoods.com
1800 Century Park East, 7th Floor
Los Angeles, CA 90067
Telephone: 310.315.8200
Fax: 310.315.8210

Attorney for Plaintiffs

ELECTRONICALLY
**FILED**
*Superior Court of California,*
*County of San Francisco*
**06/23/2026**
**Clerk of the Court**
**BY: ERNALYN BURA**
**Deputy Clerk**

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF SAN FRANCISCO**

**CGC-26-638583**

MADRYN HEALTH PARTNERS, LP, and MADRYN HEALTH PARTNERS (CAYMAN MASTER), LP, derivatively on behalf of BioQ Pharma, Incorporated, and MADRYN HEALTH PARTNERS, LP, MADRYN HEALTH PARTNERS (CAYMAN MASTER), LP, MADRYN FUND ADMINISTRATION, LLC, MADRYN BIOQ SPV, LLC, and MADRYN ASSET MANAGEMENT, LP., directly as creditors.

Plaintiffs,

vs.

JOSHUA KRIESEL, an individual; JOHN IANNUCCILLO, individually and as Trustee of the Iannuccillo Family Trust, LLEW KELTNER, an individual; MARK EHLERT, an individual; DANIEL TASSE, an individual; MARIJN DEKKERS, an individual; RICHARD NESBIT, an individual; BILL JASPER, an individual, and Does 1 through 100, inclusive

Individual Defendants; and

BIOQ PHARMA, INCORPORATED, a California corporation

Nominal Defendant.

CASE NO.______________

**COMPLAINT FOR:**

1) **BREACH OF FIDUCIARY DUTY**
2) **AIDING AND ABETTING BREACH OF FIDUCIARY DUTY**
3) **WASTE OF CORPORATE ASSETS**
4) **TORTIOUS INTERFERENCE WITH CONTRACT**
5) **TORTIOUS INTERFERENCE WITH PROSPECTIVE ECONOMIC ADVANTAGE**
6) **BREACH OF FIDUCIARY DUTY**

**REDACTED**

This suit arises from a business relationship between entities affiliated with Madryn, an investment firm, and individuals and entities affiliated with a pharmaceutical company in which they invested. Plaintiffs Madryn Health Partners, LP and Madryn Health Partners (Cayman Master), LP, derivatively in their capacity as shareholders, bring shareholder claims on behalf of BioQ Pharma, Inc. ("BioQ"), a California Corporation. Plaintiffs Madryn Health Partners, LP and Madryn Health Partners (Cayman Master), LP, Madryn Fund Administration, LLC, Madryn BioQ SPV, LLC, and Madryn Asset Management, LP (collectively with Madryn Health Partners, LP and Madryn Health Partners (Cayman Master), LP, "Madryn") bring direct claims. The claims are brought against individual defendants Joshua Kriesel, John Iannuccillo, Llew Keltner, Mark Ehlert, Daniel Tasse, Marijn Dekkers, Richard Nesbit, Bill Jasper, and Does 1 through 100, inclusive (collectively, "Individual Defendants"), as well as BioQ ("Nominal Defendant", and collectively with Individual Defendants, "Defendants"). Madryn alleges as follows:

## I. NATURE AND SUMMARY OF THE ACTION

1. Madryn is both a shareholder and creditor of BioQ Pharma, Incorporated ("BioQ").

2. Madryn, in its shareholder capacity, brings this derivative shareholder suit on behalf of BioQ and against Individual Defendants to remedy their pattern of gross mismanagement, corporate waste, and blatant disregard of fiduciary duties owed to BioQ. Madryn brings Counts 1-3 in its capacity as a shareholder of BioQ.

3. Madryn also brings suit in its capacity as a creditor against Individual Defendants for tortious interference with Madryn's contract and economic advantage with BioQ, as well as breaches of fiduciary duty owed to Madryn as a creditor. Madryn brings Counts 4-6 in its capacity as a creditor of BioQ.

4. BioQ is a specialty pharmaceutical company focused on developing and commercializing a portfolio of ready-to-use infusible pharmaceuticals. In 2017, Madryn entered into a Credit Agreement with BioQ, pursuant to which Madryn became a secured creditor and shareholder of BioQ. At that time, BioQ was positioned for growth. It had valuable technology, market opportunity, and a corporate structure to protect shareholder interests, at least on paper.

5. That promise was derailed by the Individual Defendants, led by defendant Joshua Kriesel, BioQ's Chief Executive Officer, President, and Chairman of BioQ's Board of Directors (the "Board"). Kriesel engaged in a campaign of coordinated misconduct with John Iannuccillo, to intentionally neutralize oversight, disregard corporate formalities, and sideline members of the duly appointed Board to interfere with Madryn's rights. Kriesel improperly elevated Iannuccillo, who was a non-director shareholder, to a *de facto* member of BioQ's Board, granting him undue influence over corporate governance while intentionally sidelining duly appointed members of BioQ's Board, Madryn officers Avinash Amin and James Bauersmith (the "Madryn-affiliated Board Members").

6. Other members of the Board, defendants Llew Keltner, Mark Ehlert, Daniel Tasse, Marijn Dekkers, Richard Nesbit, and Bill Jasper, actively enabled and even encouraged Kriesel's pattern of misconduct for far too long. By February 2024, the situation grew dire. At that time, Madryn attempted to offer BioQ a lifeboat. The Madryn-affiliated Board Members presented the rest of the Board with a restructuring solution that would have converted $25 million of BioQ's outstanding debt into equity—reducing BioQ's debt by more than half—and raised $20 million in new capital, thereby eliminating BioQ's most significant obstacle to attracting outside investment. Individual Defendants all knew Madryn's proposal would be beneficial to BioQ as a company; but that benefit to the company did not fully align with benefits to Individual Defendants' personal pocketbooks.

7. Rather than engage in good faith with the proposal, Kriesel—encouraged by Iannuccillo and the non-Madryn members of the Board—decided to act purely in his own self-interest. He refused to hold a formal Board meeting to vote on Madryn's proposal, secretly lobbied other individuals to oppose it, and advanced an illusory alternative plan with no terms, no committed investors, and no mechanism to address BioQ's significant outstanding debt. Kriesel's alternative plan was objectively unreasonable and, predictably, failed.

8. Four members of the Board—defendants Mark Ehlert, Daniel Tasse, Marijn Dekkers, and Richard Nesbit—ended up resigning in June 2024, while finally acknowledging Kriesel's failure to comply with Board directives, his failure to keep the Board informed, and the undue influence of non-director shareholders. In other words, they finally acknowledged the

misconduct they had actively enabled prior to their resignations. Ehlert, however, later retracted his resignation and rejoined the Board.

9. The Board resignations that actively called out Kriesel's selfish malfeasance did not deter him or the ongoing conspiracy among the Individual Defendants. After the June 2024 resignations, Kriesel simply continued his course of misconduct and commercial unreasonableness. He ignored the Board's directive to raise capital on specified timelines and refused to share pertinent financial information necessary for the Board to strategically evaluate a path forward for BioQ.

10. In September 2024, Kriesel advanced yet another illusory solution, promising a recapitalization through an unnamed "outside" investor from the United Arab Emirates. Despite repeated requests, Madryn-affiliated Board Members were never provided the identity of the investor and received only a redacted version of the resulting Memorandum of Understanding. That investment never materialized. Nor could the Board, including Madryn-affiliated Board Members in particular, properly consider the alleged plan since the necessary information was never provided. And shortly before filing this Complaint, Madryn learned that Kriesel himself was a co-founder of the very same company he held out to be an "outside" investor. Individual Defendants, including the non-Madryn Board Members, hid this from Madryn.

11. Despite having two seats on BioQ's Board until their resignations in January 2026, Madryn was intentionally excluded from any Board meetings and did not receive any Board minutes over the last two years, in direct violation of BioQ and Madryn contracts and mandatory corporate governance. Kriesel and his inner circle operated BioQ without regard to any semblance of reasonable corporate governance, and in doing so, ran a once-promising pharmaceutical company into the ground because they put their own interests ahead of BioQ and its shareholders.

12. Even more recently, Kriesel's continued gross negligence and misconduct led to BioQ's Australian subsidiary being deregistered, resulting in the loss of valuable foreign assets. All the while, defendants Keltner and Ehlert, who remain on BioQ's Board, continue to ratify and enable Kriesel's misconduct to this day.

13. Individual Defendants' pattern of misconduct has inflicted substantial financial and reputational harm on BioQ, depleted its assets, and undermined shareholder value. Through its

derivative claims, Madryn seeks to vindicate BioQ's rights, recover losses caused by Individual Defendants' intentional misconduct and gross negligence, and restore corporate governance to protect BioQ from further abuse.

14. At all times, Individual Defendants acted in concert and in their own self-interest, not in BioQ's best interest, in refusing to work with Madryn in Madryn's attempts to exercise its creditor rights in a manner that was mutually beneficial to BioQ. Madryn's proposals were beneficial to BioQ as a corporation and its shareholders, but would dilute Individual Defendants' equity in the company, so Individual Defendants conspired to frustrate Madryn through a coordinated pattern of misconduct designed to preserve their personal stakes at BioQ's expense.

15. Individual Defendants' coordinated pattern of misconduct interfered with duties owed to Madryn as a creditor. Individual Defendants conspired to do all they could to interfere with Madryn's contractual rights as a creditor, with each defendant playing a specific role in the scheme: Kriesel leading the effort and giving it the imprimatur of legitimacy, Iannuccillo providing direction and financial support, Keltner and Ehlert ratifying Kriesel's conduct, and the other Board members intentionally enabling the misconduct—causing severe damages to Madryn.

16. While Madryn tried to assist BioQ for years, Individual Defendants, led by Kriesel and Iannuccillo, let the company fail through gross mismanagement aimed not at maximizing shareholder value, but solely to preserve their personal equity stakes and to frustrate Madryn. Individual Defendants knew that Madryn's proposals would benefit BioQ and its shareholders as a whole, but because those proposals would dilute their own holdings, they chose to sacrifice the company rather than accept any reduction in their personal ownership. No reasonable fiduciary acting in good faith could have believed that rejecting Madryn's restructuring—which would have cut BioQ's debt by more than half and raised $20 million in new capital—in favor of illusory plans with no committed investors and no mechanism to address BioQ's crushing debt served any legitimate corporate purpose.

## II. PARTIES

17. Plaintiffs Madryn Health Partners, LP and Madryn Health Partners (Cayman Master) LP were shareholders of BioQ at the time of the wrongdoing complained of, have continuously been

shareholders since that time, and are currently BioQ shareholders.

18. Madryn, through the various entities forming it, is also a creditor of BioQ.

19. BioQ is a California corporation with its principal place of business at 1325 Howard St., San Francisco, California 94103.

20. At all relevant times, Defendant Joshua Kriesel was the Co-Founder, Chief Executive Officer, President, and Chairman of the Board of Directors of BioQ. Kriesel resides in San Francisco, California.

21. At all relevant times, Defendant Llew Keltner was a Director on BioQ's Board. Keltner resides in Oregon.

22. At all relevant times, Defendant Mark Ehlert was a Director on BioQ's Board. Ehlert resides in Michigan.

23. Defendant Daniel Tasse was a Director on BioQ's Board until June 24, 2024. Tasse resides in New Jersey.

24. Defendant Marijn Dekkers was a Director on BioQ's Board until June 24, 2024. On information and belief, Dekkers resides in New Hampshire.

25. Defendant Richard Nesbit was a Director on BioQ's Board until June 26, 2024. Nesbit resides in San Francisco, California.

26. At all relevant times, Defendant Bill Jasper was a Director on BioQ's Board. Jasper resides in Sonoma, California.

27. Pursuant to a California Statement of Information for Corporation, each Director's "Director Address" was 1325 Howard Street, San Francisco, California, 94103.

28. Defendant John Iannuccillo is a substantial shareholder in BioQ and resides in San Francisco, California.[1]

29. Madryn does not know the true names of defendants sued in this action as Does 1 through 100, inclusive. Madryn is informed and believes and thereon alleges that Does 1 through

[1] On information and belief, Iannuccillo is a shareholder of BioQ through a family trust of which he is Trustee. Madryn will amend this complaint if not.

100 are in some manner responsible for the acts, occurrences, and transactions set forth herein and are legally liable to Madryn. Madryn will seek leave to amend this Complaint to set forth the true names and capacities of these fictitiously named defendants, together with appropriate allegations, when ascertained.

30. Each of the Individual Defendants herein was the agent of each of the remaining Defendants, and in engaging in the acts hereinafter alleged, each was acting in the course and scope of said agency with advance knowledge of, acquiescence in, or subsequent ratification of the acts of each and every other remaining Defendant.

## III. JURISDICTION AND VENUE

31. This Court has jurisdiction over all causes of action asserted herein pursuant to the California Constitution, Article VI, §10. This case also includes causes not given by statute to other trial courts, as it contains derivative actions brought pursuant to Section 800 of the California Corporations Code to remedy Defendants' violation of the law. The amount in controversy, exclusive of interests and costs, exceeds the jurisdictional minimum of this Court.

32. This Court has general jurisdiction over each named defendant who is a resident of California. Additionally, this Court has specific jurisdiction over each named nonresident defendant because these defendants maintain sufficient minimum contacts with California to render jurisdiction by this Court permissible.

33. BioQ is headquartered in California, and because many of the allegations contained herein are brought derivatively on behalf of BioQ, and the allegations supporting Madryn's creditor claims occurred in California, Defendants' conduct was purposefully directed at California. Exercising jurisdiction over any nonresident defendant is reasonable under these circumstances.

34. San Francisco County, in which this Court is located, is the proper venue for this action pursuant to Cal. Civ. Pro. §§ 395(a) and 395.5 because a substantial portion of the transactions and wrongs complained of herein, including Defendants' primary participation in the wrongful acts detailed herein and aiding and abetting and conspiracy in violation of fiduciary duties owed to BioQ occurred in this County, and Defendants have received substantial compensation in this County by doing business here and engaging in numerous activities that had an effect in this County.

## IV. FACTS

35. Madryn re-alleges and incorporates by reference the allegations set forth above as though fully restated herein.

36. Madryn is a leading alternative asset management firm that invests in innovative healthcare companies specializing in unique and transformative products, technologies, and services. The firm draws on its extensive and diverse experience spanning the investment management and healthcare industries, and employs an independent research process based on original insights to target economic opportunities that deliver strong risk-adjusted and absolute returns for its limited partners while creating long-term value in support of its portfolio companies.

37. BioQ is a specialty pharmaceutical company which focuses on developing and commercializing a portfolio of ready-to-use infusible pharmaceuticals that work to minimize medication errors and dispensing systems dosing capabilities.

### Background of Madryn and BioQ's Relationship

38. On or about August 9, 2017, Madryn entered into a credit agreement with BioQ (the "Credit Agreement").[2] As part of the Credit Agreement, Madryn loaned BioQ an initial $25 million.

39. Through the Credit Agreement, Madryn became a shareholder of BioQ at the same time.

40. BioQ committed myriad events of default within two years of the Credit Agreement, and has been in default since November 14, 2019. No Defendant has ever disputed BioQ's numerous defaults.

41. Madryn attempted in good faith to work with BioQ regarding BioQ's defaults, and, between December 30, 2021 and December 15, 2023, the parties subsequently entered into *sixteen* amended and restated forbearance agreements.

---

[2] The Credit Agreement is attached as **Exhibit A**.

42. In each of those amended and restated forbearance agreements, BioQ acknowledged and agreed that it committed various events of default. At that time, BioQ was in dire financial straits.

43. Time and again, Madryn agreed to forbear from exercising its validly contracted rights and remedies under the Credit Agreement to provide BioQ an opportunity to obtain additional cash flow or consummate a consolidation or merger with any other entity to rectify the increasing indebtedness of BioQ. At any rate, BioQ continued to fail to meet its obligations resulting in the occurrence of additional events of default and accumulation of nearly $30 million in interest.

44. But Madryn had no interest in seeing BioQ fail just to recover that debt. Rather, Madryn set out to find a mutually beneficial manner to assist BioQ re-emerge as a leader in its sector.

45. On or about September 12, 2023, BioQ amended its bylaws to increase the size of its Board of Directors by two. Madryn-affiliated Board Members joined BioQ's Board of Directors.

46. BioQ's Board at the time comprised of the Madryn-affiliated Board Members, as well as defendants Kriesel, Tasse, Keltner, Dekkers, Ehlert, Nesbit, and Jasper.

**Madryn's Attempt to Save BioQ**

47. As of January 2024, BioQ owed Madryn more than $50 million.

48. On January 16, 2024, the forbearance period agreed to in the Sixteenth Amended and Restated Forbearance Agreement expired, and after BioQ had defaulted on various independent terms of that agreement, Madryn began exploring alternative options to assist BioQ raise money to pay Madryn back, which was a necessary predicate to put the company back on its feet. Madryn knew at that point, as would any commercially reasonable actor, that absent a material change in BioQ's financial outlook, it would have to foreclose on the collateral pursuant to the Credit Agreement.

49. That said, Madryn, in a showing of good faith, continued to financially assist BioQ by providing two emergency loans on January 25, 2024, and February 1, 2024, respectively, to cover payroll and other necessary expenses.

50. On February 17, 2024, Madryn formally presented BioQ's Board a Restructuring Support Agreement ("RSA") that, if accepted, would have allowed BioQ to cure its defaults, relieve a significant portion of its debt to Madryn, and obtain working capital to operate its business and generate cash flow rather than relying on the goodwill of certain investors to fund its payroll.

51. In presenting the RSA and subsequent Board decisions concerning it, Madryn made clear that it would not allow its officers on the Board to vote on the RSA or otherwise influence the Board by undue means. In other words, Madryn presented the RSA in good faith and as the best option to assist BioQ regain momentum towards its once promising outlook.

52. Specifically, the RSA proposed that Madryn convert $25 million of BioQ's debt into new class A shares with a 2x liquidation preference, which would have reduced BioQ's outstanding debt under the Credit Agreement in half. Then, BioQ would sell $20 million in additional class A shares to raise new capital. For every dollar of class A shares acquired by conversion or by purchase, existing investors would receive a 10% (10 cents) "pull up" through which that amount of their existing capital would be converted to new class A shares. Moreover, for every additional dollar existing investors purchased in class A shares, they would also be permitted to convert an equivalent amount of their legacy equity into new class B shares (which would be paid out after class A shares).

53. If the RSA had been accepted, BioQ's debt would have been reduced by $25 million (more than half of its then-existing outstanding balance) and would have resulted in Madryn owning 44% to 90% of BioQ, with new investors entitled to take up to 46% and 10% of BioQ's ownership reserved for existing investors. Critically, with BioQ's substantial debt cut by more than half, the RSA would have eliminated what all parties acknowledged was BioQ's biggest obstacle to raising new capital.

54. In proposing the RSA, the Madryn-affiliated Board Members made clear to Defendants that Madryn was offering an equitable lifeline that would benefit BioQ's shareholders in the present and in the future by eliminating BioQ's largest obstacle to proceeding forward as a viable business by reducing the debt owed to Madryn as a creditor.

55. Any commercially reasonable actor understood that Madryn's plan would be beneficial to BioQ and its shareholders. And in lieu of any other viable plan, it was the *only* beneficial path forward to BioQ and its shareholders.

**Kriesel's Alleged Alternate Plan**

56. Kriesel and the rest of the Individual Defendants realized that while Madryn's proposal was the only offer on the table that benefitted BioQ and its shareholders, it required a dilution of their personal equity. Rather than fulfill their fiduciary duties by accepting the only viable path forward for BioQ, they conspired to act in their own interests, coordinating their efforts to reject Madryn's proposal and advance illusory alternatives that would preserve their equity positions. Individual Defendants' conduct was not motivated by any good-faith belief that their alternative plans would benefit BioQ—they knew those plans were commercially unreasonable and destined to fail—but solely by their desire to avoid personal financial loss, even at the cost of BioQ's survival.

57. Rather than engage in good faith on the proposed RSA, the only viable framework for getting BioQ back on its feet, Kriesel refused to hold a formal Board meeting to vote on the RSA while he simultaneously lobbied insider investors to oppose the RSA. He implored certain investors to join him in support of a plan to raise capital from outside investors. Kriesel's plan, at the time, had no terms and no outside investors. And of course, the prospect of attaining an investment of the size required was nil, given BioQ's financial status.

58. On March 11, 2024, Kriesel formally presented the Board with the concept of an alternative restructuring plan (the "Insider Plan") that proposed to raise $20 million in new capital by June 2024, with terms focused primarily on preserving the equity and liquidation priority of legacy investors, including several of the Individual Defendants.

59. If the Insider Plan were viable, Madryn would have had no qualms with supporting it.

60. But as the Madryn-affiliated Board Members made clear to the rest of the Board at the time, the Insider Plan was not a good faith plan at all. It made no effort to restructure BioQ's

approximately $50 million of debt owed to Madryn, meaning it would be impossible to raise capital at any meaningful level from new or current investors.

61. Among other limited shareholders, Iannuccillo supported Kriesel's plan and, on information and belief, influenced its formulation. Iannuccillo and a group of other substantial investors signed form letters to BioQ's Board, urging it to reject Madryn's RSA in favor of the Insider Plan.

62. The Insider Plan's hopelessness was underscored by those very letters that were presented *in support* of that very plan. In those letters, each investor acknowledged that "a large incremental bolus of capital from insiders, *absent bona fide commitments from new investors*, would be an unwise investment decision."

63. In other words, even those few shareholders supporting the Insider Plan stated they would not participate without substantial capital commitments from outside investors. New investors would not commit to investing substantial capital without a substantial restructuring of BioQ's outstanding debt owed to Madryn, and the Insider Plan did not accomplish that. Even Iannuccillo, who purported to assist Kriesel in carrying out his doomed plan, signed a letter revealing the plan for what it was: just another attempt to frustrate Madryn's attempt at charting a beneficial path forward to all of BioQ's shareholders.

64. Kriesel's Insider Plan was doomed from the start. Nonetheless, BioQ's Board elected to give Kriesel a chance to make good on his promise to raise $20 million in new capital by June 2024. Outnumbered and willing to be proven wrong, the Madryn-affiliated Board Members, in good faith, agreed to allow Kriesel to try to obtain the promised outside capital.

**June 2024 Board Meeting and Ensuing Board Resignations**

65. Predictably, Kriesel did not raise the promised $20 million in new capital by June 2024.

66. On June 19, 2024, BioQ's Board convened to address the dire financial circumstances of the company and Kriesel's failure to raise any new capital or face the reality of BioQ's situation. For his part, Kriesel failed to present any meaningful new plan.

67. Per Board Minutes, "it was agreed by the Board that the company" was in dire financial straits. The only present funding for BioQ was "a group of current investors [that] are providing funding, on occasion and in small amounts, to meet employee payroll and payment of insurance premiums." In other words, BioQ's viability as a going business was entirely dependent on the goodwill of existing investors who had no commitments to fund any amounts to the company.

68. Those sustenance payments were made by a small faction of investors, including, but not limited to, Iannuccillo, who was then repaid with increased influence over Kriesel and governance over BioQ.

69. On information and belief, Kriesel and Iannuccillo agreed to prevent the Board from even considering—much less adopting—the only economically viable plan to save BioQ, not because they believed an alternative would better serve BioQ, but simply because Madryn's proposal would dilute their personal equity stakes. Their conduct was motivated entirely by self-interest and had no conceivable benefit to BioQ or its other shareholders.

70. The Board nonetheless voted to give Kriesel a last chance, directing him to raise $2.5 million in two weeks, use the funds to pay expenses and negotiate with Madryn in its capacity as a creditor, and raise $20 million additional in sixty days. If Kriesel failed to achieve either goal, the Board voted, BioQ was to secure the best negotiated restructuring of Madryn's debt.

71. That vote passed 5-3.[3] Taking away Kriesel and the Madryn-affiliated Board Members, the vote still passed 3-2.

72. Yet Kriesel willfully ignored the Board's imperative, failed to send any pertinent financial information necessary for the Board to evaluate restructuring plans, challenged the validity of the Board's actions, and took no steps towards achieving either goal.

73. Following the June 19, 2024 Board meeting, and as a direct reflection of Kriesel's improper response to the Board's vote, four Board members sent resignation letters—each complaining that Kriesel ignored a directive from the Board, failed to secure new capital or address

[3] Board member Bill Jasper was not present.

BioQ's significant outstanding debt owed to Madryn, was giving undue influence to insider investors, and failed to deliver information necessary for the Board members to comply with their fiduciary duties.

74. On June 24, 2024, Daniel Tasse submitted a resignation letter stating that "BioQ is insolvent and needs capital to operate. The CEO has not been successful in raising capital." Tasse's letter expressed extreme frustration that instead of "outlin[ing] [his] plan for raising capital . . . [Kriesel] invest[ed] time to debate whether the vote was binding and ask[ed] for legal advice on that matter, assuming that would be a good use of our very limited resources." Tasse also expressed skepticism at Kriesel allowing non-board members like Iannuccillo to influence Board decisions because "[t]hey ask the Board to rebuff [Madryn's] RSA although the final decision will belong to them" and the rest of the shareholders. Kriesel's failed leadership, according to Tasse, put "BioQ . . . at an impasse [he could not] help resolving."

75. The same day, Marijn Dekkers resigned as well. He noted BioQ's insolvency and lack of a viable way to emerge from that state due to Kriesel's obstinance as the reason for his resignation. Dekkers detailed his support of the resolution approved at the June 19, 2024 meeting that "would allow the board to do a constructive evaluation of various alternatives including 1) secure capital from inside and outside investors so that BioQ can fund itself independently of Madryn, 2) negotiate the best Madryn RSA possible, and 3) explore the scenario of bankruptcy." But he noted that the evaluation was impossible because "various insider investors" were "not willing to fund BioQ to allow for this constructive evaluation, including the funds required for the board to hire appropriate legal and restructuring counsel." Dekkers asserted no choice but to "conclude that [he] can no longer fulfill [his] fiduciary responsibilities as a BioQ board member," given that Kriesel and the insider investors' opacity precluded him from having the requisite information needed to recommend the best outcome for all BioQ shareholders.

76. On June 25, 2024, Mark Ehlert, one of Kriesel's closest allies after 15 years on the Board, sent a letter that acknowledged Kriesel's malfeasance as CEO and led him to accept that "the future of the company is imperiled and at its lowest point." At the time, Ehlert appeared to accept what Kriesel could not: While Kriesel chased self-interest-driven illusory plans in hopes of retaining

his equity position in BioQ, Ehlert (at least at the time) "accepted the fact that the reduction in value of each Class of shares is directly tied to our insolvency." Unlike Kriesel, however, Ehlert had pause (at least at the time) about putting his own interests before those of BioQ's shareholders. Ehlert highlighted that Kriesel had assured the Board there was "funding coming into BioQ for well over the last 16 months and none has materialized." Under Kriesel's leadership, Ehlert continued, "[t]he Board has not seen numbers associated with cash on hand, cash flow, unpaid bills or a recent cap table in some time" and the Board "do[es] not know where the company's liabilities exist today." Ehlert concluded by acknowledging that Kriesel's response to BioQ's insolvency and the outstanding debt to Madryn "imperil[ed] [his] fiduciary duties to the company and the shareholders."

77. On June 26, 2024, Richard Nesbit also resigned, citing Kriesel's intentional decisions to keep the Board in the dark on critical financial decisions. Specifically, he noted that he became "increasingly concerned about the lack of sufficient information provided to the board regarding key strategic decisions and important developments within the company." That lack of "access to the necessary information" caused Nesbit to doubt his ability "to fulfill [his] fiduciary duties effectively."

78. While Tasse, Dekkers, and Nesbit ultimately resigned, their resignations do not absolve them of their years of tacit endorsement and encouragement of Kriesel's pattern of gross negligence, misconduct, and ignoring his fiduciary duties. As their resignations make clear, they allowed Kriesel's mismanagement of BioQ in the many years leading to its insolvency, up to and including the June 19, 2024 Board meeting.

79. Ehlert retracted his resignation, despite explicitly noting that his doing so would breach his fiduciary duty. On information and belief, Kriesel and Iannuccillo convinced Ehlert to remain on the Board.

80. On information and belief, Kriesel and Iannuccillo were desperate to keep Ehlert on the Board because if he went through with his resignation, the Board of Directors would be deadlocked at 2-2 between the Madryn-affiliated Board Members and the other two remaining active members of the Board (Kriesel and Keltner). Because that scenario would threaten the concerted

effort to put their self-interest over that of BioQ, Kriesel and Iannuccillo convinced Ehlert to remain on the Board and continue his participation in the scheme.

**Continued Malfeasance from Kriesel**

81. In response to these resignations—because his insider group controlled the Board—Kriesel simply continued to ignore the Board's directives. He failed to raise the $2.5 million the Board had voted on within two weeks of the June 2024 Board meeting and failed to raise the $20 million within two months of the meeting.

82. Since then, Kriesel and the remaining non-Madryn-affiliated Board Members, in concert with Iannuccillo, refused to schedule any further Board meetings, despite the Madryn-affiliated Board Members' requests.

83. Kriesel told Madryn-affiliated Board Members on several occasions that he was following Iannuccillo's direction in his decision to shut out Madryn from corporate governance.

84. On September 20, 2024, after months of continued obstinance and intentionally keeping the Madryn-affiliated Board Members in the dark regarding any legitimate plan to resolve BioQ's dire financial straits, Madryn wrote a letter to Kriesel and the remaining Board. Madryn advised it had no option but to take "unilateral actions to protect [BioQ] from further damage," and Madryn would begin exercising its rights as a creditor in a manner that would best protect BioQ.[4]

85. In that same letter, Madryn decided to give the non-Madryn portion of the remaining BioQ Board a final chance to break their conspiracy, terminate their coordinated scheme to frustrate

---

[4] This letter also noted Madryn's view that individual BioQ officers breached fiduciary duties (and shareholders aided and abetted them in doing so):

> In Madryn's view it is beyond dispute that certain board members and certain officers have chosen time and again to pursue strategies for the Company that were objectively destined to fail, leading directly to loss of value and the precarious position the Company finds itself in today. Thus, in addition to the Debt Action, the Administrative Agent and the Lenders intend to pursue claims against the individuals who have, over the course of the past eight months to two years, breached their fiduciary duties as officers or directors of the Company (the "Fiduciary Duty Action"). The Fiduciary Duty Action will name as defendants all parties, including shareholders, who have used their position to improperly influence, aid or abet the breach of fiduciary duties by officers or board members.

Madryn, and act in the interest of BioQ, rather than their own personal interests: "The Board can decide to fire Josh Kriesel, appoint a reasonable person to act as an interim President and CEO of the Company, and immediately engage with Madryn regarding support for a consensual sale process." The remaining Board defendants refused this opportunity, choosing instead to continue their participation in the conspiracy.

**Kriesel Advances an Immaculately-timed but Illusory Solution**

86. By letter dated September 23, 2024, Kriesel, Keltner, and Ehlert notified Madryn that BioQ found a potential new, outside investor through the Abu Dhabi Investment Office. The letter represented that a Letter of Intent would be forthcoming in two weeks, and promised an investor to recapitalize BioQ. Madryn, in good faith, halted its course to give Kriesel a chance to make good on his miraculous proposal. Of course, Madryn as creditor and shareholder had no independent interest in having to foreclose. It behooved Madryn to see if BioQ could raise an influx of outside capital to assist the company reduce its distressed debt. However, it quickly became clear that Kriesel's eleventh-hour solution was too good to be true and further evinces his bad-faith conduct.

87. On October 18, 2024, BioQ purportedly entered a Memorandum of Understanding with an "outside" investor from Abu Dhabi that promised $50 million in capital, including a first tranche of $25 million. Pursuant to that term sheet, the parties were to (1) fund the first tranche; (2) complete a Manufacturing Agreement; and (3) finalize a license for one of BioQ's products by December 18, 2024.

88. Despite repeated requests to obtain information they were owed as BioQ Board members, the Madryn-affiliated Board Members only saw a redacted version of the MOU with no identifying information of this investor, aside from the fact that it was an investor from Abu Dhabi. Again, while Madryn would be enthusiastic at the prospect of a legitimate outside investor, Kriesel's intentional shielding of this material financial information from two members of BioQ's own Board raised concerns about the legitimacy and potential fabrication of this investor. Combined with Kriesel's utter and consistent failure as a CEO in raising capital, Madryn had its doubts.

89. Despite Kriesel, Iannuccillo, and the remaining non-Madryn-affiliated Board Members' decision to keep the Madryn-affiliated Board Members in the dark, Madryn offered yet

another life raft to BioQ in the form of another forbearance agreement to give BioQ time to close the alleged deal with the unnamed investor from the UAE, and to deliver documentation evidencing BioQ's pledge of shares of foreign subsidiaries under the Credit Agreement.

90. The Board adopted by unanimous consent with Madryn a forbearance agreement and amendment to the Credit Agreement dated November 19, 2024 (the "Forbearance Agreement").[5] That agreement granted BioQ a forbearance on Madryn debt until December 31, 2024.

91. Kriesel again failed to meet deadlines related to both items.

92. Madryn did not learn the name of this alleged investor until a full year after the Memorandum of Understanding was purportedly signed.

93. At that time, Madryn learned that Kriesel had an economic interest in the very same company he represented was an outsider savior promised to save BioQ.

94. And on April 28, 2026, Madryn learned that Kriesel co-founded that very same company and is currently a director of it.

95. On information and belief, Kriesel, Iannuccillo, Ehlert, and Keltner fabricated the promise of substantial capital from an "outside" investor or, at minimum, misrepresented material terms regarding its interest in BioQ in the limited disclosure Madryn did have.

96. His material misrepresentation of the "outside" UAE investor merely continues Kriesel's pattern of misrepresentation of material corporate facts to protect his personal interest rather than to protect BioQ as a corporation and its shareholders.

97. Still, as of the filing of this Complaint, the UAE investment has not materialized.

**Madryn-affiliated Board Members are Fully Shut Out of Corporate Governance**

98. In 2025, Kriesel's deception continued, including his exclusion of the Madryn-affiliated Board Members from corporate governance despite BioQ's turmoil.

---

[5] The Forbearance Agreement is attached as **Exhibit B**.

99. Even though BioQ was still reeling financially, Kriesel, Iannuccillo, and the remaining non-Madryn Board, shut out the Madryn-affiliated Board Members' repeated requests for information.

100. Rather than function as an entire Board, Kriesel worked exclusively with non-Madryn-affiliated Board Members Keltner and Ehlert and Iannuccillo to further solely their own interests. As evidenced by Kriesel's communications to the Madryn-affiliated Board members, this subset of non-Madryn Board members was also working with Iannuccillo during this period to prevent Madryn from finding out about material information concerning BioQ's business operations.

101. Despite requesting the identity of the UAE investor numerous times and requesting an introduction, Kriesel either denied such requests or ignored them.

102. The Madryn-affiliated Board Members' requests for Board meetings were consistently rebuked in violation of BioQ's corporate governance documents.

103. To this day, Madryn has not seen any Board minutes since the June 19, 2024 Board Meeting. On information and belief, the Individual Defendants have intentionally hidden the Board minutes from Madryn.

104. Even so, Madryn continued in its efforts to support BioQ despite Kriesel and his inner circle's desire to allow BioQ to fail if it meant diluting their personal equity. Madryn introduced BioQ to a reputable investment banker to explore options of conducting a less costly sale than a foreclosure process, which would involve more legal and administrative costs. As Madryn explained to Kriesel, a consensual sale process led by a proven investment bank would provide the best possibility of maximizing the value of BioQ's assets. That would benefit all shareholders.

105. As was his modus operandi at this point, Kriesel, along with Iannuccillo, Ehlert, and Keltner, refused to explore the possibility further when he realized the process, despite maximizing value for BioQ and its shareholders, would dilute his own position.

106. On July 10, 2025, Madryn informed Kriesel that it had elected to proceed with foreclosure on the pledged shares of BioQ's foreign subsidiaries.

**Madryn-affiliated Board Members Resign; Kriesel Continues his Destruction of BioQ**

107. On January 9, 2026, the Madryn-affiliated Board Members concluded that they could not save an entity that was being run, in direct violation of BioQ's corporate governance documents and all semblance of reasonable business sense, by Kriesel, Iannuccillo, Ehlert, and Keltner, who put their own interests ahead of BioQ and its shareholders. On that date, the Madryn-affiliated Board Members resigned because of "the Company's inability to operate or function in any reasonable fashion." The Madryn-affiliated Board Members also cited their exclusion from all Board activities, including any discussion on capital raise transactions and refinancing alternatives, due to Kriesel's attempt to consolidate power in his inner circle.

108. On information and belief, after the Madryn-affiliated Board Members resigned on January 9, 2026, the only active members remaining on BioQ's Board were Kriesel, Keltner, and Ehlert. Iannuccillo continued to provide direction in an unofficial role.

109. As of the Madryn-affiliated Board Members' resignation from BioQ's Board, the UAE (or any other refinancing or recapitalization efforts) investment has not materialized.

110. The UAE transaction was, and always has been, an illusory transaction destined to fail—advanced by Kriesel, guided by Iannuccillo, and endorsed by Ehlert and Keltner as part of the ongoing conspiracy. The sole purpose of the illusory transaction, which was offered by a company that Kriesel himself had co-founded—a fact he deliberately withheld from Madryn—was to buy Individual Defendants more time to frustrate Madryn and delay its ability to exercise its contractual rights, all to BioQ and its shareholders' detriment.

111. As the most recent example in a long line of incompetence that has proven to be detrimental to BioQ's value, BioQ's Australian subsidiary was deregistered on February 16, 2026 by the Australian Securities and Investments Commission due to Kriesel's failure to take elementary administrative steps. Due to Kriesel's incompetence and misconduct, valuable foreign assets have now been lost, despite BioQ's knowledge that Madryn would be foreclosing on its foreign assets as early as July 2025.

112. More broadly, as a result of the Kriesel-led malfeasance, BioQ's net worth and assets have diminished substantially, in an amount to be proven at trial.

**Madryn Forecloses on its Debt**

113. Last month, Madryn, in its capacity as a creditor, foreclosed on its debt with BioQ.

**Individual Defendants Intentionally Disrupted BioQ's Contracts with Madryn**

114. Individual Defendants intentionally caused BioQ to violate various contractual provisions of the Credit Agreement, including subsequent forbearance agreements, because they acted in self-interest rather than in the interest of BioQ.

115. While some of the Individual Defendants were on BioQ's Board, they at all times alleged herein acted outside of their roles, choosing to ignore their fiduciary duties and obligations to the corporation by acting in their own self-interest in interfering with BioQ's contractual obligations with Madryn.

116. Individual Defendants caused BioQ to breach the affirmative covenants contained in the Credit Agreement between BioQ and Madryn, including, but not limited to, BioQ's affirmative covenant to:

a. Consider Madryn's advice in good faith. Exhibit A at 75. BioQ, at the urging of some and acquiescence of the rest of the Individual Defendants, failed to consider Madryn's advice in good faith at all relevant times.

b. Allow Madryn to designate an observer to attend all Board meetings, receive all board materials, and address the Board with respect to BioQ's business troubles. Exhibit A at 75. BioQ, through the Individual Defendants, refused to allow Madryn an observer at Board meetings at all relevant times.

117. Individual Defendants also caused BioQ to breach amendments to that agreement, including various provisions of the forbearance agreement entered into on November 19, 2024, including, but not limited to, BioQ's contractual duty to:

c. Use "commercially reasonable efforts to consummate" the undisclosed UAE investment. Exhibit B at 4. At Kriesel and Iannuccillo's direction and endorsed by others, BioQ did not use commercially reasonable efforts insofar as it refused to disclose the identity of the investor to its full Board.

d. Deliver to Madryn a cash flow forecast and "written update in form and detail . . . regarding the status of the" UAE investment, Exhibit B at 4, along with other basic financial information from BioQ, *id.* At Kriesel and Iannuccillo's direction, and endorsed by others, BioQ refused to provide either to Madryn.

118. In addition to these specific contracts, Individual Defendants' actions described herein intentionally interfered with BioQ's obligation to pay the substantial debt it owed to Madryn under contract, thus damaging Madryn.

119. The forbearance agreements were a way to give BioQ more time to make good on the debt owed to Madryn. Individual Defendants interfered with those agreements by deliberately frustrating BioQ's ability to do so by intentionally encouraging and causing the breach of such agreements.

**Individual Defendants Engaged in a Conspiracy to Ignore Fiduciary Duties Owed to BioQ and to Tortiously Interfere with Madryn's Rights**

120. Individual Defendants formed an agreement, whether express or implied, to harm Madryn by causing BioQ to breach its contractual obligations to Madryn and by interfering with Madryn's prospective economic relationships with BioQ. The object of the conspiracy was to preserve Individual Defendants' personal equity positions at the expense of BioQ and its shareholders.

121. Individual Defendants' self-interest-driven conspiracy to harm Madryn has caused BioQ's demise. Madryn offered Individual Defendants a way to remedy the grave economic reality that BioQ found itself in, but Individual Defendants refused to engage with Madryn's solution because it would dilute their personal stakes in the company. Individual Defendants did not reject Madryn's proposals because they believed in good faith that an alternative would better serve BioQ; they rejected those proposals solely to preserve their own equity, knowing full well that their illusory alternatives would fail and that BioQ would suffer as a result. Instead, Individual Defendants pursued a coordinated course of conduct designed to frustrate Madryn's efforts and preserve their own equity, regardless of the harm to BioQ and its other shareholders. This conspiracy breached all fiduciary duties owed to BioQ.

122. Individual Defendants took the following overt acts in furtherance of the conspiracy: (a) Kriesel refused to hold formal Board meetings to vote on Madryn's RSA while secretly lobbying other shareholders to oppose it; (b) Kriesel advanced the Insider Plan despite knowing it was commercially unreasonable and could not succeed; (c) Iannuccillo formulated and supported Kriesel's illusory plans, in part due to his signing of a letter that gave the Insider Plan the imprimatur of legitimacy; (d) Kriesel, at Iannuccillo's direction, excluded the Madryn-affiliated Board Members from Board meetings, corporate governance, and material financial information; (e) Kriesel, Keltner, and Ehlert refused to remove Kriesel as CEO despite the June 2024 Board resignations citing his misconduct; (f) Kriesel misrepresented the nature of the UAE investor, concealing that it was a company he had co-founded; (g) Individual Defendants failed to disclose the true nature of the UAE investor to Madryn; and (h) Individual Defendants caused BioQ to violate multiple provisions of the Credit Agreement and forbearance agreements.

123. While certain Individual Defendants—Kriesel, Iannuccillo, Keltner, and Ehlert—played more fundamental roles in the conspiracy than others, on information and belief, each Individual Defendant was a direct, necessary, and substantial participant in the conspiracy. Kriesel orchestrated the scheme as CEO and Board Chairman. Iannuccillo provided the financial support and strategic direction that enabled Kriesel to defy Board directives and pursue his self-interested plans. Keltner and Ehlert ratified Kriesel's conduct by refusing to remove him and by signing letters rejecting Madryn's demands. The Board members who resigned—Tasse, Dekkers, Nesbit, and Jasper—participated in the conspiracy for years before their departures by intentionally enabling Kriesel's pattern of misconduct, and they put no stop to the ongoing conspiracy even as they acknowledged Kriesel's failures in their resignation letters.

124. Each of the Individual Defendants knowingly aided and abetted and rendered substantial assistance in the wrongs complained of herein. In so doing, each Individual Defendant acted with actual knowledge of the primary wrongdoing—namely, the scheme to frustrate Madryn's contractual and economic rights in order to preserve their personal equity—substantially assisted in the accomplishment of that wrongdoing through the overt acts described above, and was aware of

his overall contribution to and furtherance of the wrongdoing. Each Individual Defendant's participation was a substantial factor in bringing about the harm to Madryn and BioQ.

125. As a direct and proximate result of Individual Defendants' conspiracy, Madryn has suffered and will continue to suffer substantial damages. Because Individual Defendants blocked Madryn's restructuring efforts and caused BioQ to breach its contractual obligations, BioQ's assets have depreciated significantly, BioQ is unable to repay the more than $53 million it owes Madryn, and Madryn has been forced to incur the costs of a foreclosure sale in lieu of a mutually beneficial restructuring that would have preserved value for all shareholders. These damages were the foreseeable and intended consequence of Individual Defendants' conspiracy.

## V. ALLEGATIONS PURSUANT TO CAL CORP. CODE § 800(b)

126. Madryn repeats and re-alleges each and every allegation above as fully set forth herein.

127. Plaintiffs Madryn Health Partners, LP and Madryn Health Partners (Cayman Master) LP at all relevant times were, and continue to be, shareholders in BioQ. Cal. Corp. Code § 800(b)(1).

**Madryn's Prior Efforts to Remediate Kriesel's Malfeasance to the Board Were Rebuffed, and Another Pre-suit Demand on the Board Defendants would be Futile.**

128. On September 20, 2024, Madryn asked the remainder of the Board "to fire Josh Kriesel, appoint a reasonable person to act as an interim President and CEO of the Company, and immediately engage with Madryn regarding support for a consensual sale process."

129. Rather than doing so, BioQ's remaining Board at the time doubled down on Kriesel's illusory promise of outside infusions of capital. Kriesel, Keltner, and Ehlert signed the letter refusing to remove Kriesel.

130. On information and belief, BioQ's Board only has three members since the Madryn-affiliated Board Members resigned on January 9, 2026. The remaining three members are Kriesel, Keltner, and Ehlert.

131. Accordingly, a similar demand now—when the entire Board is comprised of those same individuals—would certainly be futile.

132. Even if two additional board members have been appointed in the interim to replace the Madryn-affiliated Board Members, Kriesel, Keltner, and Ehlert would still hold a majority of BioQ's Board.

133. The acts complained of herein were committed by the individuals who remain on the Board.

134. Each of the non-Madryn-affiliated Board Members are insiders to the conspiracy, lack independence from Kriesel, and have already repeatedly failed to place the interests of BioQ and its shareholders above personal interests. In other words, they have shown a proclivity to ignore their fiduciary duties to BioQ.

135. Each of the non-Madryn-affiliated Board Members failed to make good faith investigations into Madryn's proposal for what all ordinarily prudent people would realize was the only reasonable solution for the company.

136. Additionally, BioQ has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the current Board members have not filed any lawsuits to attempt to recover for BioQ any part of the damages BioQ suffered and will continue to suffer thereby. Thus, any demand upon BioQ's Board would be futile.

## VI. CAUSES OF ACTION

### FIRST CAUSE OF ACTION

**(Breach of Fiduciary Duty)**

**(Madryn Health Partners, LP and Madryn Health Partners (Cayman Master) LP, derivatively in their capacity as shareholders, against Kriesel, Keltner, Ehlert, Tasse, Dekkers, Nesbit, and Jasper)**

137. Madryn re-alleges and incorporates by reference the allegations set forth above as though fully restated as applied to each cause of action listed below.

138. Kriesel, Keltner, Ehlert, Tasse, Dekkers, Nesbit, and Jasper are fiduciaries of BioQ and its shareholders. They owe BioQ and its shareholders the duty to conduct BioQ's business loyally, faithfully, diligently, and prudently.

139. Kriesel and the non-Madryn-affiliated Board members participated in the acts of mismanagement alleged herein and acted in gross disregard of the realities of the facts alleged herein and failed to exercise due care to prevent the unlawful conduct complained of.

140. Kriesel and the non-Madryn-affiliated Board members violated their fiduciary duty of loyalty. They ignored the dire economic straits BioQ faced and that Madryn's solution was the only viable solution. Kriesel spent years pursuing an illusory "outside" investment instead of agreeing to Madryn's proposals that would have delivered the most value to all shareholders and saved the company. By failing to act in the best interest of all shareholders, Kriesel breached his duty of loyalty. The other Board members also acted in their own self-interest rather than the best interest of the corporation and acquiesced in Kriesel's decision to act in his own best interest to BioQ's detriment. While Kriesel led this effort, the non-Madryn-affiliated Board members ratified his conduct and in so doing violated the same fiduciary duty of loyalty.

141. Kriesel and the non-Madryn-affiliated Board members also violated their fiduciary duty to manage BioQ's business as would ordinarily prudent people. The individual members failed to make a reasonable inquiry into Madryn's RSA before jettisoning it in favor of Kriesel's alternate plan. Kriesel's plan was objectively unreasonable, tantamount to planning to pay off a $50,000,000.00 debt by buying lottery tickets.

142. Moreover, Kriesel and the non-Madryn-affiliated Board members failed to consider any other reasonable option to save the company, including failing to consider the option of selling assets by a reputable investment bank that would have maximized value for all shareholders once BioQ's distressed debt was insurmountable.

143. Instead, Kriesel wantonly engaged in a recapitalization effort designed to protect himself rather than one that had BioQ's best interests at heart.

144. Finally, Kriesel and the non-Madryn-affiliated Board members grossly mismanaged the corporation by operating it in contravention to any norm of ordinary corporate governance. The individual members refused to allow the Madryn-affiliated Board members an opportunity to participate in management of the company pursuant to their Board seats. In so doing, they further

intentionally hid information from the Madryn-affiliated Board members in violation of their duties and in furtherance of their scheme.

145. Kriesel and the non-Madryn-affiliated Board members' breaches of these fiduciary duties caused BioQ's significant economic harm in an amount to be proven at trial.

**SECOND CAUSE OF ACTION**

**(Aiding and Abetting Breach of Fiduciary Duty)**

**(Madryn Health Partners, LP and Madryn Health Partners (Cayman Master) LP, derivatively in their capacity as shareholders, against Iannuccillo)**

146. Madryn re-alleges and incorporates by reference the allegations set forth above as though fully restated herein.

147. Led by Kriesel, the non-Madryn-affiliated Board Members breached their fiduciary duties owed to BioQ and its shareholders by prioritizing the interests of the few over the corporation's for the reasons discussed herein.

148. Through a close friendship with Kriesel and subsistence infusions of cash to BioQ to allow the company to continue operations, Iannuccillo bent Kriesel's ear any direction he wanted.

149. Rather than do so in a way that benefitted BioQ generally, Iannuccillo encouraged Kriesel to ignore Madryn's reasonable solutions in favor of advancing a fanciful and illusory investment. That result would benefit Iannuccillo and the rest of the Individual Defendants, but its infeasibility meant that BioQ and its shareholders suffered.

150. Iannuccillo instructed Kriesel to stop holding board meetings with the Madryn-affiliated Board Members. He also instructed Kriesel and other non-Madryn Board members to intentionally hide information from the Madryn-affiliated Board members.

151. Iannuccillo's influence over Kriesel caused BioQ to miss opportunities to restructure in a manner beneficial to all shareholders.

152. BioQ's assets have depreciated significantly as a result of Iannuccillo's influence over Kriesel and the other Individual Defendants and led to the attendant mismanagement of BioQ.

**THIRD CAUSE OF ACTION**

**(Waste of Corporate Assets)**

**(Madryn Health Partners, LP and Madryn Health Partners (Cayman Master) LP, derivatively in their capacity as shareholders, against all Individual Defendants)**

153. Madryn re-alleges and incorporates by reference the allegations set forth above as though fully restated herein.

154. Individual Defendants, by their decisions and actions taken or those actions they caused to be taken, have caused BioQ to waste valuable assets, including, but not limited to, through Individual Defendants' gross mismanagement. Individual Defendants' conduct was reckless, grossly negligent, and done solely to benefit themselves. The corporate waste was not the result of mistake or poor judgment.

155. For example, Individual Defendants caused valuable foreign assets to vanish due to a failure to comply with basic administrative tasks with the intent to frustrate Madryn. On February 16, 2026, Madryn learned that Individual Defendants' intentional misconduct led to a valuable Australian marketing authorization to be wasted. Because Madryn will not be able to foreclose on that and other wasted corporate assets, it will need to foreclose on other BioQ assets.

156. As a direct and proximate cause of Individual Defendants' corporate waste, BioQ has suffered monetary damages in an amount to be proven at trial.

**FOURTH CAUSE OF ACTION**

**(Tortious Interference with Contract)**

**(Madryn, directly as a creditor, against Individual Defendants)**

157. Madryn re-alleges and incorporates by reference the allegations set forth above as though fully restated herein.

158. Beginning with the Credit Agreement and continuing with the many agreements amending it, Madryn and BioQ shared several valid contracts, to which Individual Defendants were not parties.

159. Individual Defendants, by their respective statuses as Board members and, in Iannuccillo's case, due to his undue influence over Kriesel, had knowledge of each contract.

160. Individual Defendants, through their concerted mismanagement of BioQ described herein, conspired to and did intentionally cause BioQ to breach myriad contractual provisions in the contracts to which it was a party with Madryn.

161. Individual Defendants also intentionally interfered with the Credit Agreement and subsequent amendments by delaying BioQ's fulfillment of its obligations to Madryn through Kriesel's misrepresentation of the UAE investor. Madryn gave Kriesel and his inner circle more time to make good on this "outside" investment in good faith, only to learn in April of 2026 that the source of the investment was a company that Kriesel himself had co-founded. On information and belief, the Individual Defendants intentionally withheld this information from Madryn.

162. That misrepresentation caused months of delay, all while BioQ's assets continued depleting, to Madryn's detriment.

163. The Individual Defendants acted with actual malice in interfering with BioQ's contracts with Madryn because they acted purely out of self-interest—i.e., to preserve their own equity—rather than in BioQ's interest. They were thus acting outside of their capacity as BioQ corporate representatives.

164. Individual Defendants' interference with Madryn's contract with BioQ have caused damages to Plaintiff, because in doing so, BioQ's value has plummeted rendering it impossible for Madryn to collect the more than $53 million it is owed.

**FIFTH CAUSE OF ACTION**

**(Tortious Interference with Prospective Economic Advantage)**

**(Madryn, as creditor, against Individual Defendants)**

165. Madryn re-alleges and incorporates by reference the allegations set forth above as though fully restated herein.

166. Madryn had prospective business relations with BioQ in the form of the RSA or other mutually beneficial restructuring agreements to address BioQ's distressed debt.

167. Individual Defendants interfered with the RSA and other mutually beneficial restructuring agreements by breaching their fiduciary duties as explained herein, through illusory promises and mismanagement of the company to prevent BioQ from entering such a deal.

168. Individual Defendants so interfered not to save BioQ, but to try to preserve their own interests at BioQ's demise, and to spite Madryn. In doing so, they breached fiduciary duties owed both to BioQ and its shareholders and to Madryn as a creditor.

169. The Individual Defendants acted with actual malice by interfering with BioQ's prospective business relations with Madryn because they acted purely out of self-interest, rather than in BioQ's interest, and were thus acting outside of their capacity as BioQ corporate representatives.

170. Madryn's relationship with BioQ has suffered as a result of Individual Defendants' tortious interference that precluded a mutually beneficial restructuring, as Madryn has now formally begun a costly foreclosure sale that will preclude it from recovering the amount owed under the contract.

**SIXTH CAUSE OF ACTION**

**(Breach of Fiduciary Duty/Trust Fund Doctrine)**

**(Madryn, as creditor, against Kriesel, Keltner, Ehlert, Tasse, Dekkers, Nesbit, and Jasper)**

171. Madryn re-alleges and incorporates by reference the allegations set forth above as though fully restated herein.

172. As of at least June 19, 2024 and continuing to present, BioQ has been in dire financial straits. Since then, the Board had a duty to safeguard the company's assets to pay off creditors like Madryn.

173. Kriesel and the non-Madryn-affiliated Board Members unduly risked corporate assets that may have otherwise been used to pay creditors by refusing to consider Madryn's restructuring proposal in good faith and neglecting to preserve valuable foreign assets.

174. Moreover, Kriesel, Keltner, and Ehlert separately failed to safeguard BioQ's assets by advancing an illusory and misrepresented outside investment plan that simply delayed Madryn's right to recover, all while allowing BioQ's assets to continue to wither away.

175. These breaches have caused Madryn concrete damages in the decreased ability to recover on its loan, as well as the costs taken to initiate formal foreclosure proceedings.

## VII. PRAYER

1. WHEREFORE, Madryn, derivatively on behalf of BioQ and, separately directly as a creditor, seeks judgment against Defendants, and each of them, in an amount according to proof, as follows:

2. For a money judgment representing past and future economic damages estimated to exceed $50,000,000.00, and all other sums of money, together with interest on these amounts;

3. For compensatory and general damages according to proof;

4. For exemplary damages pursuant to Civil Code § 3294 and any other applicable law in amounts sufficient to punish Defendants for the wrongful conduct alleged herein and to deter such conduct in the future;

5. For attorneys' fees as authorized by statute or law;

6. For prejudgment and postjudgment interest according to any applicable provision of law at the highest available rate, from the first day allowable by law, according to proof;

7. For costs of suit; and,

8. For such other and further relief as the court may deem just and proper.

DATED: June 23, 2026

**MCGUIREWOODS LLP**

By: */s/* [signature]

Nicholas J. Hoffman

*Attorney for Plaintiffs*

# EXHIBIT A

# FILED CONDITIONALLY UNDER SEAL

# EXHIBIT B

# FILED CONDITIONALLY UNDER SEAL

**MCGUIREWOODS LLP**
Nicholas J. Hoffman (SBN #284472)
nhoffman@mcguirewoods.com
1800 Century Park East, 7th Floor
Los Angeles, CA 90067
Telephone: 310.315.8200
Fax: 310.315.8210

Attorney for Plaintiffs

ELECTRONICALLY
FILED
*Superior Court of California, County of San Francisco*
06/23/2026
Clerk of the Court
BY: ERNALYN BURA
Deputy Clerk

**SUPERIOR COURT OF THE STATE OF CALIFORNIA**

**COUNTY OF SAN FRANCISCO**

MADRYN HEALTH PARTNERS, LP, and MADRYN HEALTH PARTNERS (CAYMAN MASTER), LP, derivatively on behalf of BioQ Pharma, Incorporated, and MADRYN HEALTH PARTNERS, LP, MADRYN HEALTH PARTNERS (CAYMAN MASTER), LP, MADRYN FUND ADMINISTRATION, LLC, MADRYN BIOQ SPV, LLC, and MADRYN ASSET MANAGEMENT, LP., directly as creditors.

Plaintiffs,

vs.

JOSHUA KRIESEL, an individual; JOHN IANNUCCILLO, individually and as Trustee of the Iannuccillo Family Trust, LLEW KELTNER, an individual; MARK EHLERT, an individual; DANIEL TASSE, an individual; MARIJN DEKKERS, an individual; RICHARD NESBIT, an individual; BILL JASPER, an individual, and Does 1 through 100, inclusive

Individual Defendants; and

BIOQ PHARMA, INCORPORATED, a California corporation

Nominal Defendant.

CASE NO. **CGC-26-638583**

**PLAINTIFF MADRYN'S NOTICE OF LODGING DOCUMENTS CONDITIONALLY UNDER SEAL**

**TO DEFENDANTS JOSHUA KRIESEL, JOHN IANNUCCILLO, LLEW KELTNER, MARK EHLERT, DANIEL TASSE, MARIJN DEKKERS, RICHARD NESBIT, BILL JASPER, Does 1 through 100, and BIOQ PHARMA, INCORPORATED AND THEIR COUNSEL OF RECORD:**

PLEASE TAKE NOTICE that pursuant to Rules 2.551(b)(3) and (d) of the California Rules of Court, Plaintiffs Madryn Health Partners, LP, Madryn Health Partners (Cayman Master), LP, Madryn Fund Administration, LLC, Madryn BioQ SPV, LLC, and Madryn Asset Management, LP (collectively, "Madryn") are lodging with the Court the following documents conditionally under seal:

- Exhibit A to Madryn's Complaint, the 2017 Credit Agreement between Madryn and Nominal Defendant, BioQ [conditionally lodged under seal].
- Exhibit B to Madryn's Complaint, the November 19, 2024 Forbearance Agreement between Madryn and BioQ [conditionally lodged under seal] (collectively with the 2017 Agreement, the "Confidential Documents").

The Confidential Documents contain commercially sensitive infromation, including the specific financial terms of Madryn and BioQ's financial arrangement. If Madryn does not file a motion to seal the documents within ten days, these documents may be placed in the public record pursuant to California Rule of Court 2.551(b)(3)(B). In accordance with Rule 2.551(b)(3)(A) of the California Rules of Court, Madryn has filed public, redacted versions of the above-referenced documents and has lodged versions of the above-referenced documents containing the confidential material with the Court.

DATED: June 23, 2026

MCGUIREWOODS LLP

By: ______________________________

Nicholas J. Hoffman

Attorney for Plaintiffs

**CM-010**

ATTORNEY OR PARTY WITHOUT ATTORNEY STATE BAR NUMBER: 284472
NAME: Nicholas J. Hoffman
FIRM NAME: McGuireWoods LLP
STREET ADDRESS: 1800 Century Park East, 7th Floor
CITY: Los Angeles STATE: CA ZIP CODE: 90067
TELEPHONE NO.: 310.315.8200 FAX NO.: 310.315.8210
EMAIL ADDRESS: nhoffman@mcguirewoods.com
ATTORNEY FOR (*name*): Plaintiffs Madryn Health Partners, LP et al.

**SUPERIOR COURT OF CALIFORNIA, COUNTY OF SAN FRANCISCO**
STREET ADDRESS: 400 McAllister Street
MAILING ADDRESS: 400 McAllister Street
CITY AND ZIP CODE: San Francisco, CA 94102
BRANCH NAME: Civil Division, Civic Center Courthouse

CASE NAME:
Madryn Health Partners, LP et al. v. Joshua Kriesel, et al.

*FOR COURT USE ONLY*

ELECTRONICALLY
**FILED**
*Superior Court of California, County of San Francisco*
**06/23/2026**
**Clerk of the Court**
**BY: ERNALYN BURA**
**Deputy Clerk**

**CGC-26-638583**

CASE NUMBER:

JUDGE:
DEPT.:

## CIVIL CASE COVER SHEET

[X] **Unlimited** (Amount demanded exceeds $35,000)
[ ] **Limited** (Amount demanded is $35,000 or less)

## Complex Case Designation

[ ] Counter [ ] Joinder

Filed with first appearance by defendant (Cal. Rules of Court, rule 3.402)

*Items 1–6 below must be completed (see instructions on page 2).*

1. Check **one** box below for the case type that best describes this case:

**Auto Tort**
- [ ] Auto (22)
- [ ] Uninsured motorist (46)

**Asbestos**
- [ ] Asbestos (04)

**Other PI/PD/WD (Personal Injury/Property Damage/Wrongful Death) Tort**
- [ ] Product liability (24)
- [ ] Medical malpractice (45)
- [ ] Other PI/PD/WD (23)

**Non-PI/PD/WD (Other) Tort**
- [X] Business tort/Unfair business practice (07)
- [ ] Civil rights (08)
- [ ] Defamation (13)
- [ ] Fraud (16)
- [ ] Intellectual property (19)
- [ ] Professional negligence (25)
- [ ] Other non-PI/PD/WD tort (35)

**Employment**
- [ ] Wrongful termination (36)
- [ ] Other employment (15)

**Contract**
- [ ] Breach of contract/warranty (06)
- [ ] Rule 3.740 collections (09)
- [ ] Other collections (09)
- [ ] Insurance coverage (18)
- [ ] Other contract (37)

**Real Property**
- [ ] Eminent domain/Inverse condemnation (14)
- [ ] Wrongful eviction (33)
- [ ] Other real property (26)

**Unlawful Detainer**
- [ ] Commercial (31)
- [ ] Residential (32)
- [ ] Drugs (38)

**Judicial Review**
- [ ] Asset forfeiture (05)
- [ ] Petition re arbitration award (11)
- [ ] Writ of mandate (02)
- [ ] Other judicial review (39)

**Employment Development Department (EDD)**
- [ ] EDD decision review (48)

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.404)**
- [ ] Antitrust/Trade regulation (03)
- [ ] Construction defect (10)
- [ ] Mass tort (40)
- [ ] Securities litigation (28)
- [ ] Environmental/Toxic tort (30)
- [ ] Comprehensive groundwater adjudication (47)
- [ ] Insurance coverage claims arising from the above listed provisionally complex case types (41)

**Enforcement of Judgment**
- [ ] Enforcement of judgment (20)

**Miscellaneous Civil Complaint**
- [ ] RICO (27)
- [ ] Other complaint *(not specified above)* (42)

**Miscellaneous Civil Petition**
- [ ] Partnership and corporate governance (21)
- [ ] Other petition *(not specified above)* (43)

2. Is this case complex under rule 3.400 of the California Rules of Court? [x] Yes [ ] No

If the case is complex, mark the factors requiring exceptional judicial management:

a. [x] Large number of separately represented parties
b. [ ] Extensive motion practice raising difficult or novel issues that will be time-consuming to resolve
c. [ ] Substantial amount of documentary evidence
d. [ ] Large number of witnesses
e. [ ] Coordination with related actions pending in one or more courts in other counties, states, or countries, or in a federal court
f. [ ] Substantial postjudgment judicial supervision

3. Remedies sought *(check all that apply):*

a. [x] monetary
b. [ ] nonmonetary; declaratory or injunctive relief
c. [x] punitive

4. Number of causes of action *(specify):* Six

5. Is this case a class action suit? [ ] Yes [x] No

6. If there are any known related cases, file and serve a notice of related case. *(You may use form CM-015.)*

Date: June 23, 2026

Nicholas J. Hoffman
(TYPE OR PRINT NAME)

▶ [signature]
(SIGNATURE OF PARTY OR ATTORNEY FOR PARTY)

**NOTICE**

- Plaintiff must file this cover sheet with the first paper filed in the action or proceeding (except small claims cases or cases filed under the Probate Code, Family Code, or Welfare and Institutions Code). (Cal. Rules of Court, rule 3.220.) Failure to file may result in sanctions.
- File this cover sheet in addition to any cover sheet required by local court rule.
- If this case is complex under rule 3.400 et seq. of the California Rules of Court, you must serve a copy of this cover sheet on all other parties to the action or proceeding.
- Unless this is a collections case under rule 3.740 of the California Rules of Court or a complex case, this cover sheet will be used for statistical purposes only.

**INSTRUCTIONS ON HOW TO COMPLETE THE COVER SHEET**

**To Plaintiffs and Others Filing First Papers.** If you are filing a first paper (for example, a complaint) in a civil case, you **must** complete and file, along with your first paper, the Civil Case Cover Sheet contained on pages 1 and 2. This information will be used to compile statistics about the types and numbers of cases filed. You must complete items 1 through 6 on the sheet. In item 1, you must check **one** box for the case type that best describes the case. If the case fits both a general and a more specific type of case listed in item 1, check the more specific one. If the case has multiple causes of action, check the box that best indicates the **primary** cause of action. To assist you in completing the sheet, examples of the cases that belong under each case type in item 1 are provided below. A cover sheet must be filed only with your initial paper. Failure to file a cover sheet with the first paper filed in a civil case may subject a party, its counsel, or both to sanctions under rules 2.30 and 3.220 of the California Rules of Court.

**To Parties in Rule 3.740 Collections Cases.** A "collections case" under rule 3.740 of the California Rules of Court is defined as an action for recovery of money owed in a sum stated to be certain that is not more than $35,000, exclusive of interest and attorney's fees, arising from a transaction in which property, services, or money was acquired on credit. A collections case does not include an action seeking the following: (1) tort damages, (2) punitive damages, (3) recovery of real property, (4) recovery of personal property, or (5) a prejudgment writ of attachment. The identification of a case as a rule 3.740 collections case on this form means that it will be exempt from the general time-for-service requirements and case management rules, unless a defendant files a responsive pleading. A rule 3.740 collections case will be subject to the requirements for service and obtaining a judgment in rule 3.740.

**To Parties in Complex Cases.** In complex cases only, parties must also use the Civil Case Cover Sheet to designate whether the case is complex. If a plaintiff believes the case is complex under rule 3.400 of the California Rules of Court, this must be indicated by completing the appropriate boxes in items 1 and 2. If a plaintiff designates a case as complex, the cover sheet must be served with the complaint on all parties to the action. A defendant may file and serve no later than the time of its first appearance a joinder in the plaintiff's designation, a counter-designation that the case is not complex, or, if the plaintiff has made no designation, a designation that the case is complex.

**SEE PAGE 3 FOR INFORMATION PURPOSES ONLY.**

## CASE TYPES AND EXAMPLES

**Auto Tort**
- Auto (22)–Personal Injury/Property Damage/Wrongful Death
- Uninsured Motorist (46) *(if the case involves an uninsured motorist claim subject to arbitration, check this item instead of Auto)*

**Asbestos**
- Asbestos (04)
  - Asbestos Property Damage
  - Asbestos Personal Injury/Wrongful Death

**Other PI/PD/WD (Personal Injury/ Property Damage/Wrongful Death) Tort**
- Product Liability *(not asbestos or toxic/ environmental)* (24)
- Medical Malpractice (45)
  - Medical Malpractice–Physicians & Surgeons
  - Other Professional Health Care Malpractice
- Other PI/PD/WD (23)
  - Premises Liability (e.g., slip and fall)
  - Intentional Bodily Injury/PD/WD (e.g., assault, vandalism)
  - Intentional Infliction of Emotional Distress
  - Negligent Infliction of Emotional Distress
  - Other PI/PD/WD

**Non-PI/PD/WD (Other) Tort**
- Business Tort/Unfair Business Practice (07)
- Civil Rights (e.g., discrimination, false arrest) *(not civil harassment)* (08)
- Defamation (e.g., slander, libel) (13)
- Fraud (16)
- Intellectual Property (19)
- Professional Negligence (25)
  - Legal Malpractice
  - Other Professional Malpractice *(not medical or legal)*
- Other Non-PI/PD/WD Tort (35)

**Employment**
- Wrongful Termination (36)
- Other Employment (15)

**Contract**
- Breach of Contract/Warranty (06)
  - Breach of Rental/Lease Contract *(not unlawful detainer or wrongful eviction)*
  - Contract/Warranty Breach–Seller Plaintiff *(not fraud or negligence)*
  - Negligent Breach of Contract/Warranty
  - Other Breach of Contract/Warranty
- Collections (e.g., money owed, open book accounts) (09)
  - Collections Case–Seller Plaintiff
- Other Promissory Note/Collections Case
- Insurance Coverage *(not provisionally complex)* (18)
  - Auto Subrogation
  - Other Coverage
- Other Contract (37)
  - Contractual Fraud
  - Other Contract Dispute

**Real Property**
- Eminent Domain/Inverse Condemnation (14)
- Wrongful Eviction (33)
- Other Real Property (e.g., quiet title) (26)
  - Writ of Possession of Real Property
  - Mortgage Foreclosure
  - Quiet Title
  - Other Real Property *(not eminent domain, landlord-tenant, or foreclosure)*

**Unlawful Detainer**
- Commercial (31)
- Residential (32)
- Drugs (38) *(if the case involves illegal drugs, check this item; otherwise, report as Commercial or Residential)*

**Judicial Review**
- Asset Forfeiture (05)
- Petition re Arbitration Award (11)
- Writ of Mandate (02)
  - Writ–Administrative Mandamus
  - Writ–Mandamus on Limited Court Case Matter
  - Writ–Other Limited Court Case Review
- Other Judicial Review (39)
  - Review of Health Officer Order
  - Notice of Appeal–Labor Commissioner Appeals

**Employment Development Department (EDD)**
- EDD Decision Review (48) *(if the case involves an Employment Development Department decision, check this item instead of Wrongful Termination or Other Employment)*

**Provisionally Complex Civil Litigation (Cal. Rules of Court, rules 3.400–3.403)**
- Antitrust/Trade Regulation (03)
- Construction Defect (10)
- Claims Involving Mass Tort (40)
- Securities Litigation (28)
- Environmental/Toxic Tort (30)
- Comprehensive Groundwater Adjudication (47)
- Insurance Coverage Claims *(arising from provisionally complex case type listed above)* (41)

**Enforcement of Judgment**
- Enforcement of Judgment (20)
  - Abstract of Judgment (Out of County)
  - Confession of Judgment *(non-domestic relations)*
  - Sister-State Judgment
  - Administrative Agency Award *(not unpaid taxes)*
  - Petition/Certification of Entry of Judgment on Unpaid Taxes
  - Other Enforcement of Judgment Case

**Miscellaneous Civil Complaint**
- RICO (27)
- Other Complaint *(not specified above)* (42)
  - Declaratory Relief Only Injunctive Relief Only *(non-harassment)*
  - Mechanic's Lien
  - Other Commercial Complaint Case *(non-tort/non-complex)*
  - Other Civil Complaint *(non-tort/non-complex)*

**Miscellaneous Civil Petition**
- Partnership and Corporate Governance (21)
- Other Petition *(not specified above)* (43)
  - Civil Harassment
  - Workplace Violence
  - Elder/Dependent Adult Abuse
  - Election Contest
  - Petition for Name Change
  - Petition for Relief From Late Claim
  - Other Civil Petition



Print Save Clear

# NOTICE TO PLAINTIFF

A Case Management Conference is set for:

**DATE:** **DEC 30, 2026**

**TIME:** **10:30 am**

**PLACE:** **Department 610**
**400 McAllister Street**
**San Francisco, CA 94102-3680**

All parties must appear and comply with Local Rule 3.

CRC 3.725 requires the filing and service of a case management statement form CM-110 no later than 15 days before the case management conference. However, it would facilitate the issuance of a case management order **without an appearance** at the case management conference if the case management statement is filed and served twenty-five days before the case management conference.

Plaintiff must serve a copy of this notice upon each party to this action with the summons and complaint. Proof of service subsequently filed with this court shall so state. **This case is eligible for electronic filing and service per Local Rule 2.11. For more information, please visit the Court's website at https://sf.courts.ca.gov under Online Services.**

**[DEFENDANTS: Attending the Case Management Conference does not take the place of filing a written response to the complaint. You must file a written response with the court within the time limit required by law. See Summons.]**

## ALTERNATIVE DISPUTE RESOLUTION REQUIREMENTS

**IT IS THE POLICY OF THE SUPERIOR COURT THAT EVERY CIVIL CASE SHOULD PARTICIPATE IN MEDIATION, ARBITRATION, NEUTRAL EVALUATION, AN EARLY SETTLEMENT CONFERENCE, OR OTHER APPROPRIATE FORM OF ALTERNATIVE DISPUTE RESOLUTION PRIOR TO A TRIAL.**

(SEE LOCAL RULE 4)

Plaintiff **must** serve a copy of the Alternative Dispute Resolution (ADR) Information Package on each defendant along with the complaint. (CRC 3.221.) The ADR package may be accessed at https://sf.courts.ca.gov/divisions/civil-division/alternative-dispute-resolution or you may request a paper copy from the filing clerk. All counsel must discuss ADR with clients and opposing counsel and provide clients with a copy of the ADR Information Package prior to filing the Case Management Statement.

**Superior Court Alternative Dispute Resolution Administrator**
**400 McAllister Street, Room 103-A**
**San Francisco, CA 94102**
**adrcoordinator@sftc.org**

**See Local Rules 3.3, 6.0 C and 10 B re stipulation to judge pro tem.**

# Superior Court of California, County of San Francisco
# Information Sheet
# Voluntary Expedited Jury Trial Summary

The San Francisco Superior Court encourages the use of Voluntary Expedited Jury Trials ("EJTs") in appropriate cases. EJTs provide an excellent opportunity to resolve your client's case in an expeditious and inexpensive way. Voluntary EJTs are authorized by statute. CCP §§ 630.01.

EJTs can resolve your entire case **or** a single important case critical issue that, once adjudicated, can promote resolution of the entire case (for example: course and scope of employment, causation of an injury, whether a contract was formed, etc.) EJTs promote equal access to civil justice as they are less expensive, consume fewer courtroom days, provide flexibility throughout, encourage high/low agreements to limit risk, and feature streamlined pre-trial procedures.

These are highlights of an EJT (C.C.P. §§ 630.01 et seq. and Rules of Court 3.1549 - 3.1553):

- Parties encouraged to submit a joint jury questionnaire;
- 8 jurors (6 must agree);
- 3 peremptory challenges per side;
- 5-hour time limit per side unless agreed otherwise and approved;
- One to two court days completion unless agreed otherwise and approved;
- Option to present evidence by stipulation and objection;
- High/low arrangement option;
- Limited appeal (misconduct by judge or jury substantially affecting parties' rights or corruption, or bad faith.)

If the parties agree to the Voluntary EJT, they should file and serve the completed and signed (Proposed) Consent Order for Voluntary Expedited Jury Trial, Judicial Council Form EJT-020.

# EXHIBIT 3

BAILEY | CAVALIERI

**KEITH A. LITTLE**
**E klittle@baileycav.com**
**D 614-229-3264**

August 11, 2026

Joshua Kriesel
President & CEO
BioQ Pharma Incorporated
(josh.kriesel@bioqpharma.com)

**VIA EMAIL**

| | | |
|---|---|---|
| RE: | Insurer: | Scottsdale Insurance Company |
| | Insured: | BioQ Pharma Incorporated |
| | Policy No.: | EKS3586644 |
| | Claimant: | Madryn Health Partners, L.P., et al. |
| | File No.: | 2245419 |

Dear Mr. Kriesel:

We have been retained by Nationwide Professional & Specialty Claims, on behalf of Scottsdale Insurance Company ("Scottsdale" or the "Insurer"), to represent its interests as coverage counsel with respect to this matter. On behalf of Scottsdale, we again acknowledge receipt of the Complaint filed in the following lawsuit (the "Lawsuit"):

> Madryn Health Partners, L.P., et al. v. Joshua Kriesel, et al., Case No. CGC-26-638583, Superior Court of the State of California, County of San Francisco.

We are directing this letter to you as the authorized insurance representative of BioQ Pharma Incorporated ("BioQ" or the "Company") and the individual Insureds under Business and Management Indemnity Policy No. EKS3586644 (the "Policy"). To the extent you are not representing any of the Insureds for insurance coverage purposes with respect to this matter, please forward a copy of this letter to such party or to their authorized representative(s) and let us know with whom we should communicate in the future concerning this matter.

This letter sets forth Scottsdale's analysis of coverage for the Lawsuit under the Policy based on the information currently available. As discussed below, very little if any coverage is available under the Policy for the Lawsuit. Nonetheless, Scottsdale will provide the Insureds with a defense to the Lawsuit subject to Scottsdale's reservation of rights. If, after reviewing this letter, you or the Insureds disagree with Scottsdale's coverage position with respect to this matter, Scottsdale invites you to provide us with any information or materials that you believe may support a contrary conclusion. We also generally invite you to contact us with any questions you have regarding anything set forth in this letter.

A. The Lawsuit

The Lawsuit was filed on or about June 23, 2026 by Madryn Health Partners, L.P. and Madryn Health Partners (Cayman Master), LP, derivatively on behalf of BioQ and also directly as creditors along with Madryn Fund Administration, LLC, Madryn BioQ SPV, LLC and Madryn Asset Management, LP. The Lawsuit names the following parties as defendants: Joshua Kriesel; John Iannuccillo, individually and as Trustee of the Iannuccillo Family Trust; Llew Keltner; Mark Ehlert; Daniel Tasse; Marijn Dekkers; Richard Nesbit; Bill Jasper; and BioQ, as nominal defendant.

Plaintiffs allege that, in 2017, Madryn Health Partners, LP, Madryn Health Partners (Cayman Master), LP, and Madryn Asset Management, LP (collectively, "Madryn") entered into a Credit Agreement with BioQ, pursuant to which Madryn loaned BioQ $25 million and became a secured creditor and shareholder of BioQ. According to the Lawsuit, BioQ committed various events of default within two years of the Credit Agreement and has been in default since November 14, 2019. Madryn allegedly attempted to work with BioQ on the defaults and, between December 30, 2021 and December 15, 2023, the parties entered into sixteen amended and restated forbearance agreements.

As of January 2024, BioQ allegedly owed Madryn more than $50 million. Nonetheless, Madryn allegedly provided two emergency loans on January 25, 2024 and February 1, 2024 to cover payroll and other necessary expenses. On February 17, 2024, Madryn allegedly presented BioQ's Board a Restructuring Support Agreement ("RSA") that, if accepted, would have allowed BioQ to cure its defaults and relieve a portion of its debt to Madryn by converting debt to special shares of equity held by Madryn. Plaintiffs allege that the Defendants rejected Madryn's proposal because it would have diluted their personal equity in the Company. Plaintiffs allege that the Defendants failed to generate any viable alternative options to restructure the Company, but still refused to accept the RSA or other offers from Madryn. Madryn was forced to foreclose on the debt with BioQ in May 2026.

The Lawsuit sets forth the following causes of action: breach of fiduciary duty; aiding and abetting breach of fiduciary duty; waste of corporate assets; tortious interference with contract, tortious interference with prospective economic advantage; and breach of fiduciary duty/trust fund doctrine.

B. The Policy

The Policy is a claims-made-and-reported policy that was issued to BioQ, effective for the policy period from August 29, 2025 to August 29, 2026 (the "Policy Period"). Subject to its terms, conditions, and exclusions, the Policy contains the following coverage sections: (1) Directors and Officers and Company Coverage Section ("D&O Coverage Section"); and (2) Fiduciary Coverage Section. Based on the information currently available, it appears that the D&O Coverage Section is the only coverage section potentially implicated by the Lawsuit.

Insuring Clause A.1. of the Policy's D&O Coverage Section states that Scottsdale shall pay the Loss of the Directors and Officers for which the Directors and Officers are not indemnified by the Company and which the Directors and Officers have become legally obligated to pay by reason of a Claim first made against the Directors and Officers during the Policy Period or, if elected, the Extended Period, and reported to Scottsdale pursuant to Section E.1. of the Policy, for a Wrongful Act taking place prior to the end of the Policy Period.

Insuring Clause A.2. of the Policy's D&O Coverage Section provides that Scottsdale shall pay the Loss of the Company for which the Company has indemnified the Directors and Officers and which the Directors and Officers have become legally obligated to pay by reason of a Claim first made against the Directors and Officers during the Policy Period or, if elected, the Extended Period, and reported to Scottsdale pursuant to Section E.1. herein, for a Wrongful Act taking place prior to the end of the Policy Period.

Insuring Clause A.3. of the Policy's D&O Coverage Section provides that Scottsdale shall pay the Loss of the Company which the Company becomes legally obligated to pay by reason of a Claim first made against the Company during the Policy Period or, if applicable, the Extended Period, and reported to Scottsdale pursuant to Section E.1. herein, for a Wrongful Act taking place prior to the end of the Policy Period.

The Policy's D&O Coverage Section affords up to $3 million in coverage (inclusive of Costs, Charges and Expenses) for each Claim, with an additional Limit of Liability of $1 million for all Loss (inclusive of Costs, Charges and Expenses) under Insuring Clause A.1., subject to a $4 million maximum aggregate Limit of Liability. Each Claim made under Insuring Clauses A.2. and A.3. is subject to a $50,000 retention. Under no circumstances shall Scottsdale be liable for any amount within the retention or in excess of the Policy's applicable limit of liability.

C. <u>Coverage Discussion</u>

Scottsdale believes it prudent to identify for you at this time Scottsdale's coverage analysis with respect to the Lawsuit based upon the information currently known to Scottsdale. Scottsdale recognizes that the allegations set forth in the Lawsuit have not been proven and the Insureds should not interpret the following discussion as a suggestion by us that any of the allegations have any legal or factual merit. The following coverage analysis is based only upon the unsubstantiated allegations in the Lawsuit and the information known to Scottsdale.

<u>First</u>, as set forth above, coverage is only available under the Policy for Insureds. The term Insured is defined in Section B.5. of the D&O Coverage Section as the Company and the Directors and Officers. Company is defined in the Policy to include BioQ and any Subsidiary.[1]

[1] The term Subsidiary is defined in relevant part to mean any entity of which more than 50% of the outstanding securities or voting rights representing the present right to vote for the election of such entity's directors or managers

Directors and Officers is defined at Section B.4. of the D&O Coverage Section in relevant part as a person who was, now is or shall become a duly elected or appointed director, officer, or similar executive of the Company, or any member of the management board of the Company, or a full-time or part-time employee of the Company. Based on the information and materials currently available, Defendants Kriesel, Keltner, Ehlert, Tasse, Dekkers, Nesbit and Jasper appear to be Directors and Officers under the Policy. Defendant Iannuccillo does not appear to be a Director and Officer or an Insured as defined in the Policy.[2] No coverage is available under the Policy for any amounts incurred by or on behalf of Defendant Iannuccillo or any other non-insured parties in the Lawsuit.

Second, Section C.1. of the D&O Coverage Section, as amended by Endorsement No. 26 (the "Creditor Exclusion"), provides that Scottsdale shall not be liable for Loss under the D&O Coverage Section on account of any Claim brought, or maintained by, on behalf of, in the right of, at the direction of, at the behest of, or for the benefit of any: (i) person; (ii) partnership or any of its partners, directors, officers, or employees, or (iii) corporation, or any of its directors, officers or employees, who is a secured or unsecured creditor of the Company. Based on the allegations in the Lawsuit and the information currently available, Plaintiffs are creditors of BioQ. Accordingly, the Creditor Exclusion appears to preclude coverage for this matter and Scottsdale reserves its rights to deny coverage for the Lawsuit.

Third, coverage is only available under the Policy for certain sums the Insureds become legally obligated to pay as Loss by reason of a Wrongful Act. The term Wrongful Act is defined under Section B.9. of the Policy's D&O Coverage Section as including any actual or alleged error, omission, misleading statement, misstatement, neglect, breach of duty or act allegedly committed or attempted by: (a) any of the Directors and Officers, while acting in their capacity as such, or any matter claimed against any Director and Officer solely by reason of his or her serving in such capacity; (b) any of the Directors and Officers, while acting in their capacity as a director, officer, trustee, governor, executive director or similar position of any Outside Entity where such service is with the knowledge and consent of the Company; and (c) the Company, but only with respect to Insuring Clause 3. of the D&O Coverage Section. Similarly, Section C.1.j. of the D&O Coverage Section, as amended by Endorsement No. 15, provides, in relevant part, that Scottsdale shall not be liable for Loss on account of any Claim for a Wrongful Act actually or allegedly committed or attempted by any of the Directors and Officers in his or her capacity as a director, officer, trustee, manager, member of the board of managers or equivalent executive of a limited liability company or employee of, or independent contractor for or in any other capacity or position with any entity other than the Company. No coverage is available under the Policy to the extent any Insureds are liable for wrongdoing committed in their personal capacity, their capacity with a non-insured entity, or in any other non-insured capacity.

---

are owned or controlled by BioQ, directly or indirectly, if such entity (i) was so owned on or prior to the inception date of this Policy, or (ii) becomes so owned after the inception date of this Policy.

[2] The Iannuccillo Family Trust is also not an Insured under the Policy.

Fourth, Section B.7. of the Policy's D&O Coverage Section, as amended by Endorsement Nos. 7 and 31, provides that Loss shall not include: (a) certain taxes, fines or penalties; (b) matters uninsurable under the laws pursuant to which the Policy is construed; (c) punitive or exemplary damages, or the multiple portion of any multiplied damage award, except to the extent that such punitive or exemplary damages, or the multiple portion of any multiplied damage award are insurable under the internal laws of any jurisdiction which most favors coverage for such damages and where the Insureds, Scottsdale, the Policy, or the Claim giving rise to such damages is located in such jurisdiction; (d) the cost of any remedial, preventative or other non-monetary relief, including without limitation any costs associated with compliance with any such relief of any kind or nature imposed by any judgment, settlement or governmental authority; (e) any amount for which the Insured is not financially liable or legally obligated to pay; (f) the costs to modify or adapt any building or property to be accessible or accommodating, or more accessible or accommodating, to any disabled person; and (g) any amounts owed or paid under any written or express contract or agreement. Scottsdale shall not be liable for any uninsurable loss, including restitution or disgorgement of ill-gotten gains which are uninsurable as a matter of law in California, or for any other amounts that do not constitute covered Loss under the Policy or applicable law.

Fifth, Section G. of the D&O Coverage Section, as amended by Endorsement No. 13, provides that if any Loss covered under the D&O Coverage Section is covered under any other valid insurance, then the Policy shall cover the Loss, subject to its terms and conditions, only to the extent that the amount of the Loss is in excess of the amount of such other insurance whether such other insurance is stated to be primary, contributory, excess, contingent or otherwise. If any Loss covered under the D&O Coverage Section is not collectible or recoverable under such other valid policy, then the Policy shall be primary insurance, unless expressly written to be excess over other applicable insurance. Scottsdale reserves its rights pursuant to the Policy's "Other Insurance" provision.

D. Defense Arrangement

Pursuant to Section F.1. of the Policy's D&O Coverage Section, Scottsdale shall have the right and duty to defend the Insureds against any Claim. Within that right is Scottsdale's right to appoint counsel to represent the Insureds' interests in connection with a potentially covered Claim. Accordingly, Scottsdale has retained David Aveni at Wilson Elser to defend the Insureds in the Lawsuit.

Section F.3. of the Policy's D&O Coverage Section provides that the Insureds agree not to incur any Costs, Charges and Expenses without the prior written consent of Scottsdale and that Scottsdale shall not be liable for any Costs, Charges and Expenses to which it has not consented.

Section F.4. of the Policy's D&O Coverage Section provides that the Insureds agree to provide the Insurer will all information, assistance and cooperation which Scottsdale reasonably requests and agree that, in the event of a Claim, the Insureds will do nothing that shall prejudice the position of the Insurer or its potential or actual rights of recovery.

E. Reservation of Rights

In addition to the coverage issues and defenses set forth above, Scottsdale expressly reserves all of its other rights and defenses under the Policy and available at law with respect to this matter, including the right to withdraw its defense of the Insureds in this matter based on any of the Policy term, condition, or defense that may be applicable or as additional facts come to our attention. Scottsdale also expressly reserves its Buss rights to recoup defense costs in the event no coverage is available for some or all of this matter. Nothing herein shall be construed as a waiver of any rights or defenses that Scottsdale now has or hereafter may have under the Policy or at law. Scottsdale recognizes that the Insureds are similarly reserving their rights.

* * *

If you have any questions or concerns regarding Scottsdale's coverage analysis, we invite you to contact us. If you or the Insureds believe that Scottsdale's coverage analysis set forth in this letter is incorrect, we also invite you to submit any additional materials or information that you believe may support a contrary conclusion.

While we encourage you to first contact us with any questions or concerns that you may have with regard to the positions expressed in this letter, you may be entitled to have your claim reviewed by the California Department of Insurance to the extent that you disagree with any or all of the positions we have expressed herein. Your inquiry should be directed as follows:

State of California Department of Insurance
Claims Services Bureau
300 South Spring Street, 11th Floor
South Tower
Los Angeles, CA 90013
1-800-927-4357 (calling from within CA)
213-897-8921 (calling from outside CA)

Sincerely,

BAILEY CAVALIERI LLC

Keith A. Little

cc: Emil Soskin, Esq. (Emil.Soskin@nationwide.com)
Amy Wong (amy.wong@hubinternational.com)
Mary Castiglia (Mary.Castiglia@hubinternational.com)